USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  9/13/16

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X

LVL XIII BRANDS, INC.,

                     Plaintiff,

            -v-

LOUIS VUITTON MALLETIER S.A. and LOUIS
VUITTON NORTH AMERICA, INC.,

                     Defendants.

------------------------------------------------------------------X
------------------------------------------------------------------X

LOUIS VUITTON MALLETIER S.A. and LOUIS
VUITTON NORTH AMERICA, INC.,

                     Counterclaim-
                     Plaintiffs,

            -v-

LVL XIII BRANDS, INC.,

                     Counterclaim-
                     Defendant.

------------------------------------------------------------------X

14 Civ. 4869 (PAE)

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

In this trademark lawsuit, two fashion companies go toe-to-toe over the right to affix a metal plate to the toe of "luxury" men's sneakers. Plaintiff LVL XIII Brands, Inc. ("LVL XIII," pronounced "Level 13") is a New York start-up company that manufactures, markets, and sells men's luxury athletic footwear. LVL XIII brings this action against defendants Louis Vuitton Malletier S.A. and Louis Vuitton North America, Inc. (collectively, "LV"). It claims that LV, through its marketing and sale of the On the Road Sneaker ("OTR Sneaker"), infringed LVL XIII's trademark rights in a metal toe plate (the "TP") which was featured on all shoes in LVL XIII's first sneaker collection.

LVL XIII brings claims for (1) trademark infringement, unfair competition, and false designation of origin, under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); (2) New York common law unfair competition; and (3) deceptive business practices, under New York General Business Law ("GBL") § 349.  It seeks actual and punitive damages, costs and fees, and an injunction barring LV from selling footwear bearing the allegedly infringing toe plate.

In response, LV brings counterclaims for (1) a declaratory judgment, under 28 U.S.C. § 2201, that LVL XIII has no exclusive right in the shape of a rectangular metal toe plate; and (2) an injunction requiring LVL XIII to disclaim the non-distinctive elements of the TP.  Separately, it brings counterclaims for trademark infringement, unfair competition, and false designation of origin under the Lanham Act, based on LVL XIII's alleged infringement of LV's monogram mark (the "Initials Logo").  In connection with those counterclaims, LV seeks damages, costs and fees, and an injunction barring LVL XIII from continuing to use its "LVL XIII" mark or any other mark confusingly similar to the Initials Logo.

The parties have filed cross-motions for summary judgment on each of LVL XIII's claims.  In connection with its summary judgment motion, LV has also moved to preclude the report and testimony of LVL XIII's expert witness.  Separately, LVL XIII has moved for summary judgment on each of LV's counterclaims.

For the reasons that follow, the Court grants (1) LV's motion to preclude LVL XIII's expert; (2) LV's motion for summary judgment on each of LVL XIII's claims; and (3) LVL XIII's motion for summary judgment on each of LV's counterclaims.  The Court denies LVL XIII's motion for summary judgment on its own claims.

The end result is that all claims in this lawsuit are dismissed.

## I.      Background

### A.      Factual Background[1]

#### 1.      LVL XIII and its First Sneaker Collection

##### a.      The Launch of LVL XIII's First Sneaker Collection

LVL XIII is a New York start-up company founded by Antonio Brown.  JSF ¶¶ 1–2.

Brown long had the goal of starting a luxury footwear company; in the mid-2000s, he began to

---

[1] The following facts are drawn primarily from the parties' submissions in support of the motions for summary judgment, including the parties' Joint Stipulated Facts, Dkt. 102 ("JSF"), and respective Rule 56.1 statements and responses, Dkt. 110 ("Def. 56.1"); Dkt. 144 ("Pl. 56.1"); Dkt. 154 ("Def. Supp. 56.1"); Dkt. 163 ("Pl. Supp. 56.1").  Standalone citations to the parties' 56.1 statements incorporate the evidentiary materials cited therein.  The Court also references the materials attached to the declarations submitted by counsel, including the Declaration of Wendi E. Sloane in Support of LV's Motion for Summary Judgment, Dkts. 117, 156 ("Sloane Decl."); the Declarations of Maureen Harmon in Support of LV's Motion for Summary Judgment, Dkt. 107 ("Harmon Decl."), Dkt. 153 ("Harmon Supp. Decl."); and the Declarations of Joel G. MacMull in Support of LVL XIII's Cross-Motion for Summary Judgment, Dkts. 127–28 ("MacMull Decl."), Dkt. 161 ("MacMull Supp. Decl.").  Where the Court cites to multiple iterations of a single deposition (*e.g.*, "Brown Dep. I" and "Brown Dep. II"), it is because the parties have submitted piecemeal segments of the transcript of that deposition throughout the briefing process.

Where facts stated in a party's Rule 56.1 statement are supported by testimonial or documentary evidence, and denied by a conclusory statement by the other party without citation to conflicting testimonial or documentary evidence, the Court finds such facts true.  *See* S.D.N.Y. Local Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party."); *id.* at 56.1(d) ("Each statement by the movant or opponent . . . controverting any statement of material fact[] must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c)."); *Amnesty Am. v. Town of W. Hartford*, 288 F.3d 467, 470 (2d Cir. 2002) (Sotomayor, J.) ("Fed. R. Civ. P. 56 does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute.") (collecting cases); *Chimarev v. TD Waterhouse Investor Servs., Inc.*, 280 F. Supp. 2d 208, 223 (S.D.N.Y. 2003) (material facts set forth in a Rule 56.1 statement "are uncontested and may be accepted as true" where Rule 56.1 counter-statement consists solely of "blanket denials" that are "not supported by citation to any evidence"), *aff'd*, 99 F. App'x 259 (2d Cir. 2004) (summary order).  On the other hand, the Court disregards all asserted facts that are unsupported by record evidence or otherwise inadmissible.

collect images of shoes as a hobby.  Def. Supp. 56.1 ¶ 277.  In summer 2012, Brown began soliciting capital contributions from friends and family, and recruiting artists and graphic designers, to help bring his visions to life.  *See id.* ¶¶ 278–80.  The designs that would serve as the basis for LVL XIII's first sneaker collection were developed in September and October 2013.  *See id.* ¶¶ 281, 284.  Sometime thereafter, they were submitted to a factory in Hong Kong to be made into samples.  *Id.* ¶ 285.  Each design featured the TP—a rectangular metal toe plate with a "LVL XIII inscription" secured to the front outsole of the sneaker by metal screws.  *See* MacMull Decl., Ex. 5.  Brown testified that he wanted the TP to "distinguish [his] brand from the market"—to be something that could "identify [his] shoe design from the rest of the shoes."  MacMull Decl., Ex. 1 ("Brown Dep. I"), at 137.

In December 2012, LVL XIII was incorporated in New York.  Def. Supp. 56.1 ¶ 286.  By March 2013, it began preparing a formal business plan with the help of a third-party vendor.  *Id.* ¶ 287.  The business plan was completed and distributed to investors sometime after November 2013.  *Id.* ¶ 288.  It states that "LVL XIII believes its typical consumer will be an affluent male between the ages of 17 and 35 years of age who appreciates luxury goods and typically shops for designer labels."  JSF ¶ 13.[2]

In January 2013, LVL XIII hired Lamont Johnson to serve as its publicist.  Sloane Decl., Ex. 3 ("Brown Dep. III"), at 172.  Brown testified that because LVL XIII was operating on a "shoestring budget," he and Johnson knew it would be hard to obtain formal ad placements in major publications.  MacMull Decl., Ex. 2 ("Brown Dep. II"), at 173–74.  Accordingly, he

---

[2] The plan further states that LVL XIII's target customer "will consist of a consumer from the age group of 17–35 with the income ability to afford the likes of a Gucci or Louis Vuitton item."  JSF ¶ 14.  Brown testified that when he created the business plan, he identified Gucci, Lanvin, Christian Louboutin, Giuseppe Zanotti, and LV as his "inspiration" and his "competitors."  Sloane Decl., Ex. 51 ("Brown Dep. V"), at 83.

testified, the two men "creatively came together. . . [and devised] creative ways to submit the brand for press and publicity[,] like ceding shoes to celebrities and . . . editors . . . [to] garner[] interest." *Id.* at 174.[3]  One of those celebrities was pop star Jason Derulo, who, on July 19, 2013, performed on *Good Morning America* wearing LVL XIII sneakers.  Def. Supp. 56.1 ¶ 296.[4] Another was pop star Chris Brown, who, in September 2013, wore a pair of LVL XIII sneakers during a photo shoot for Annex Man Magazine.  *Id.* ¶ 301.[5]  According to Brown and Johnson, LVL XIII sneakers were also publicly worn by Kroy Biermann, Jim Jones, DeRay Davis, and Chris Rock.  *Id.* ¶ 331.

---

[3] Johnson testified that, to generate publicity for LVL XIII, he engaged in "celebrity placement," *i.e.*, "[r]eaching out to different celebrities[,] . . . sending them photos and information about Antonio and LVL XIII. . . . [and] get[ting] them to wear [LVL XIII sneakers] in [the] hopes that they're photographed in [them] because that can turn into more press opportunities."  Sloane Decl., Ex. 54 ("Johnson Dep. II"), at 38.  Johnson explained that, as part of this initiative, he would provide free shoes to certain celebrities who agreed to wear them.  *See id.* at 39.

[4] Darius Baptist, Derulo's stylist, attested that, in spring 2013, after learning about Brown and LVL XIII through online media "buzz," he approached Brown to obtain shoes for Derulo's performance.  Dkt. 135 ("Baptist Decl.") ¶¶ 9–11.  Brown testified that, before agreeing to supply sneakers for the performance, he spoke with Baptist "to make sure that [Derulo] was the right fit to carry the shoes in that he catered to an audience that was a direct reflection of who [LVL XIII was] trying to target in the sense of [its] demographics."  MacMull Decl., Ex. 4 ("Brown Dep. IV"), at 374–75.  He testified that he "wasn't giving [his] shoes out to people just because they requested them.  [He] wanted to know that it was a good fit and that [the celebrities who wore his shoes] fit into the target audience [that LVL XIII was] trying to reach."  *Id.* at 375.  Derulo was such a "fit," Brown explained, because "[h]e was an international pop star that didn't fall into the urban market at all, he fell into the mainstream market."  *See id.*

[5] Brown testified that Chris Brown's stylist reached out to LVL XIII to obtain a pair of shoes because he "wanted a shoe that represented luxury and was different than what was in the market at the time."  Brown Dep. IV, at 376–77.  During this conversation, Brown testified, Chris Brown's stylist noted that Chris Brown "was a pop star, that he represented a mainstream audience[,] and that his music was played on all the radio stations."  *Id.* at 377.  After the photo shoot, a photo of Chris Brown wearing LVL XIII sneakers was posted on the "Chris B. Fashion" Tumblr page—a fan page dedicated to tracking clothes worn by Brown.  Def. Supp. 56.1 ¶ 303.

In addition to reaching out to celebrities, LVL XIII leveraged its social media presence to garner free publicity. *See id.* ¶¶ 298–99.  In April 2013, Brown began posting images of LVL XIII sneakers on his personal Instagram account, which, by then, had 50,000 followers. *Id.* ¶ 300; *see* Sloane Decl., Ex. 39 ("Media Placements"), at 1.[6]  In June 2013, LVL XIII posted its first Instagram. *See* Media Placements, at 1; Sloane Decl., Ex. 6 ("Johnson Dep. I"), at 66–67.  Brown testified that social media has been a cornerstone of LVL XIII's brand development.  Def. Supp. 56.1 ¶ 298.

Between July 21 and 23, 2013, LVL XIII debuted its first sneaker collection at the Project Sole event in New York City. *Id.* ¶ 293.  There, samples of LVL XIII sneakers were displayed to retailers, from whom LVL XIII began taking orders and deposits. *Id.* ¶ 295; JSF ¶ 21.  At the end of the event, male supermodel Tyson Beckford hosted a launch party for LVL XIII in New York City.  Def. Supp. 56.1 ¶ 294.  In August 2013, LVL XIII exhibited its sneakers at the Magic Show, a trade show in Las Vegas attended by wholesalers, retailers, press, and celebrities. *Id.* ¶ 302.

In the months that followed, Brown and LVL XIII were featured in a handful of online magazines including *Details*, *Ebony*, *Paper*, and *Footwear News*. *Id.* ¶ 297.  The majority of the brand's media coverage, however, was on social media platforms and online blogs. *See* Media Placements.[7]  LVL XIII estimates that, in 2013, it spent a total of approximately $82,000 in

---

[6] Brown testified that his followers consist mostly of "fashion enthusiasts, editors, creative directors," and celebrity stylists.  Brown Dep. II, at 365–69.  These followers, Brown testified, "are very diverse," reflecting that his Instagram "tailors more to a mainstream audience" than to "an urban or hip hop demographic."  Brown Dep. IV, at 370.

[7] The list of "Media Placements" compiled by LVL XIII's publicist includes 25 pre-March 2014 media placements, including Brown's and LVL XIII's first Instagram posts.  Pl. 56.1 ¶ 218; *see* Media Placements, at 1–2.  Johnson testified that only four of those media placements were

connection with marketing, advertising, and promotion.  JSF ¶ 35.[8]  Of that, approximately

$15,000 was spent on the New York launch party, approximately $10,000 on the Project Sole

Trade Show, approximately $10,000 on the Magic Show, and approximately $30,000 on monthly

payments to LVL XIII's publicist.  Pl. 56.1 ¶ 163; Brown Dep. II, at 172–73; Def. Supp. 56.1

¶ 330.  Brown testified that LVL XIII did not engage in TV advertising or purchase any

newspaper or magazine advertisements.  Brown Dep. I, at 158–59.  As he explained, he "didn't

feel like it was necessary to invest [LVL XIII's] dollars into print ads and things of that nature,

especially with the dying business of print publications this day and age."  Brown Dep. II, at

175–76.

In November 2013, LVL XIII's first sneaker collection became available for purchase at

retail.  Pl. 56.1 ¶ 230.  LVL XIII produced 1,000 pairs of sneakers for it, each of which featured

the TP.  JSF ¶ 31; Def. Supp. 56.1 ¶ 325.  The sneakers were sold at prices between $495 and

$1,200, with most priced between $495 and $595.  Pl. 56.1 ¶¶ 154–55.  Between November 2013

and March 2014, they were sold in at least 10 locations, including in Houston, Texas; Atlanta,

Georgia; Los Angeles, California; Harvey, Illinois; Chicago, Illinois; Miami, Florida; and

Washington D.C.  Id. ¶ 234.  They were also sold through the Carbon Bazaar website.  Id.

¶¶ 246–47.[9]  LVL XIII estimates that it sold approximately 500 pairs of sneakers from its first

---

"unsolicited"—*i.e.*, not the result of a pitch by LVL XIII's PR firm.  Pl. 56.1 ¶ 218.

[8] LVL XIII has not produced evidence of its 2014 advertising expenditures.  *See* Pl. 56.1 ¶ 164.

[9] As of the date of this Opinion and Order, the Carbon Bazaar website is no longer operative.

collection.  JSF ¶ 32.  The remaining 500 pairs were returned to LVL XIII to be donated.  *Id.* ¶ 33.  In total, LVL XIII achieved $141,241 in product sales in 2013.  *Id.* ¶ 34.[10]

> **b.**   **LVL XIII's Efforts to Obtain Trademark Protection for its Marks**

In March 2013, LVL XIII filed two trademark registration applications with the U.S. Patent and Trademark Office ("PTO").  JSF ¶¶ 11–12.  The first (the "'370 Application"), filed on March 4, was for the word mark "LVL XIII."  *Id.* ¶ 11.  The second (the "'102 Application"), filed on March 6, sought registration for a "shoe toe design featuring a rectangular metal plate across the front of the shoe toe with the wording LVL XIII engraved in the metal plate, and four small screws in the corners of the metal plate."  *Id.* ¶ 12; Sloane Decl., Ex. 32, at 1.

On June 24, 2013, the PTO issued a non-final Office Action as to the '102 Application, requiring LVL XIII to submit a new drawing showing the screws in dotted lines, "as they cannot be part of the mark."  Pl. 56.1 ¶ 102.  The next day, LVL XIII submitted a revised application in accordance with the PTO's directive.  *Id.* ¶¶ 104–05.  It stated:

> LVL XIII (Stylized and/or with Design, see mark) – The applicant is not claiming color as a feature of the mark.  The mark consists of a shoe toe design featuring a rectangular metal plate across the front of the shoe toe with the wording LVL XIII engraved in the metal plate, and four small screws in the corners of the metal plate.  The dotted lines in the drawing are not part of the mark but show its position on the goods.

*Id.* ¶ 106.  LVL XIII later amended the '102 Application to include two screws rather than four. *Id.* ¶ 107.

---

[10] LVL XIII has not produced any sales records for 2014, and the record evidence indicates that retailers placed orders for shoes from LVL XIII's first sneaker collection during 2013 only.  *See* Brown Dep. IV, at 410; Def. Supp. 56.1 ¶ 304.  However, Brown testified that sneakers from that collection were available at retail until at least March 2014.  *See* Brown Dep. IV, at 300–01.

On July 10 and August 7, 2013, respectively, the PTO issued a Notice of Publication for the '370 and '102 Applications.  JSF ¶¶ 22, 24.  On September 24 and October 22, 2013, respectively, it issued a Notice of Allowance for each application.  *Id.* ¶¶ 25–26.  On March 24 and April 7, 2014, respectively, LVL XIII submitted a Statement of Use in connection with each application.  *Id.* ¶¶ 37–38.  Each stated that LVL XIII had first used the claimed mark in commerce "at least as early as" August 1, 2013.  *Id.*  On May 27, 2014, the PTO issued a Registration Certificate for the '370 Application.  *Id.* ¶ 41.

On July 18, 2014, two weeks after the initiation of this lawsuit, the PTO issued an Office Action for the '102 Application, declining to approve the application in its current form.  *See id.* ¶¶ 43–44.  It explained that "[a] product design can never be inherently distinctive as a matter of law [because] consumers are aware that such designs are intended to render the goods more useful or appealing rather than [to] identify their source."  *Id.* ¶ 44.  Accordingly, it directed, LVL XIII must "disclaim[] . . . the rectangular shape of the shoe toe plate . . . because it is a configuration of a feature of the shoe design."  *Id.*  It warned that if LVL XIII did not do so, the PTO "may refuse to register the entire mark."  *Id.*  Sometime thereafter, the PTO, at LVL XIII's request, suspended the '102 Application, pending the outcome of this lawsuit.  *Id.* ¶ 45.

### 2.     Louis Vuitton

Louis Vuitton Malletier S.A. ("LVM") is a French company, founded in Paris in 1854. Pl. Supp. 56.1 ¶ 374.  It manufactures, sells, and distributes luxury merchandise, including handbags, luggage, apparel, shoes, watches, jewelry, and other fashion accessories.  JSF ¶¶ 7–8. Louis Vuitton North America, Inc. is a Delaware corporation that markets and distributes Louis Vuitton merchandise in the U.S.  *Id.* ¶¶ 5–6.

### a.      The Initials Logo

The Initials Logo consists of a stylized "L" and V" presented, in a Roman-like font, as a single, interlocking image, with the "V" overlapping the italicized "L" on a downward angle from right to left.  The logo was created in 1897 by George Vuitton, in honor of his late father Louis Vuitton, the founder of the House of Louis Vuitton.  Pl. Supp. 56.1 ¶ 375.  It has been continuously used for more than 100 years in the U.S., and currently appears on hundreds of LV products.  *Id.* ¶ 376.

LVM owns multiple registered U.S. trademarks for the Initials Logo, which apply to a wide variety of goods ranging from clothing to suitcases and stationery.  *See generally* Sloane Decl., Ex. 59.  Among these is a registered mark, which has become incontestable, for use of the Initials Logo on "shoes, boots[,] sandals, [and] tips for footwear."  *Id.* at 1–3.

LV advertisements, at least some of which feature the Initials Logo, have appeared in magazines such as *Vanity Fair*, *Vogue*, and *Elle*.  Pl. Supp. 56.1 ¶ 378.  LV has also received media coverage in publications such as *Marie Claire*, *Town & Country*, and the "Pop Sugar" online blog.  *Id.* ¶ 379.  In 2015, Interbrand Rankings and Brand Z ranked LV as one of the 100 most valuable global brands.  *Id.* ¶ 381.

### b.      The OTR Sneaker

LVL XIII's claims arise from LV's use of a metal toe plate on its OTR Sneaker.  That sneaker was designed and developed in June 2013, in the weeks leading up to LV's Men's Spring/Summer 2014 fashion show (the "Fashion Show"), which took place in Paris on June 27, 2013.  Sloane Decl., Ex. 1 ("Viti Aff.") ¶ 5.  Fabrizio Viti, the Style Director for LVM's footwear division, oversaw the design process.  *See* Dkt. 112 ("Viti Decl.") ¶¶ 1, 5.

The theme for the Fashion Show was a "road trip" through 1950s Americana, focusing on the style of icons such as James Dean, Steve McQueen, and Jack Kerouac, and mixing in an "astronaut mood."  Pl. 56.1 ¶¶ 32, 40.  In keeping with that theme, Viti decided to use the Converse Jack Purcell sneaker, worn by James Dean in a famous photo, as the inspiration for his design for the OTR Sneaker.  *Id.* ¶ 41; Viti Aff. ¶ 6; Sloane Decl., Ex. 9 ("Viti Dep. I"), at 26–28.[11]  An identifying feature of the Jack Purcell sneaker is the "smile," a thin dark rubber inset curving upwards in the sneaker's rubber toe.  Pl. 56.1 ¶ 42.  Accordingly, the initial design for the OTR Sneaker (then called the "Dean") included a thin metal strip inset into the shoe's outsole, which Viti described as LVM's "reinterpretation of the Jack Purcell [smile] with contemporary features."  Viti Decl. ¶ 8.  Viti attested that this "reinterpretation" was informed by his knowledge of "metal detailing," *i.e.*, the ornamental use of metal accents, which had been trending among high-end shoe designers, including LV, for several years.  *See* Pl. 56.1 ¶¶ 43, 55–56.[12]

On June 7, 2013, a member of LV's design team emailed the prototype for the OTR Sneaker to LV's in-house legal department.  Pl. 56.1 ¶ 50; *see* Sloane Decl., Ex. 20.  The email identified several characteristics of the Jack Purcell sneaker and asked whether, legally speaking, there were enough areas of difference between those two shoes.  Pl. 56.1 ¶ 51; *see* Sloane Decl.,

---

[11] This decision was made in collaboration with Jim Jones, LVM's Artistic Director for "Men's Ready to Wear."  Viti Dep. I, at 22, 26–28.

[12] LVL XIII was *not* among the designers that Viti identified as having previously used metal shoe accents.  To the contrary, Viti attested that, until this litigation, he was unaware of Brown, LVL XIII, or its sneakers.  Viti Decl. ¶ 13; *see also* Viti Dep. I, at 11–12.  He further attested that LVL XIII's sneaker design did not inform his design of the OTR Sneaker.  *See* Viti Decl. ¶ 14.

Exs. 20–21.[13]  On June 10, 2013, LV's legal department responded that "there [was] a degree of risk attached" to LV's use of the "smile." Pl. 56.1 ¶¶ 53–54.

The next day, Viti's assistant Mathieu Desmet[14] emailed Viti, stating that "due to leg[a]l issue we need to change [th]e sneakers from the show." Def. Supp. 56.1 ¶ 308; *see also* Sloane Decl., Ex. 57 ("Viti Dep. II"), at 38–40.  Desmet attached to his email a revised design for the OTR Sneaker, which featured a thicker metal plate at the toe of the shoe.  Def. Supp. 56.1 ¶ 309; Pl. 56.1 ¶ 60.  That design was later revised because Viti and LV's Artistic Director believed the metal plate was too large and "looked like a car." Pl. 56.1 ¶ 61.

The final version of the OTR Sneaker was reviewed at a model fitting on June 22, 2013. *Id.* ¶ 62.  The design featured a plain metal toe plate in the shape of an isosceles trapezoid, with the top slightly shorter than the bottom, as a "subtle reference to the Jack Purcell [s]mile." Viti Decl. ¶ 9; *see* Sloane Decl., Ex. 27.[15]  The toe plate had rounded edges and was inset into the rubber shoe toe.  *Id.*  The design also featured a rectangular metal heel plate.  Pl. Supp. 56.1 ¶ 407.  LV's "LOUIS VUITTON" trademark was imprinted on the sneaker's heel plate, tongue, shoelace rivets, and insole.  *Id.*  The Initials Logo was imprinted on its rubber sole.  *Id.*

On June 27, 2013, the OTR Sneaker was publicly debuted on the runway at the Fashion Show.  Pl. 56.1 ¶ 74.  In the ensuing months, it was pictured in several print and online publications in the U.S.  *See id.* ¶¶ 76, 78–80.  On March 4, 2014, it became available for

---

[13] The email also pointed out that LV had featured the metal strip "accessory" on the heel of a men's shoe in LV's Fall/Winter 2013 collection.  Pl. 56.1 ¶ 52.

[14] Viti testified that Desmet's job was to "develop [Viti's] designs and to . . . make the work go forward in a practical way."  Viti Dep. II, at 38.  Specifically, Desmet would "expand" and "develop" Viti's designs, but had no creative license to change them.  *Id.* at 39–40.

[15] According to Viti, he did not consider the toe plate to be an indicator of source; rather, he "designed [it] . . . to be a decorative or ornamental feature."  Viti Decl. ¶ 10.

purchase by U.S. customers, exclusively through LV's stores and website.  *Id.* ¶¶ 83, 88.  It was available in four basic styles, which ranged in price from $830 to $1,790.  *Id.* ¶¶ 69, 84–87.[16]

Between March 4 and September 13, 2014, LV sold 714 pairs of the OTR Sneaker in the U.S., generating $764,000 in revenue.  *Id.* ¶¶ 90–91.

### 3.   LVL XIII's Discovery of the OTR Sneaker, Purported Confusion, and Aftermath

Brown first learned about the OTR Sneaker in March 2014, when celebrity stylist Shaundell Hall called him to ask whether LVL XIII was collaborating with LV.  *See* Brown Dep. IV, at 385–86; Dkt. 132 ("Hall Decl.") ¶ 8.  Hall attested that, upon first seeing the OTR Sneaker, he assumed there had been a collaboration between the two brands because of the similarities between the metal toe plates that appeared on each sneaker.  Hall Decl. ¶ 8.

LVL XIII has submitted declarations by six individuals, including Hall, who attest to having made such an assumption.[17]  Four—Hall, Darius Baptist, Devon Johnson, and Eric Hamilton—are acquaintances of Brown's.[18]  Each attested that, when he contacted Brown to inquire about the OTR Sneaker, Brown clarified that there had been no collaboration between the two brands.[19]

The remaining two declarants—Tavius Bolton and Kathleen Roque—are consumers who bought LVL XIII sneakers in early 2014.  *See* Bolton Decl. ¶ 2; Roque Decl. ¶ 3.  Each attested

---

[16] These were: (1) sneaker boot in python and leather, (2) sneaker boot in bandana patchwork, (3) low-top in python and leather, and (4) low-top in bandana patchwork.  Pl. 56.1 ¶ 69.

[17] *See* Hall Decl.; Dkt. 130 ("Johnson Decl."); Dkt. 131 ("Hamilton Decl."); Dkt. 133 ("Bolton Decl."); Dkt. 134 ("Roque Decl."); Baptist. Decl.

[18] *See* Pl. 56.1 ¶ 268; Hall Decl. ¶ 3; Baptist Decl. ¶ 9; Johnson Decl. ¶ 4; Hamilton Decl. ¶ 4.

[19] Hall Decl. ¶¶ 10–11; Baptist Decl. ¶¶ 15–16; Johnson Decl. ¶ 11; Hamilton Decl. ¶ 11.

that, upon later seeing the OTR Sneaker, he or she assumed that LVL XIII had collaborated with LV.  *See* Bolton Decl. ¶ 4; Roque Decl. ¶ 4.  Each attested that he had been disappointed by what he perceived as LVL XIII's "selling out" to LV,[20] and had been glad to learn that such was not the case.  Bolton Decl. ¶¶ 4–6; Roque Decl. ¶¶ 6–9.

Brown testified that, shortly after his communication with Hall, LVL XIII began receiving "Instagram questions about whether or not [] the [OTR Sneaker] was LVL XIII." Brown Dep. IV, at 386.  LVL XIII has identified two Instagram posts[21] and three text messages,[22] which it claims evince such confusion.  *See* Sloane Decl., Exs. 46–47.  In total, LVL XIII has identified 12 individuals who it claims were confused whether LVL XIII had collaborated with LV.  Pl. 56.1 ¶¶ 267, 271–72.  However, Brown testified that he is unaware of any potential consumers who: (1) at the point of purchase, were confused as to whether the OTR Sneaker was affiliated with, or related to, LVL XIII; (2) bought the OTR Sneaker while thinking

---

[20] Roque attested that she was "disappoint[ed]" that LVL XIII had "s[old] out," because "the draw of LVL XIII's products . . . [was] the 'start-up urban culture' that is at the core of the company[,] which [she] view[ed] as the antithesis of [LV's] design and product offerings." Roque Decl. ¶ 6.  Bolton attested that he was disappointed because he had thought of LVL XIII as a "'street' start-up that [he] could identify with and get behind," and assumed that "now LVL XIII . . . would become just another tired, oversaturated 'global' sneaker brand, eroding its cachet as a street-style-driven-start-up company."  Bolton Decl. ¶ 5.  He attested that, had he not learned the truth, he "doubt[ed] that [he] would ever have purchased products from LVL XIII again."  *Id.* ¶ 6.

[21] One features a photo of the OTR sneaker and a user comment inquiring whether it was produced by LVL XIII.  Sloane Decl., Ex. 46, at 2.  The other features a photo of the OTR Sneaker, tagged "New #LVL XIII shoe."  *Id.* at 1.

[22] The first, sent by Hall, attaches a photo of the OTR Sneaker and states:  "Don't know if u scene it before, but LV did that . . . Lvl Viii wayy doper.  But i saw that metal in the front and was like 'oh ok' lol."  Sloane Decl., Ex. 47, at 1.  The second, sent by a Sean Roberson, attaches a photo of the OTR Sneaker and asks, "Lvlxiii?"  *Id.*, Ex. 46, at 3; Pl. 56.1 ¶ 260.  The third, sent by Brown's former colleague, states:  "Louis Vuitton should hire you instead of copying your designs!"  Sloane Decl., Ex. 47, at 2; Brown Dep. IV, at 393–94.

it was really a LVL XIII sneaker; or (3) saw LVL XIII sneakers on the street and were confused whether they were produced by LV or LVL XIII.  Brown Dep. IV, at 436–38.

On June 30, 2014, LVL XIII filed this lawsuit.  Dkt. 1.  Sometime thereafter, it removed its sneakers from the market.  Def. Supp. 56.1 ¶ 339.  Brown testified that a reason for that decision was that at least one retailer had refused to carry LVL XIII's shoes due to concerns about this lawsuit.  Brown Dep. IV, at 439–41; Brown Dep. II, at 446–48.

In September 2015, LVL XIII launched its second shoe collection.  Pl. 56.1 ¶ 128.  The sneakers in that collection featured a new, modified toe plate, with rounded edges and no screws. *Id.* ¶¶ 130–32.  The collection also included shoes without a metal toe plate.  JSF ¶ 46.

### B.    Procedural History of This Litigation

On June 30, 2014, LVL XIII filed a complaint.  Dkt. 1 ("Compl.").  On September 22, 2014, LV filed an answer and counterclaims.  Dkt. 18.  On October 9, 2014, LVL XIII filed an answer to LV's counterclaims.  Dkt. 21.  On December 26, 2014, with leave of court, LV filed an amended answer and counterclaims.  Dkt. 40.  On January 16, 2015, LVL XIII filed an answer to the amended counterclaims.  Dkt. 42.

On January 15, 2016, the parties filed the Joint Stipulated Facts, in anticipation of their respective forthcoming motions for summary judgment.  Dkt. 102.

On January 21, 2016, LV moved to preclude the report and testimony of LVL XIII's expert witness, Charles E. Colman, Dkt. 103, and filed a memorandum of law, Dkt. 104 ("Def. *Daubert* Br."), and a declaration by its counsel, Dkt. 105, in support.  That day, LV also filed a motion for summary judgment, Dkt. 106, along with a Rule 56.1 statement, Dkt. 110, a memorandum of law, Dkt. 108 ("Def. SJ Br."), and supporting declarations, Dkts. 107, 109, 112, 117.

15

On February 16, 2016, LVL XIII filed an opposition to LV's motion to preclude LVL XIII's expert. Dkt. 120 ("Pl. *Daubert* Opp. Br.").  That day, LVL XIII moved to preclude the testimony of LV's expert witness, Michael Mazis. Dkts. 121–23.  Also that day, LVL XIII filed a cross-motion for summary judgment, Dkt. 125, along with a memorandum of law, Dkt. 126 (Pl. SJ Br."), and a Rule 56.1 response and counterstatement, Dkt. 136.  LVL XIII also filed nine supporting declarations, Dkts. 127–35, including by Erik Pelton, LVL XIII's trademark counsel, Dkt. 129 ("Pelton Decl.").

On March 15, 2016, LV filed an opposition to LVL XIII's motion to preclude LV's expert.  Dkts. 145–47.

On March 22, 2016, LV filed reply briefs in support of its motion to preclude LVL XIII's expert, Dkt. 148 ("Def. *Daubert* Reply Br."), and its motion for summary judgment, Dkt. 152 ("Def. SJ Reply Br."), along with supporting declarations, Dkts. 149, 153, and a supplemental Rule 56.1 statement, Dkt. 154.  That day, LV also filed a motion to strike certain statements in LVL XIII's 56.1 response and counterstatement and the Pelton Declaration.  Dkts. 150–51, 155.

On April 4, 2016, LVL XIII filed a reply brief in support of its motion to preclude LV's expert.  Dkt. 159.

On April 21, 2016, LVL XIII filed a reply brief in support of its cross-motion for summary judgment, Dkt. 162 ("Pl. SJ Reply Br."), along with a response to LV's supplemental Rule 56.1 statement, Dkt. 163.  That day, LVL XIII also filed a brief in opposition to LV's motion to strike.  Dkt. 164.

On July 28, 2016, the Court heard argument.  *See* Dkt. 172 ("Tr.").  At the hearing, the Court ruled, at length, from the bench on LVL XIII's motion to preclude LV's expert and LV's

motion to strike.  For the reasons stated on the record at the hearing, the Court denied both

motions.  *See* Dkt. 170; Tr. 3–42.

## II.      Discussion

Before the Court are (1) LV's motion to preclude the report and testimony of LVL XIII's

expert witness; (2) the parties' cross-motions for summary judgment on LVL XIII's claims; and

(3) LVL XIII's motion for summary judgment on LV's counterclaims.  The ensuing analysis

proceeds as follows:  The Court first addresses, and grants, LV's motion to preclude the report

and testimony of LVL XIII's expert witness.  The Court next addresses the cross-motions for

summary judgment on LVL XIII's claims.  Finally, the Court addresses LVL XIII's motion for

summary judgment on LV's counterclaims.

## III.     LV's Motion to Preclude LVL XIII's Expert

LVL XIII retained Charles E. Colman to provide an expert report and testimony on the

issues of inherent distinctiveness and secondary meaning with regard to the TP.  *See* Dkt. 105,

Ex. 1 ("Colman Rpt."), at 1.  LV has moved to preclude Colman's report and testimony in their

entirety pursuant to *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993).  For the

following reasons, that motion is granted.

### A.      Applicable Legal Standards

Federal Rule of Evidence 702 gives an expert witness testimonial latitude unavailable to

others, "so long as the witness is 'qualified as an expert' and (1) 'the testimony is based on

sufficient facts or data,' (2) 'the testimony is the product of reliable principles and methods,' and

(3) 'the expert has reliably applied the principles and methods to the facts of the case.'"  *United

States v. Pryor*, 474 F. App'x 831, 834 (2d Cir. 2012) (summary order) (quoting Fed. R. Evid.

702).

17

"[T]he proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied." *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007).  As the Supreme Court emphasized in *Daubert*, it is the Court's duty to act as a "gatekeep[er]," ensuring that an expert's testimony "both rests on a reliable foundation and is relevant to the task at hand."  509 U.S. at 597.  The Court's task "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1991).

The Second Circuit instructs district courts to exclude expert testimony if it is "speculative or conjectural or based on assumptions that are 'so unrealistic and contradictory as to suggest bad faith.'"  *Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC*, 571 F.3d 206, 214 (2d Cir. 2009) (quoting *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996)).  Courts should also exclude "testimony that usurp[s] either the role of the trial judge instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it."  *Nimely v. City of New York*, 414 F.3d 381, 397 (2d Cir. 2005) (internal quotation marks and citations omitted).  Finally, as with all evidence, under Rule 403, the Court may exclude testimony if its probative value is substantially outweighed by the danger of unfair prejudice, confusion, or delay.  *Hart v. Rick's Cabaret Int'l, Inc.*, 60 F. Supp. 3d 447, 465 (S.D.N.Y. 2014).

### B.     Analysis

LV moves to exclude Colman's report and testimony on the grounds that: (1) Colman is not qualified to offer expert testimony on any topic on which he opines; (2) his focus on the

"urban male" population makes his opinions irrelevant and unreliable; and (3) his opinions are based on an unreliable methodology.[23]  The Court addresses these challenges in turn.

### 1.      Colman is Not Qualified to Opine on Secondary Meaning

LV first argues that Colman is not qualified to offer expert testimony on any of the topics on which he opines.  *See* Def. *Daubert* Br. 9–12; Def. *Daubert* Reply Br. 2–5.

"Whether a witness is qualified as an expert is a threshold question that precedes the court's relevance and reliability inquiries."  *Loyd v. United States*, No. 08 Civ. 9016 (KNF), 2011 WL 1327043, at *4 (S.D.N.Y. Mar. 31, 2011) (citing *Nimely*, 414 F.3d at 396 n.11).  Rule 702 states that a witness may be "qualified as an expert by knowledge, skill, experience, training, or education."  The Second Circuit has instructed that these words "be read in light of the liberalizing purpose of" Rule 702.  *United States v. Brown*, 776 F.2d 397, 400 (2d Cir. 1985), *cert. denied*, 475 U.S. 1141 (1986).  Accordingly, even if a proposed expert lacks formal training in a given area, he may still have "practical experience" or "specialized knowledge" that qualifies him to give opinion testimony.  *See McCullock v. H.B. Fuller Co*., 61 F.3d 1038, 1043 (2d Cir. 1995) (internal quotation marks omitted) (quoting Fed. R. Evid. 702).  However, "[i]f the witness is relying solely or primarily on experience, then [he] must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts."  *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 691 F. Supp. 2d 448, 473 n.148 (S.D.N.Y.

---

[23] LV also objects that: (1) Colman did not review relevant parts of the record; (2) his opinions are contradicted by record evidence; (3) he opines on ultimate issues of fact and law; and (4) his bias against LV influenced his opinions.  *See* Def. *Daubert* Br. 12–14, 17–19; Def. *Daubert* Reply Br. 10.  The three objections addressed in the text are, in the Court's assessment, LV's most substantial grievances.  Because the Court holds Colman's report and testimony inadmissible on each of those grounds, it need not decide whether LV's other objections require preclusion.

2010) (quoting Fed. R. Evid. 702 Advisory Committee Note).  Where a witness's "expertise is too general or too deficient," the Court "may properly conclude that [he is] insufficiently qualified."  *Stagl v. Delta Air Lines, Inc*., 117 F.3d 76, 81 (2d Cir. 1997).

Here, although Colman's report addresses a range of topics, LVL XIII has clarified that it contains only one "core conclusion": that LVL XIII's TP achieved secondary meaning among the relevant consumer population before LV's OTR Sneaker came on the market—*i.e.*, that, by March 2014, "in the minds of the public, the primary significance of [this] feature . . . [was] to identify the source of the product rather than the product itself."  *Christian Louboutin S.A. v. Yves Saint Laurent Am. Holdings, Inc.*, 696 F.3d 206, 216 (2d Cir. 2012) (quoting *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 851 n.11 (1982)) (internal quotation marks omitted); *see* Pl. *Daubert* Opp. Br. 8–9; *see also id.* at 15–16.  The Court must thus resolve whether Colman is qualified to opine on that issue.

### a.      Background

Colman is a 2009 law school graduate with a B.A. in linguistics.  Colman Rpt., Appx. A, at 1.  He was recently appointed Assistant Professor at the University of Hawaii William S. Richardson School of Law, where he will teach intellectual property law and other business-related subjects.[24]  Between 2013 and 2016, Colman was an Acting Assistant Professor at NYU School of Law, where he taught "Lawyering" to first-year students, and, for one year, led a reading group on "Identity, Consumption, and American Law."  Colman Rpt., Appx. A, at 1.  Between 2014 and 2016, he also served as an Adjunct Professor and Faculty Fellow in the "Visual Culture: Costume Studies" M.A. Program at NYU Steinhardt School of Culture,

---

[24] *See* University of Hawaii Manoa, UH Law School Announces New Faculty Member to Teach Intellectual Property Law (Mar. 14, 2016), https://manoa.hawaii.edu/news/article.php?aId=7761.

Education, and Human Development, where he taught a course on "Contemporary Dress." *Id.*; Dkt. 105, Ex. 2 ("Colman Dep."), at 105–06.  In fall 2013, Colman taught a course, "Fashion and Power," in NYU's Media, Culture, and Communications Department.  Colman Rpt. ¶ 5.  In spring 2013, he co-taught, as a visiting lecturer, a course on "International Business Strategies and Fashion Law" at New York City's Fashion Institute of Technology, Department of Marketing and International Trade.  *Id.*; *see also* http://charlescolmanlaw.com/about (accessed Aug. 1, 2016).

Since 2012, Colman has written, in various formats, on fashion and intellectual property law.  *See* Colman Rpt. ¶¶ 13–14; *id.*, Appx. A, at 2.  He has contributed chapters on fashion and intellectual property law to practitioner reference guides and an undergraduate textbook.  *Id.* ¶ 13.  And he has published articles on fashion history, the contemporary fashion landscape, intellectual property law, and related topics in academic and online journals.  *See id.* ¶¶ 13–14. His book, *Patents and Perverts: The Hidden Moral Agenda of American Design Law*, is slated to be published by the Cambridge University Press in 2016–2017.  *Id.* ¶ 14.

Since 2011, Colman has practiced intellectual property law through his sole proprietor firm Charles Colman, PLLC.  *Id.* ¶ 9.  That firm "cater[s] primarily to clients in the fashion, media, and related industries."  *Id.*  To date, Colman has prosecuted approximately 10 trademark applications (approximately five of which were related to the fashion industry), and litigated approximately six oppositions or cancellation petitions.  Colman Dep. 88–90, 206–07.

### b.    Analysis

LV argues that Colman is not qualified to opine on whether the TP acquired secondary meaning primarily because: (1) he did not conduct a marketing analysis or a secondary meaning survey; (2) he has no background or experience in fashion marketing; and (3) his practical

experience in trademark law is too limited to supply relevant expertise.  Def. *Daubert* Br. 10–12;
Def. Reply Br. 2–4.

In response, LVL XIII argues that, "based on his extensive training, learning,
experience[,] and recognition," Colman has expertise in "intellectual property [law]; the history,
business and culture of fashion; and the cultural matrix where these intersect."  Pl. *Daubert* Opp.
Br. 1.  LVL XIII asserts that Colman acquired that expertise "through many years spent in a
university setting . . . supplemented by thousands of hours of research, writing, and publishing on
the fashion industry and U.S. intellectual property law, related cultural practices, and symbolic
systems associated therewith[,] and years of professional experience spent representing parties in
and writing about legal proceedings concerning the fashion industry."  *Id.* at 8.  LVL XIII argues
that such expertise "amply qualif[ies] [Colman] to testify on . . . whether the LVL XIII toe plate
achieved secondary meaning."  *Id.* at 9.

On this issue, the Court holds for LV.  It is well established that even if "a witness
qualifies as an expert with respect to certain matters or areas of knowledge, it by no means
follows that he or she is qualified to express expert opinions as to other fields."  *Nimely*, 414
F.3d at 399 n.13 (citation omitted); *see also United States v. Tin Yat Chin*, 371 F.3d 31, 40 (2d
Cir. 2004) ("To determine whether a witness qualifies as an expert, courts compare the area in
which the witness has superior knowledge, education, experience, or skill with the subject matter
of the proffered testimony.").  Here, although Colman's experience and education may qualify
him as an expert in certain areas of fashion history and intellectual property law, LVL XIII has

not shown how such expertise qualifies him to testify as to the central, and largely empirical,

issue addressed in his report: whether the TP acquired secondary meaning.[25]

"Because the primary element of secondary meaning is 'a *mental association* in buyer[s']

minds between the alleged mark and a single source of the product,' the determination whether a

mark or dress has acquired secondary meaning is primarily an empirical inquiry." *Sunbeam*

*Products, Inc. v. W. Bend Co.*, 123 F.3d 246, 253 (5th Cir. 1997) (citation omitted) (emphasis in

original). Accordingly, courts have long held that consumer surveys are the most persuasive

evidence of secondary meaning. *See, e.g.*, *Sports Traveler, Inc. v. Advance Magazine*

*Publishers, Inc. ("Sports Traveler II")*, 25 F. Supp. 2d 154, 164 (S.D.N.Y. 1998) ("[C]onsumer

surveys have become the usual way of demonstrating secondary meaning."); *Ergotron, Inc. v.*

*Hergo Ergonomic Support Sys., Inc.*, No. 94 Civ. 2732 (SAS), 1996 WL 143903, at *8

(S.D.N.Y. 1996) ("A consumer survey is the most persuasive element in demonstrating

secondary meaning, because such a survey provides direct evidence.") (citing, *inter alia*, *20th*

*Century Wear, Inc. v. Sanmark-Stardust Inc.*, 815 F.2d 8, 10 (2d Cir. 1987), and *Mattel, Inc. v.*

*Azrak-Hamway Int'l, Inc.*, 724 F.2d 357, 361 (2d Cir. 1983)). To be sure, consumer surveys are

not the *only* form of evidence relevant to determining secondary meaning. *Centaur Commc'ns,*

---

[25] LVL XIII cites *HealthONE of Denver, Inc. v. UnitedHealth Group, Inc.*, No. 10 Civ. 1633, 2012 U.S. Dist. LEXIS 4506, at *7 (D. Colo. Jan. 12, 2012), and *Pandora Jewelers 1995, Inc. v. Pandora Jewelry, LLC*, 2011 U.S. Dist. LEXIS 62969, at *21 (S.D. Fla. June 7, 2011), for the proposition that attorneys may qualify as experts in trademark cases. *See* Pl. *Daubert* Opp. Br. 10. But those cases are inapposite, as the experts there did not offer opinions on secondary meaning. *See HealthONE*, 2012 U.S. Dist. LEXIS 4506, at *14–21 (holding trademark lawyer qualified to testify as to contents of trademark search report, deferring judgment as to whether lawyer could testify about consumer survey conducted by other expert, and noting that it would depend on "whether or not [he] ha[d] any familiarity with the methods or reasoning used . . . in [the] survey and what his experience [was] with surveys"; court demurred on whether lawyer could testify as to one factor in likelihood-of-confusion test); *Pandora*, 2011 U.S. Dist. LEXIS 62969, at *21–22 (lawyer who specialized in "legal and regulatory compliance" could testify as expert "on distribution channels for branded and non-branded jewelry").

*Ltd. v. A/S/M Commc'ns, Inc.* (*"Centaur II"*), 830 F.2d 1217, 1223 (2d Cir. 1987).  As reviewed in detail *infra*, the Second Circuit has identified five other potentially relevant factors.[26] Nevertheless, the ultimate determination of whether a particular trademark or trade dress has acquired secondary meaning remains an "empirical question of consumer association."  *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 770–71 (1992) (internal quotation marks and citation omitted) (recognizing that it is "often prohibitively difficult" to conduct that inquiry).

The expertise most germane to such a determination thus involves training or experience performing empirical analyses.[27]  But as to this critical qualification, Colman's credentials are woefully deficient.

---

[26] *See infra*, at 49–67.  These are: (1) advertising expenditures, (2) unsolicited media coverage of the product, (3) sales success, (4) attempts to plagiarize the mark, and (5) length and exclusivity of the mark's use.  *Centaur II*, 830 F.2d at 1222.  Conceivably, Colman's knowledge of the "history of American fashion, contemporary American fashion, fashion subcultures . . . and the history, development, and present landscape of American fashion design, marketing, and merchandising" may qualify him to opine on some of these factors.  Colman Rpt. ¶ 14; *see, e.g.*, *id.* ¶ 39(c) (stating that "[f]ashion companies . . . have in recent years had at their disposal a new, paradigm-shifting set of tools for achieving consumer recognition—tools that are more effective than the traditional paid advertisements that were the hallmark of the pre-Internet era").  But it does not follow that he is qualified to draw the empirical conclusion that LVL XIII, whether through such "paradigm-shifting . . . tools" or otherwise, in fact achieved secondary meaning among the relevant consumer population before LV's OTR Sneaker came on the market.

[27] The Second Circuit cases on which LVL XIII relies are not to the contrary.  In *McGregor-Doniger Inc. v. Drizzle Inc.*, 599 F.2d 1126 (2d Cir. 1979), the Circuit held that it was not error for the district court to admit the testimony of expert witnesses with "extensive experience as [] professional buyer[s] of women's coats" "to establish the level of sophistication of the typical purchaser of [defendant's] coats."  *Id.* at 1138 n.7.  But the witnesses there did not, as is proposed here, offer testimony on the issue of secondary meaning.  *Scarves by Vera, Inc. v. Todo Imports Ltd. (Inc.)*, 544 F.2d 1167 (2d Cir. 1976), is similarly inapposite.  Plaintiffs' "experts on the fashion industry" testified there only that "plaintiff was recognized among the top 'name' designers"—they did not opine on secondary meaning.  *Id.* at 1170.  Finally, in *Triangle Publications v. Rohrlich*, 167 F.2d 969 (2d Cir. 1948), *overruled by Monsanto Chem. Co. v. Perfect Fit Products Mfg. Co.*, 349 F.2d 389 (2d Cir. 1965), the Circuit noted that the "testimony of qualified witnesses who were in the merchandising business" supported a finding of secondary meaning and/or confusion as to sponsorship.  *Id.* at 972.  But it offered no details as to

Colman does not appear to have any training or experience measuring secondary meaning—whether through a traditional marketing survey or otherwise. He purports to have done so here by employing "observational and analytical techniques" of the "Visual Culture Studies" ("VCS") canon. *See* Colman Rpt. ¶¶ 17, 19–20; Colman Dep. 61–63. But, even assuming *arguendo* that VCS supplies a reliable empirical methodology (which, as discussed *infra*, it does not), there is no basis for concluding that Colman has experience thus applying it.[28] Colman testified that he has never served as an expert witness or used the VCS methodology to

_____

the mode of analysis (*i.e.*, empirical vs. theoretical) through which the experts had reached their opinions.

LVL XIII has identified one case outside this Circuit where the court held that it was proper to admit expert testimony on the issue of secondary meaning even though the proffered experts had no experience performing empirical analyses. In *Yamaha Int'l Corp. v. Hoshino Gakki Co.*, 840 F.2d 1572 (Fed. Cir. 1988), the Federal Circuit upheld the PTO's decision to admit the testimony (although affording it only "modest weight") of a guitar-maker and a jazz guitarist regarding the source-identifying function of guitar heads. *Id.* at 1582–83. That case is distinguishable, however, because, there, the PTO had made clear that it was the experts' "*professional 'lifetimes' of observation and experience*" which made it unnecessary for them to be "experts in conducting consumer surveys or to have actually conducted such surveys." *Yamaha Int'l Corp.*, 231 U.S.P.Q. (BNA) ¶ 926 (P.T.O. Oct. 9, 1986) (internal quotation marks and citation omitted). Here, by contrast, Colman's personal "contact knowledge, experience, training, and understanding [of the relevant consumer population]" has clearly not progressed to such a level so as to render an empirical analysis superfluous. *Id.*

[28] This case is thus easily distinguished from *Hi Ltd. P'ship v. Winghouse of Fla., Inc.*, 3 Civ. 116 (ACC), 2004 WL 5486964 (M.D. Fla. Oct. 5, 2004), where plaintiff's expert was held qualified to testify as to whether Hooters' trade dress had acquired secondary meaning. There, plaintiff's expert had (1) taught a restaurant management course for more than 20 years; (2) taught a course on restaurant brand management in which he addressed secondary meaning in the context of trade dress; (3) wrote his dissertation on "A Model to Identify the Efficient Capacity Range for Monopolistically Competitive Fine Dining Restaurant Firms"; (4) authored case studies and articles on the subject of restaurant brand identity; (5) consulted with leading restaurant chains concerning brand management and trade dress; and (6) twice served as a testifying expert in trade dress cases. *Id.* at *9. Those credentials dwarf Colman's, and evince a level of experience performing empirical analyses glaringly absent from Colman's CV. *Beastie Boys v. Monster Energy Co.*, 983 F. Supp. 2d 354 (S.D.N.Y. 2014), is similarly distinguishable. There, the parties agreed that the expert's 20 years of experience in branding and marking amply qualified him to assess the memorability of the infringing video. *Id.* at 363–64.

measure secondary meaning in connection with a legal case.  Colman Dep. 80–81, 190.  In fact, although he represents that he has "spent hundreds of hours familiarizing [himself] with the Visual Cultural canon," Colman Rpt. ¶ 3, he does not purport to have *ever* applied its techniques to test whether a particular trademark or trade dress had acquired secondary meaning.  None of his publications entail or reveal any such endeavor.[29]

Under these circumstances, the Court is "not persuaded that [Colman] can offer opinion testimony [as to whether the TP achieved secondary meaning] that is anything other than conjecture."  *Loyd*, 2011 WL 1327043, at *5 ("Though [a medical expert] need not be a specialist in the exact area of medicine implicated by the plaintiff's injury, he must have relevant experience and qualifications such that whatever opinion he will ultimately express would not be speculative." (internal quotation marks and citation omitted)).  The Court, therefore, holds that Colman is not qualified to offer expert testimony on this issue.[30]

---

[29] Each of Colman's publications relating to trademark law (which LVL XIII produced to the Court on July 15 and 18, 2016, *see* Dkt. 167) sets forth either basic legal principles or Colman's observations and normative views as to the development and present state of intellectual property law in the United States.  *See* materials listed at Colman Rpt., Appx. A, at 2; Dkt. 105, Ex. 3.

[30] Colman's report implies that he also intended to opine on a different issue: whether the TP constitutes a conventional trademark, which can be held inherently distinctive, as opposed to product-design trade dress, which cannot be.  The report states that "the placement of the metal toe plate in a regular and consistent manner on LVL XIII's shoes has most likely served, since its inception, not as product design, or even product packaging, but rather, as a conventional trademark."  Colman Rpt. ¶ 23 (emphasis omitted).  LVL XIII now disclaims this statement as "not fundamentally part of [Colman's] opinion, nor central to it."  Pl. *Daubert* Opp. Br. 15.  For avoidance of doubt, the Court would not have found this to be an appropriate area for Colman's testimony, for two reasons.  First, Colman's scholarly works do not appear to address this narrow issue, and Colman's experience practicing trademark law is too limited to qualify him as an expert on it.  Second, Colman's opinion appears to be a legal conclusion; accordingly, it is inadmissible, as it would "usurp either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it" by "undertak[ing] to tell the jury what result to reach" without providing any explanation or criteria by which the jury could render its own judgment.  *Nimely*, 414 F.3d at 397–98 (internal quotation marks and citations omitted); *cf. Ideal World Mktg., Inc. v. Duracell, Inc.*, 15 F. Supp. 2d 239, 244 n.2

### 2.    Colman's Incorrect Assumption as to LVL XIII's Customer Base Makes his Testimony Unhelpful and Unreliable

In a separate aspect of its *Daubert* challenge, LV argues that Colman's assumption that "urban males" are LVL XIII's primary customer base is incorrect, and makes his resulting opinions irrelevant and unreliable. *See* Def. *Daubert* Br. 13 & n.3; Def. *Daubert* Reply Br. 5–6. That critique is persuasive.

To be admissible, expert testimony must be of the type that will "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. This means that the testimony must be both reliable *and* relevant in that it "fits" the facts of the case. *Daubert*, 509 U.S. at 591–92. The "fit" and "reliability" requirements overlap: Testimony is neither helpful nor reliable where "there is simply too great an analytical gap between the data [on which the expert relies] and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

Here, LV argues that Colman's opinions are, at best, unhelpful, and, at worst, unfairly prejudicial, because they rest on a faulty assumption: that LVL XIII's customer base consisted primarily of "urban male[s] (i.e., African-American and African-American cultured-inclined) luxury footwear buyers between the ages of 17 and 36." Colman Rpt. ¶ 22 (internal quotation marks omitted); *see* Def. *Daubert* Br. 13 & n.3; Def. *Daubert* Reply Br. 5–6. The Court agrees.

---

(E.D.N.Y. 1998) (rejecting trademark attorney's proposed expert opinion that "PowerCheck" mark was suggestive and not descriptive because it was a "legal conclusion" which "impinge[d] upon the Court's role . . . and [was] of no probative value on [summary judgment] motion"), *aff'd*, 182 F.3d 900 (2d Cir. 1999); *Motown Productions, Inc. v. CACOMM, Inc*., 668 F. Supp. 285, 288 (S.D.N.Y. 1987) (rejecting trademark lawyer's expert opinion that "Nightlife" mark was "suggestive" because "the expert testimony of an attorney as to an ultimate issue of domestic law or as to the legal significance of facts is inadmissible") (citing *Marx & Co. v. The Diners' Club, Inc.*, 550 F.2d 505, 508–11 (2d Cir. 1977)), *rev'd on other grounds*, 849 F.2d 781 (2d Cir. 1988).

At the outset of his report, Colman posits that "urban males" are LVL XIII's primary customer base.  Colman Rpt. ¶ 22.  He then identifies characteristics of this demographic which he claims shape their perception as consumers.  For instance, he states that such persons:

> are, by and large, extremely sensitive to the nuances of what many fashion historians and theorists have described as "sneaker culture."  Accordingly, these consumers are attuned, whether consciously or not, to detect source indicators that are often far more subtle than the metal toe plate at issue in this case.

*Id.* ¶ 24.  Based on this "extreme[] sensitivity," Colman concludes that the TP is "likely to be perceived by—and has been perceived by—a significant majority . . . of actual and potential consumers . . . as an inherently distinctive indicator of source."  *Id.* ¶ 22; *see also id.* ¶¶ 24, 26, 29.

Colman similarly anchors his other opinions on this assumption about LVL XIII's target market.  These include that: (1) the TP achieved secondary meaning; (2) the TP "most likely served" as a "conventional trademark" rather than "product design"; and (3) the public will be harmed by LV's alleged infringement of the TP.  *See id.* ¶ 39(c) ("LVL XIII achieved [] widespread penetration" of "brand/visual-feature awareness . . . among actual or potential urban male high-end luxury footwear consumers aged 17 to 36 before [LV] first used a confusingly similar toe plate in U.S. commerce."); *id.* ¶¶ 23–24 (opining that, due to their "extreme[] sensitiv[ity] to the nuances of . . . 'sneaker culture,'" urban males were not likely to perceive LVL XIII's metal toe plate as product design); *id.* ¶ 39(d) ("The social media and remaining cultural landscape of 2013 reveal that Antonio Brown's leadership of LVL XIII resonated for countless members of the consumer group identified above [*i.e.*, urban males], in no small part because Mr. Brown has consistently espoused values (like genuine design innovation, pride in one's individuality and accomplishments, and spiritual fulfillment) that a substantial portion of this group found compelling.  The public would be harmed if [LV's] confusing imitation of LVL

XIII's metal toe plate were permitted . . . to (a) deprive LVL XIII of the financial means to create truly innovative designs . . . and (b) disillusion the public, for whom Mr. Brown's and LVL XIII's beliefs and mission statement have so strongly resonated, by suggesting to the public that such idealistic ventures will only result in 'selling out,' failure, and/or being overpowered or 'bullied' by large, wealthy companies like defendants, without being protected by the courts.").

This testimony fails *Daubert*'s "fit" requirement.  It is a mismatch for the facts of this case, because Colman's definition of the relevant consumer market lacks record foundation. Colman offers no factual basis for positing that "urban males" are a material segment of LVL XIII's customer base.  And LVL XIII has adduced no evidence to support that proposition.[31] The record evidence is to the contrary:  Testifying as LVL XIII's 30(b)(6) witness, Brown stated that his brand was *not* tailored to "the hip hop urban market," but was "more of a mainstream brand with mainstream appeal."  Brown Dep. IV, at 378.  And, he testified, his Instagram "tailors more to a mainstream audience" than to "an urban or hip hop demographic."  *Id.* at 370.  Finally, LVL XIII's business plan identifies its "typical consumer" as "an affluent male . . . who appreciates luxury goods and typically shops for designer labels"—it makes no mention of race or ethnicity.  MacMull Decl., Ex. 6, at 19; *see also* JSF ¶ 9 ("LVL XIII is a start-up founded by

---

[31] Nor, as the Court explained in its bench decision denying LVL XIII's motion to preclude the report and testimony of LV's expert, do the pleadings allege such an "urban" demographic.  LVL XIII claims that its complaint hints at the popularity of its sneakers among young African-American males by noting several African-American celebrities, such as Chris Brown and Jason Derulo, who endorsed, or were seen wearing, LVL XIII shoes.  Pl. *Daubert* Opp. Br. 5 (citing Compl. ¶¶ 25, 27, 29, 30, 32, 34).  But the complaint does not draw that connection, and Brown himself testified that Derulo and Chris Brown do not do not "fall into the urban market at all," but rather appeal to "mainstream" audiences.  *See* Brown Dep. IV, at 374–75, 377–78.  Indeed, he testified that Derulo's mainstream appeal made him a "good fit" for the "target audience [that LVL XIII was] trying to reach."  *Id.* at 375.  Nor does the fact that Brown was featured in *Ebony* magazine, which LVL XIII calls the "pioneering media outlet for African Americans," Pl. *Daubert* Opp. Br. 6 (citing Compl. ¶ 35), support that urban males were the dominant part of LVL XIII's customer base.

Antonio Brown . . . to introduce a line of luxury footwear catering to 'affluent male consumers between the ages of 17 to 35 with an annual income in excess of $100,000.'").

Under these circumstances, Colman's characterization of LVL XIII's target market as consisting predominantly of urban males is conjecture.  To the extent that his opinions are based on that unsupported assumption, they are not relevant.[32]  Put differently, even if Colman had a reliable basis for concluding that urban males perceived the TP as a source identifier, that opinion would not assist the trier of fact in determining the pertinent issue *in this case*: whether the TP achieved secondary meaning *among the relevant consumer population* (*i.e.*, young affluent men—across all races—with the proclivity to purchase luxury footwear).  *Cf. Centaur Commc'ns, Ltd. v. A/S/M Commc'ns, Inc. ("Centaur I")*, 652 F. Supp. 1105, 1110–11 (S.D.N.Y. 1987) (secondary meaning survey of "dubious value" where its universe was not keyed to the relevant market), *aff'd*, 830 F.2d 1217 (2d Cir. 1987); *Bank of Texas v. Commerce Southwest, Inc.*, 741 F.2d 785, 789 (5th Cir. 1984) (survey of a "population taken from an area . . . comprising only a portion of the City of Dallas" insufficiently probative of whether service mark

---

[32] *See, e.g.*, *Zaremba v. Gen. Motors Corp.*, 360 F.3d 355, 357–60 (2d Cir. 2004) (upholding exclusion of expert testimony where expert's "opinions were speculative because they were based on [his] unsupported conjecture of how the accident occurred"); *Boucher*, 73 F.3d at 22 (district court should have excluded expert testimony regarding plaintiff's lost earnings because the expert's projection "was based on assumptions about [plaintiff's] employment prospects that represent[ed] a complete break with his work history of seasonal and intermittent employment"); *Loyd*, 2011 WL 1327043, at *5 ("[A]n opinion that rests on a faulty assumption may not be based on good grounds and, therefore, may render the opinion unreliable, ergo inadmissible." (internal quotation marks omitted) (citing *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 269 (2d Cir. 2002)).

For the same reason, although testimony as to the perceptual tendencies of LVL XIII's *typical* consumer may have been relevant, *see, e.g.*, *JIPC Mgmt., Inc. v. Incredible Pizza Co.*, No. 08 Civ. 04310 (MMM), 2009 WL 8591607, at *4 (C.D. Cal. July 14, 2009); *Chase Manhattan Bank, USA, N.A. v. Freedom Card, Inc*., 333 F. Supp. 2d 239, 249 n.17 (D. Del. 2004), Colman's testimony as to attributes of this much more narrow demographic would not substantially "help the trier of fact" in resolving any issue in this case.  Fed. R. Evid. 702.

had acquired secondary meaning in the entire county).  To the contrary, it would significantly

risk *misleading* the factfinder.

Because the danger of confusion substantially outweighs any trifling probative value of

Colman's proffered opinions, preclusion is required under both Rules 403 and 702.

### 3.    Colman's Methodology is Not Reliable

Finally, LV argues that Colman's report and testimony must be precluded because his

methodology is "neither discernable nor reliable."  Def. *Daubert* Br. 14; *see id.* at 14–17; Def.

*Daubert* Reply Br. 6–9.  That argument, too, is convincing.

### a.    Applicable Legal Standards

Under *Daubert*, the Court must ensure that expert testimony "is not only relevant, but

reliable," 509 U.S. at 589, that is, that the proffered testimony is "more than subjective belief or

unsupported speculation," *id.* at 590.  The Supreme Court has clarified that this "gate-keeping

function applies not just to scientific expert testimony . . . but also to testimony based on

'technical' and 'other specialized' knowledge."  *Brooks v. Outboard Marine Corp.*, 234 F.3d 89,

91 (2d Cir. 2000) (quoting *Kumho Tire*, 526 U.S. at 141) (internal quotation marks omitted).

In *Daubert*, the Supreme Court set out a list of non-exclusive factors that the Court may

consider in determining whether an expert's methodology is reliable.  These are: (1) whether the

expert's technique or theory can be or has been tested; (2) whether it has been subjected to peer

review and publication; (3) whether there is a high error rate for the expert's technique, and

whether there are "standards controlling the technique's operation"; and (4) whether the expert's

technique or theory is generally accepted by the relevant scientific community.  *Daubert*, 509

U.S. at 592–94; *accord Nimely*, 414 F.3d at 396.  How the *Daubert* factors apply in a particular

case will depend on "the nature of the issue, the expert's particular expertise, and the subject of

his testimony." *Kumho Tire*, 526 U.S. at 150.  The Court "should consider the specific factors identified in *Daubert* where they are reasonable measures of the reliability of expert testimony." *Id.* at 152.

"In addition to setting forth these criteria for testing an expert's methodology, the Supreme Court has also stated that reliability within the meaning of Rule 702 requires a sufficiently rigorous analytical connection between that methodology and the expert's conclusions." *Nimely*, 414 F.3d at 396.  "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec.*, 522 U.S. at 146.  Accordingly, "expert testimony should be excluded if it is speculative or conjectural," *Boucher*, 73 F.3d at 21, or where the proffered opinion is "based on data, a methodology, or studies that are simply inadequate to support the conclusions reached," *Amorgianos*, 303 F.3d at 266.

### b.      Analysis

Colman purports to have used the VCS methodology to reach his opinions about the TP. *See* Colman Rpt. ¶¶ 15–20; Colman Dep. 61–63.  According to Colman, scholars in the VCS field "employ the tools and insights of, *inter alia*, semiotics/linguistics, aesthetics, anthropology, social history, and law" to "engag[e] with . . . 'visual cultures,'" such as the "'culture' of contemporary luxury consumer goods."  Colman Rpt. ¶ 16.  Colman claims to have applied the VCS methodology here by: (1) reviewing Brown's social media history, press coverage of LVL XIII, and the other "visual and textual material generated by both parties"; and (2) using the insights he has derived from the scholarly literature and his professional and personal experience to (3) determine whether the TP achieved secondary meaning before LV's OTR Sneaker came on the market.  *See Id.* ¶ 20; Colman Dep. 55, 61–64.

This methodology does not come close to withstanding scrutiny under *Daubert*—it does not satisfy a single one of the *Daubert* factors.

First, and most significant, Colman's methodology has not been—and, for multiple reasons, cannot be—tested or challenged in any objective sense.  In forming his opinions, Colman claims to have relied primarily on data he retrieved from social media platforms, as well as press coverage he retrieved through Google.  *See* Colman Dep. 55.  Critically, however, he did not preserve, much less produce, the vast majority of the materials on which he purportedly relied.  LVL XIII claims that Colman reviewed "over 100,000 unsolicited third-party online posts," Pl. *Daubert* Opp. Br. 7, but Colman—astoundingly—produced copies of only 12 posts.  *See* Sloane Decl., Ex. 41; Pl 56.1 ¶ 205.[33]

Worse, it is impossible to reconstruct Colman's searches.  He did not (1) retain a list of the search terms he used, his hit results, or the sites he reviewed but discarded as "duplicative" or "not relevant"; or (2) collect his results in a chart or table.  Colman Dep. 55–59.  Indeed, Colman conceded that without "go[ing] back into [his] computer," it would be "[im]possible to replicate the pool [of documents he relied upon] in the exact manner that [he] did the first time."  *Id.* at 57; *see also id.* at 192 ("We know this from quantum physics that there are going to be differences that cannot be avoided, and to the extent that you are talking about replicating precise sort[s] of

---

[33] LVL XIII denies that these 12 posts constitute "the entirety of Colman's produc[tion] in the way of 'social media posts,'" but it has not cited any record evidence of additional posts that Colman produced.  *See* Pl. 56.1 ¶ 205.  Colman's failure to produce other posts is, therefore, deemed admitted.  *See* S.D.N.Y. Local Rule 56.1(c), (d).

Although not strictly relevant to the *Daubert* analysis, LVL XIII's woefully incomplete disclosure of the basis for its expert's opinion violates Federal Rule of Civil Procedure 26(a).  *See Koppell v. N.Y. State Bd. of Elections*, 97 F. Supp. 2d 477, 482 (S.D.N.Y. 2000).  Were Colman's testimony not excluded under *Daubert*, this lapse would likely itself require exclusion.

variables, that is not possible in the world that we live in that is not possible because you can't travel back in time.").[34]

This elementary lapse makes it impossible for a court or adversary to test—or a jury to assess—Colman's methodology, as applied here, for veracity and reliability. *See Amorgianos*, 303 F.3d at 267 (in assessing the reliability of proposed expert's analysis, "the district court should undertake a rigorous examination of the facts on which the expert relies"). For this reason alone, exclusion of Colman's conclusions is mandatory under *Daubert*.[35]

---

[34] Defending his failure to preserve documentation, Colman testified that he believed that doing so was unnecessary because the sites and social media posts he reviewed are "representative of the general landscape of what is out there." Colman Dep. 56. But because Colman did not produce those materials, the Court has no means by which to verify that claim, and "is left only with his *ipse dixit*." *Cross Commerce Media, Inc. v. Collective, Inc.*, No. 13 Civ. 2754 (KBF), 2014 WL 11343849, at *10 (S.D.N.Y. Aug. 21, 2014) (rejecting expert's opinion as unreliable where he identified group of consumer survey respondents as "the correct group, but provide[d] no rationale as to why," instead, leaving the court "only with his *ipse dixit*").

[35] LVL XIII cites *Louis Vuitton Malletier S.A. v. Sunny Merch. Corp.*, 97 F. Supp. 3d 485 (S.D.N.Y. 2015), and *Broadspring, Inc. v. Congoo, LLC*, No. 13 Civ. 1866 (JMF), 2014 WL 4100615, at *16 (S.D.N.Y. Aug. 20, 2014), for the proposition that it is "proper for an expert to testify regarding his review and analysis of vast amounts of material, available to all parties, in order to make them accessible, comprehensible and coherent." Pl. *Daubert* Opp. Br. 13. But those cases are easily distinguished. There, the raw data/materials on which the experts relied were available to all parties. *See Sunny Merch*, 97 F. Supp. 3d at 504 (plaintiff's expert "combed through at least 100 pages of sales reports [produced by defendant], compiled and aggregated the data . . . , and presented it in a more readily understandable format"); *Broadspring*, 2014 WL 4100615, at *16 (expert "reproduce[d] the results of Internet searches and other third-party statements in his report . . . and relied on his specialized knowledge in the field of information security to synthesize [that] information . . . and to form an opinion"). As such, that data could be independently evaluated to assess the experts' conclusions. *Compare Loyd*, 2011 WL 1327043, at *7 (expert "may [have been] relying simply on *post hoc, ergo propter hoc* reasoning," where plaintiffs failed to produce records he claimed supported his opinion), *with U.S. Info. Sys., Inc. v. Int'l Bhd. of Elec. Workers Local Union No. 3, AFL-CIO*, 313 F. Supp. 2d 213, 229 (S.D.N.Y. 2004) (plaintiff's expert's testimony was admissible, even though it was "open to dispute" whether he drew an "appropriate inference" from the data in the record, because "defendants [would be] fully able . . . to contest this inference both through the testimony of their own expert witnesses, and through cross-examination") (internal citation omitted). Here, Colman's failure even to preserve a record of the materials he reviewed or to provide clear instructions that would permit a third-party to retrace his steps precludes such an

Second, there is no indication that the VCS methodology has ever been applied to assess secondary meaning—much less subjected to peer review in that context.[36]  Colman's two peer-reviewed publications do not entail any such analysis.  *See* Charles E. Colman, *Design and Deviance: Patent as Symbol, Rhetoric as Metric—Part 1*, 55 Jurimetrics J. 419–62 (2015); Charles E. Colman, *Design and Deviance: Patent as Symbol, Rhetoric as Metric—Part 2*, 56 Jurimetrics J. 1–45 (2015).

Third, Colman could not, when prompted at his deposition, identify a known or potential error rate for his methodology.  *See* Colman Dep. 185 ("That is like asking what is the known rate of error in history.").  He countered that "no one has ever, to [his] knowledge, criticized [his] employment of this methodology in visual culture studies or law with regard to very similar subject matter."  *Id.* 189–90.  But given that the Court has not located any prior occasion on which Colman applied this methodology to assess secondary meaning, his statement supplies little reassurance.

Colman has also not identified any standards controlling the application of the VCS methodology.  To the contrary, when asked whether VCS offers "one specific methodology so that two people reviewing the information would reach the same conclusion," Colman answered: "People employ different methodologies in ways that can vary depending upon the project, right? . . .  [T]he tools that will be best suited to a given situation . . . will vary depending on the situation and the sources examined in that situation."  *Id.* at 179.  And, based on his account of

---

objective assessment.

[36] Colman claimed that "[t]here is a sort of peer review system [in VCS] where people weigh in on the persuasiveness and thoroughness of other people's projects," but did not identify any project concerning secondary meaning that was subject to such review.  *See* Colman Dep. 186–87.

his application of the methodology here, Colman did not heed objective standards.  He did not, for instance, establish parameters to guide his selection of data (*e.g.*, social media posts).  Rather, he simply "reviewed more and more material until [he] felt that [he] had achieved a view . . . [as to] consumer perceptions of the metal toe plate."  *Id.* at 64.

Finally, Colman has not shown that his methodology has been recognized by the courts or gained acceptance within the relevant expert community.  He could not identify any expert who has been held qualified to testify in a court proceeding (as to secondary meaning or otherwise) based on the VCS methodology.  *See id.* at 190, 236.  On the contrary, he acknowledged that the VCS methodology is at odds with "traditional measures used to determine secondary meaning" and the "completely haphazard methodology sometimes used by federal courts" to determine whether a trademark is inherently distinctive.  Colman Rpt. ¶ 19; Colman Dep. 235–36.  He also failed to identify any study or scholarly literature in which VCS was applied to measure secondary meaning.

To be sure, that "testimony is qualitative, rather than quantitative, does not mean that it must be excluded [under *Daubert*]."  *Sunny Merch*, 97 F. Supp. 3d at 505.  As the Court explained in a prior intellectual property case, "'[t]echnical . . . or other specialized knowledge,' may be relevant and reliable, and therefore admissible under *Daubert*, even if the field of knowledge, be it marketing or plumbing, does not readily lend itself to a formal or quantitative methodology."  *Beastie Boys*, 983 F. Supp. 2d at 365 (quoting Fed. R. Evid. 702).  But the Court may not abdicate its gatekeeping function simply because an expert's methodology does not fit neatly into *Daubert*'s four-factor test.  Use of a qualitative or experience-based methodology does not exempt an expert from *Daubert* scrutiny.  *See Kumho Tire*, 526 U.S. at 151–52; *cf. Hi Ltd.*, 2004 WL 5486964, at *4 ("[A] vague claim of 'prior experience' cannot salvage an opinion

. . . that is the product of guesswork.  Otherwise, proffered expert witnesses could easily circumvent the requirements of *Daubert* by resorting to ambiguous claims of 'past experience.'").

Here, as is apparent, the problems with Colman's methodology go far beyond foregoing a quantitative model:  He has failed entirely to show a "sufficiently rigorous analytical connection between [his qualitative] methodology and [his] conclusions." *Nimely*, 414 F.3d at 396.  Colman testified that he arrived at his conclusions by "reviewing the content of the images [of LVL XIII sneakers posted on social media platforms], the comments that accompany the images, [] the number of likes, [and] the dates."  Colman Dep. 62.  But he offered no non-conclusory, or remotely clear, explication as to how any of those factors bore on his analysis.  Instead, he stated vaguely that "[w]hat was relevant was whether there were retweets, whether there were likes, whether there were comments, and if so, the nature of the retweets, the people retweeting, [and] what people said when they commented on the images." *Id.* at 63.  Without any explanation *how* the content of a particular comment or retweet might support or negate a finding of secondary meaning, or *how many* "likes" or "retweets" are necessary to show acquired distinctiveness, the Court is left with no meaningful guidance as to how Colman reached his conclusion. *See* Fed. R. Evid. 702, Advisory Committee Note ("The trial court's gatekeeping function requires more than simply 'taking the expert's word for it.' . . .  The more subjective and controversial the expert's inquiry, the more likely the testimony should be excluded as unreliable." (internal quotation marks and citations omitted)).[37]

_____

[37] A related problem:  Colman was tasked with determining whether the TP had achieved secondary meaning as of March 2014.  But the social media posts he produced appear to be from a later time period. *See* Sloane Decl., Ex. 41; Pl 56.1 ¶¶ 205–06.  It is unclear to say the least, why such posts would be probative of the existence of secondary meaning at an earlier point. *See Cross Commerce*, 2014 WL 11343849, at *9 (use of marketing document as evidence of

On this point, *Linde v. Arab Bank, PLC*, 922 F. Supp. 2d 316 (E.D.N.Y. 2013), and *Koppell*, 97 F. Supp. 2d 477, supply a revealing contrast.  In *Linde*, plaintiff's expert, Spitzen, described his methodology as "collect[ing] [] information from many sources[,] . . . cross-referencing them, [and] examin[ing] [] new information that support[ed] or contradict[ed] previous assumptions that ha[d] been made in the course of [his] research."  922 F. Supp. 2d at 322 (internal quotation marks omitted).  Unlike Colman, however, Spitzen did not leave the court to speculate how his review of those sources ultimately led to his conclusion.  The opposite:  Spitzen "describe[d] eighteen criteria, derived from his professional experience, academic studies, and other documents . . . that he used when [formulating his opinions]."  *Id.* at 322–23.  Admitting Spitzen's expert testimony, the court noted that Spitzen's explication of those factors had "ma[de] plain and transparent the considerations he evaluated in reaching his conclusions."  *Id.* at 323.

The shortcomings of the expert excluded in *Koppell* provide a closer analogue.  There, defendants' expert, Chapin, purported to base his opinions on his political experience, historical education, and the "methodology of history."  97 F. Supp. 2d at 481.  In his report, he explained that, in reaching his conclusions, he "relied on campaign literature, newspapers, conversations with certain undisclosed individuals, and his 'own memories.'"  *Id.*  He did not, however, "cite particular facts, pieces of literature, or articles" that shaped his analysis.  *Id.*  Nor did he (or defendants) produce the particular articles upon which he relied.  *Id.*  Citing these lapses, the court held that Chapin's report "fail[ed] to meet the threshold for reliability required by *Daubert*" because it "d[id] not rely upon any discernible methodology."  *Id.*  Rather, it held, the report was

---

secondary meaning was "problematic" because "the marketing document fail[ed] to address the appropriate timeframe at issue with regard to secondary meaning").

"essentially a compendium of Dr. Chapin's [personal] opinions." *Id.* As such, it was "not methodologically sound enough to provide reliable evidence." *Id.*

The same outcome is necessary here. Like Chapin, the *Koppell* expert, Colman has supplied virtually no insight into the considerations that shaped his qualitative analysis. There is thus no basis on which to hold that his opinions derive from a reliable methodology. The Court is left to assume that they are the product of Colman's "subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 590.[38] It would be a "dereliction of this Court's role as a 'gatekeeper' to find such [] opinion[s] admissible." *Cross Commerce*, 2014 WL 11343849, at *8 (citing *Williams*, 506 F.3d at 160).

\* \* \*

In sum, the Court holds that Colman's report and testimony are inadmissible for at least three independent reasons: first, Colman is not qualified to offer the proffered testimony; second, his opinions are unhelpful and unreliable because they do not "fit" the facts of this case; and third, he did not use a reliable methodology. The Court, therefore, grants LV's motion to preclude Colman's report and testimony in its entirety. Accordingly, it will not consider this evidence in resolving the parties' cross-motions for summary judgment on LVL XIII's claims.

---

[38] *Compare Hi Ltd.*, 2004 WL 5486964, at *2, *4 (rejecting expert opinion as "highly speculative and unreliable" where expert testified that his methodology was "essentially, a thought process. . . . I discussed it with Bill Kerr . . . ; I read the restaurant data . . . ; I considered the prior cases we had done, my prior experience. It's really kind of a combination of all of those," without assigning any value to various factors or data points), *with Broadspring*, 2014 WL 4100615, at *16 (rejecting claim that expert's report "contain[ed] no method whose reliability could be tested," where the report "guide[d] the reader through each step of the analysis" and identified the specific findings on which the expert based his conclusion).

**IV.     The Motions for Summary Judgment**

**A.     Applicable Legal Standards**

To prevail on a motion for summary judgment, the movant must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the burden of demonstrating the absence of a question of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

When the movant has properly supported its motion with evidentiary materials, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009) (internal quotation marks and citation omitted). "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (internal quotation marks and citation omitted). In determining whether there are genuine issues of material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)).

"A court faced with cross-motions for summary judgment need not 'grant judgment as a matter of law for one side or the other,' but 'must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration.'" *Cariou v. Prince*, 784 F. Supp. 2d 337, 345 (S.D.N.Y. 2011) (quoting *Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993)).

40

**B.      The Cross-Motions for Summary Judgment on LVL XIII's Claims**

LVL XIII brings claims for (1) trademark infringement, unfair competition, and false designation of origin, under § 43(a) of the Lanham Act; (2) New York common law unfair competition; and (3) deceptive business practices, under GBL § 349.  The parties have filed cross-motions for summary judgment on each claim.

For the reasons that follow, the Court holds that LV is entitled to summary judgment on (1) LVL XIII's Lanham Act claims, because LVL XIII has not established secondary meaning or a likelihood of confusion; (2) LVL XIII's common law unfair competition claim, because LVL XIII has not shown bad faith or a likelihood of confusion; and (3) LVL XIII's deceptive business practices claim, because LVL XIII has not shown material deception or public harm.

**1.      Lanham Act Claims**

**a.      Section 43(a) of the Lanham Act**

Section 43(a) of the Lanham Act protects registered and unregistered marks against the use of any word, term, name, symbol, or device "likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person."  15 U.S.C. § 1125(a).  To prevail on a trademark infringement, false designation of origin, or unfair competition claim under this provision, a plaintiff must show, first, that he or she has a valid mark that is entitled to protection, and, second, that the defendant's actions are likely to cause confusion as to the origin or sponsorship of the defendant's goods.  *See, e.g.*, *Louboutin*, 696 F.3d at 224; *Virgin Enters. Ltd. v. Nawab*, 335 F.3d 141, 146 (2d Cir. 2003); *Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 115 (2d Cir. 2001).

As to the first requirement, for a mark to be "protectable," it must be "distinctive." *Louboutin*, 696 F.3d at 216. A mark is "inherently distinctive" if its "intrinsic nature serves to identify a particular source." *Two Pesos*, 505 U.S. at 768; *see also Qualitex Co. v. Jacobson Prod. Co.*, 514 U.S. 159, 162–63 (1995) (inherently distinctive marks "almost *automatically* tell a customer that they refer to a brand") (emphasis in original). Even if a mark is not inherently distinctive, it may "acquire" distinctiveness by achieving "secondary meaning" among the relevant consumer market. *Two Pesos*, 505 U.S. at 769. A mark has acquired "secondary meaning" when, "in the minds of the public, the primary significance of a product feature . . . is to identify the source of the product rather than the product itself.'" *Id.* at 766 n.4 (quoting *Inwood Labs*, 456 U.S. at 851 n.11).

Section 43(a) protects "not just word marks, such as 'Nike,' and symbol marks, such as Nike's 'swoosh' symbol, but also 'trade dress'—a category that originally included only the packaging, or 'dressing,' of a product, but in recent years has been expanded by many Courts of Appeals to encompass the design of a product." *Wal-Mart Stores, Inc. v. Samara Bros.*, 529 U.S. 205, 209 (2000); *see also TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 28 (2001). However, the Supreme Court and Second Circuit have instructed that courts must exercise "particular 'caution,' when extending protection to product designs." *Yurman Design*, 262 F.3d at 114 (quoting *Landscape Forms, Inc. v. Columbia Cascade Co.*, 113 F.3d 373, 380 (2d Cir. 1997)); *see also Wal-Mart*, 529 U.S. at 215. That is because, unlike word marks and product packaging, whose "predominant function [is often] source identification," *id.* at 212, product design "almost invariably" serves another purpose: "to render the product itself more useful or

more appealing," *Yurman Design*, 262 F.3d at 114–15 (quoting *Wal-Mart*, 529 U.S. at 213).[39]

Accordingly, trade dress protection for product design "entails a greater risk of impinging on

ideas," *id.* at 116, and "hamper[ing] efforts to market competitive goods," *Landscape Forms*, 113

F.3d at 380.[40]

 A plaintiff asserting rights in product design, therefore, must "surmount additional

hurdles." *Yurman Design*, 262 F.3d at 115.  Relevant here, in *Wal-Mart*, the Supreme Court held

that product design can never be inherently distinctive, and thus always requires secondary

meaning to be protected.  529 U.S. at 216.  Thus, whereas word marks and product packaging

can be held distinctive by virtue of *either* inherent distinctiveness or secondary meaning, "[t]he

product design plaintiff . . . must always make the second, more difficult showing." *Yurman*

*Design*, 262 F.3d at 115 (citing *Wal-Mart*, 529 U.S. at 213–14).[41]

---

[39] *See also* Restatement (Third) Unfair Competition § 16 cmt.b (1995) ("Product designs are more likely to be seen merely as utilitarian or ornamental aspects of the goods.").

[40] *See also Fun-Damental Too, Ltd. v. Gemmy Indus. Corp.*, 111 F.3d 993, 1001 (2d Cir. 1997) ("[O]ver-inclusive protection of the product design risks conferring benefits beyond the intended scope of the Lanham Act and entering what is properly the realm of patent law."); *Landscape Forms*, 113 F.3d at 380 ("[G]ranting trade dress protection to an ordinary product design would create a monopoly in the goods themselves.").

[41] An additional "doctrinal hurdle is the congressionally-imposed requirement that a plaintiff prove that an unregistered trade dress is 'not functional.'" *Yurman Design*, 262 F.3d at 116 (quoting 15 U.S.C. § 1125(a)(3)).  A design feature is functional, and thus not protectable, if it is "essential to the use or purpose of the article, . . . affects the cost or quality of the article," or, in cases involving an aesthetic feature, if its protection "would put competitors at a significant non-reputation-related disadvantage." *Id.* at 116 (quoting *TrafFix*, 532 U.S. at 32–33) (internal quotation marks omitted).  Finally, the claimed product design cannot be "generic," *i.e.*, so broad that it refers only "to the genus of which the particular product is a species." *Id.* at 115 (quoting *Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.*, 58 F.3d 27, 32, 33 (2d Cir. 1995)) (internal quotation marks omitted).

Here, LV concedes that the TP is not functional, *see* Tr. 58, and has not argued that it is generic.  Because LVL XIII's claims fail on other grounds, the Court has no occasion to consider, *sua sponte*, whether the TP is generic.  But the issue whether LVL XIII's toe plate is so, and hence

The parties here hotly dispute the proper classification of the TP, which LVL XIII defines as a rectangular metallic plate affixed to the toe of an entire line of men's sneakers. *See* Tr. 70; Pl. SJ Br. 16.[42]  LV argues that this is product design trade dress, which is not protectable absent a showing of secondary meaning. *See* Def. SJ Br. 15–17; Def. SJ Reply Br. 6–11.  LVL XIII counters that the TP is not product design, but a conventional trademark or, alternatively, product packaging, either of which can be held inherently distinctive. *See* Pl. SJ Br. 10–16.  The Court accordingly addresses first whether the TP is properly classified as product design, as opposed to a conventional trademark or product packaging, as this determination resolves whether LVL XIII must demonstrate secondary meaning.[43]

---

unprotectable even if it had acquired secondary meaning, appears substantial:  The claimed trade dress consists of an unadorned metal toe plate—which, as discussed below, is a common design feature in the high-end footwear industry. *See Yurman Design*, 262 F.3d at 115 ("[E]ven a showing of secondary meaning is insufficient to protect product designs that are overbroad or 'generic.'"); *Fun-Damental*, 111 F.3d at 1000 ("A trade dress that consists of the shape of a product that conforms to a well-established industry custom is generic and hence unprotected. For example, the cosmetics industry's common use of black, rectangular-shaped compacts renders that packaging generic."); *Jeffrey Milstein, Inc.*, 58 F.3d at 33 ("Despite its initial novelty within the greeting card industry[,] . . . Paper House's trade dress cannot qualify for trade dress protection because Paper House is effectively seeking protection for an idea or concept—die-cut photographic greeting cards.").

[42] *See also* Brown Dep. I, at 91–92 (testifying as LVL XIII's 30(b)(6) witness that the allegedly infringed source identifier consists of a "metal plate" which (1) is "rectangular in shape with soft edges"; (2) contours the front of the toe of the shoe; (3) is "approximately 3 to 4 millimeters thick"; and (4) is inset into a two millimeter indentation in the outsole of the sneaker); Brown Dep. III, at 100 (the TP does not include the screws or the "literal element of LVL XIII"). Notably, this definition is broader than that recited in (1) the '102 Application, which sought protection for "a shoe toe design featuring a rectangular metal plate across the front of the shoe toe *with the wording LVL XIII engraved in the metal plate*," Pl. 56.1 ¶ 106 (emphasis added); and (2) the complaint, which defines the TP as a "rectangular metal plate across the front of the shoe toe including the legend 'LVL XIII' engraved in the metal plate, secured by small screws in the corners of the metal plate," Compl. ¶ 5.

[43] LVL XIII argues that this question cannot be resolved on a motion for summary judgment because it presents a question of fact.  Pl. SJ Br. 12 n.3 (citing *In re Slokevage*, 441 F.3d 957, 959 (Fed. Cir. 2006) ("[T]he determination whether trade dress is product design is a factual

### b.      Classification of the TP

In *Wal-Mart*, the Supreme Court did not provide definitive guidance on how to determine

whether a particular mark qualifies as product design.  *See Adidas-Salomon AG v. Target Corp.*,

228 F. Supp. 2d 1192, 1206–07 (D. Or. 2002).[44]  It instructed, however, that "[t]o the extent

there are close cases, . . . courts should err on the side of caution and classify ambiguous trade

dress as product design, thereby requiring secondary meaning."  *Id.* at 215.

This is not a close case.  Even a cursory examination of the TP discloses that it does not

qualify as a trademark or product packaging.  The trademark designation is virtually always

applied to two-dimensional words or symbols—not three-dimensional configurations like a metal

toe plate.  *See Decorations for Generations, Inc. v. Home Depot USA, Inc.*, 128 F. App'x 133,

136 (Fed. Cir. 2005) ("[W]hile a two-dimensional symbol or drawing may be considered a

trademark, three-dimensional product designs or packaging may, under the right circumstances,

be considered trade dress.").[45]  And product packaging is generally limited to "the appearance of

---

finding.")).  But, even if this determination is properly cast as a factual question as opposed to an
application of law to fact, a court may resolve such a question on summary judgment where
"only one possible conclusion may be drawn from the undisputed facts."  *Tuthill v. United
States*, 270 F. Supp. 2d 395, 399 (S.D.N.Y. 2003); *see also Wal-Mart*, 529 U.S. at 215 ("To the
extent there are close cases, we believe that *courts* should err on the side of caution and classify
ambiguous trade dress as product design.") (emphasis added); *cf. Jewish Sephardic Yellow
Pages, Ltd. v. DAG Media, Inc.*, 478 F. Supp. 2d 340, 355–56 (E.D.N.Y. 2007) ("Although the
classification [of a mark] is a fact-bound determination, [w]hen reasonable minds could not
differ as to the import of the proffered evidence, then summary judgment is proper." (internal
quotation marks and citations omitted)).

[44] The Court had no occasion to do so, because it was undisputed that the mark at issue—"one-
piece seersucker outfits decorated with appliques of hearts, flowers, fruits, and the like—was
product design.  *Wal-Mart*, 529 U.S. at 207 (2000).

[45] In holding that the TP is three-dimensional, the Court does not rely on LVL XIII's purported
concession to that effect (from which LVL XIII now distances itself), *see* Pl. 56.1 ¶ 126, but on
its own evaluation of the record photographs of the TP, *see, e.g.*, Compl. 2, 5, 8–9, and on the
inherent dimensions of such a "metal plate."

labels, wrappers, boxes, envelopes, and other containers used in packaging a product as well as displays and other materials used in presenting the product to prospective purchasers." Restatement (Third) of Unfair Competition § 16 cmt.a (1995).[46]

Tellingly, LVL XIII has not offered any admissible evidence to support its claim that the TP falls within either of these categories.[47]  And the record evidence is decidedly to the contrary.

First, the "packag[ing]" described in LVL XIII's business plan consists solely of "distinctive branded shoe boxes" and "black cotton dust bags"—it does not include the TP.  *See* Pl. Supp. 56.1 ¶ 404.

Second, in declining to register the '102 Application, the PTO stated that "the rectangular shape of the shoe toe plate . . . is a configuration of a feature of the *shoe design*," which "can never be inherently distinctive as a matter of law."  JSF ¶ 44 (emphasis added); *see also id.* (requiring LVL XIII to "disclaim" the "rectangular shape of the shoe toe plate . . . because it is a *configuration of a feature of the shoe design*") (emphasis added).  Although the PTO's determination is not dispositive, the Court is to "accord weight" to it.  *Genesee Brewing Co. v.*

---

[46] *Compare L'Oreal USA, Inc. v. Trend Beauty Corp.*, No. 11 Civ. 4187 (RA), 2013 WL 4400532, at *2 (S.D.N.Y. Aug. 15, 2013) (perfume bottle and box containing bottle were packaging), *and Paddington Corp. v. Attiki Imps. & Distribs.*, 996 F.2d 577, 583–84 (2d Cir. 1993) (shape of ouzo bottles was packaging), *with Fedders Corp. v. Elite Classics*, 268 F. Supp. 2d 1051, 1062 (S.D. Ill. 2003) ("undulating curve" on face plate of air conditioner unit was product design, not packaging).

[47] In support of its trademark claim, LVL XIII relies solely on Colman's opinion that "the placement of the metal toe plate in a regular and consistent manner on LVL XIII's shoes has most likely served, since its inception, *not* as product design, or even product packaging, but rather, as a conventional trademark."  Pl. SJ Br. 11 (citing Colman Rpt. ¶ 23).  But that opinion is "purely conclusory" and "without factual basis."  *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 311 (2d Cir. 2008) (internal quotation marks and citation omitted).  Even if Colman's entire report had not been struck, this assertion would have been "inappropriate material for consideration on a motion for summary judgment."  *Id.*  LVL XIII has offered absolutely no evidence to support its claim that the TP is product packaging.

*Stroh Brewing Co.*, 124 F.3d 137, 148 n.11 (2d Cir. 1997) (internal quotation marks and citation

omitted) (citing, *inter alia*, *D.M. & Antique Import Corp. v. Royal Saxe Corp.*, 311 F. Supp.

1261, 1274 (S.D.N.Y. 1970) ("[T]he expertise of the trademark examiners does entitle their

views to respectful consideration.")).  Such deference is particularly appropriate where, as here,

the PTO's determination is consistent with the registrant's own characterization of the claimed

mark:  As noted, the '102 Application sought registration for a "shoe toe *design*."  Pl. 56.1 ¶ 106

(emphasis added); *see In re Slokevage*, 441 F.3d at 959 ("Slokevage's reference in her

application to the trade dress as a 'cut-away flap design' supported a determination that the

configuration constitutes product design.").  And LVL XIII used dotted lines to identify un-

claimed portions of the mark, Pl. 56.1 ¶ 105, a procedure required only for "trade dress marks."

*See* U.S. Patent & Trademark Office, Trademark Manual of Examining Procedures ("TMEP")

§ 1202.02(c)(i) (Apr. 2016 ed.).[48]

    Despite this evidence, LVL XIII argues that the TP is an inherently distinctive trademark

because its uniform size and placement on LVL XIII's line of sneakers renders it "arbitrary" and

"fanciful," and thus apt to be an automatic indicator of source.  *See* Pl. SJ Br. 10–12; Tr. 74.

    That argument is not persuasive.  In *In re Slokevage*, the Federal Circuit flatly rejected it

when faced with a materially identical fact pattern.  There, Slokevage had sought PTO protection

for a "'configuration' that consist[ed] of a label with the words 'FLASH DARE!' in a V-shaped

---

[48] LVL XIII denies that its language in the '102 Application shows that it "contemplated trade
dress and not a trademark registration."  Pl. SJ Br. 13.  In so arguing, it relies on the attestation of
its trademark counsel, Erik Pelton, that he uses the word "design . . . whenever the mark that is
the subject matter of an application for registration contains a non-literal element," not just for
trade dress.  Pelton Decl. ¶ 9.  But even if that were true, it would not explain why, pursuant to
TMEP § 1202.02(c), the rule for "drawings, descriptions, and disclaimers in *trade dress*
applications," LVL XIII amended its application to depict the screws on the toe plate in dotted
lines, to indicate that they were not part of the mark.  *See* Pl. 56.1 ¶¶ 104–05.

background, and cut-out-areas located on each side of the label[,] . . . [which] consist[ed] of a hole in a garment and a flap attached to the garment with a closure device."  441 F.3d at 958. The PTO refused to register the mark on the ground that it was "product design/configuration," which, under *Wal-Mart*, could not be registered without a showing of secondary meaning.  *Id.* at 958–59.  On appeal, Slokevage argued that her mark should not be so classified because (1) "it d[id] not alter the entire product but [was] more akin to a label being placed on a garment," and (2) it was "located on the rear hips of garments, which is a location that consumers frequently recognize as identifying the source of the garment."  *Id.* at 960, 962.  The Federal Circuit disagreed.  It rejected Slokevage's premise that "product design trade dress must implicate the entire product," and held that "design features" incorporated into a garment also fall within this category.  *Id.* at 962.  That holding, it explained, is consistent with the "reasoning behind the Supreme Court's determination that product design cannot be inherently distinctive": that the "predominant function" of product design is often not source identification, but rather to render a product "more useful or more appealing."  *Id.* (quoting *Wal-Mart*, 529 at 212–13) (internal quotation marks omitted).  The court noted that Slokevage's design "c[ould] serve such utilitarian and aesthetic functions.  For example, consumers may purchase Slokevage's clothing for the utilitarian purpose of wearing a garment or because they find the appearance of the garment particularly desirable."  *Id.*  Therefore, it concluded, it was "appropriate to require proof of acquired distinctiveness."  *Id.*

The same is so here.  Despite LVL XIII's efforts to shoehorn the TP into the trademark category, it does not fit.  Rather, like the configuration in *Slokevage*, the TP serves a primarily aesthetic function: making LVL XIII's sneakers appear more enticing.  Accordingly, the TP can

be classified only as a product design feature which is not inherently distinctive.[49]  To prevail on

its Lanham Act claims, LVL XIII must therefore show that the TP acquired secondary meaning.

### c.  Secondary Meaning

A mark has secondary meaning when "in the minds of the public, the primary

significance of a product feature . . . is to identify the source of the product rather than the

product itself."  *Louboutin*, 696 F.3d at 216 (quoting *Inwood Labs*, 456 U.S. at 851 n.11).  The

Second Circuit has identified six non-exclusive factors that bear on this inquiry: "(1) advertising

expenditures, (2) consumer studies linking the mark to a source, (3) unsolicited media coverage

of the product, (4) sales success, (5) attempts to plagiarize the mark, and, (6) length and

exclusivity of the mark's use."  *Id.* at 226 (internal quotation marks and citation omitted).

"Although the Second Circuit has stated that district courts should be cautious in weighing these

factors at the summary judgment stage, it has nonetheless supported summary judgment in cases

where the proponent of the alleged trademark has failed to raise a material issue of fact on the

question of secondary meaning."  *Jewish Sephardic Yellow Pages*, 478 F. Supp. 2d at 344

(collecting cases).

---

[49] Given this holding, the Court need not determine whether LVL XIII would otherwise be bound by the admission in its amended answer that the TP is product design trade dress.  *See* Def. SJ Br. 16 (quoting Dkts. 40, 42, ¶ 86 (admitting that "[t]he predicate for all four counts of LVL XIII's complaint is that it has protectable trade dress rights in a shoe toe design featuring a rectangular metal plate across the front of the toe of a shoe")); *compare Hoodho v. Holder*, 558 F.3d 184, 191 (2d Cir. 2009) ("Facts admitted by a party are judicial admissions that bind th[at] [party] throughout th[e] litigation." (internal quotation marks and citation omitted)), *and Hausler v. JP Morgan Chase Bank, N.A.*, 127 F. Supp. 3d 17, 37 (S.D.N.Y. 2015) ("It is clear that under federal law, 'stipulations and admissions in the pleadings are generally binding on the parties and the Court' as judicial admissions." (quoting *PPX Enterprises, Inc. v. Audiofidelity, Inc*., 746 F.2d 120, 123 (2d Cir. 1984)), *with Black & Decker Corp. v. Dunsford*, 944 F. Supp. 220, 225 n.7 (S.D.N.Y. 1996) (defendants' "so-called judicial admissions of descriptiveness" in answer and counterclaim "do not constitute binding admissions that the mark is descriptive"), *and Jewish Sephardic Yellow Pages*, 478 F. Supp. 2d at 354 (defendants' earlier admission that mark was descriptive was "probative and admissible," but not binding).

"[P]roof of secondary meaning entails vigorous evidentiary requirements." *Thompson*

*Med. Co. v. Pfizer Inc.*, 753 F.2d 208, 217 (2d Cir. 1985) (internal quotation marks and citation

omitted).  A plaintiff bears the burden of proving that his mark acquired secondary meaning by

the time the allegedly infringing product came on the market.  *Id.*  The relevant inquiry here,

then, is whether the TP acquired secondary meaning by March 2014, when the OTR Sneaker

became available for purchase in the U.S.  The Court examines the relevant factors in turn.

### i)      Advertising Expenditures

Advertising expenditures are regarded as "indirect evidence of the possible effect that

advertising may have on consumers' association of the trade dress with the source of the

product." *Ergotron*, 1996 WL 143903, at *8 (citing *Centaur II*, 830 F.2d at 1222).  Targeted

albeit low-cost advertising may establish this factor, but only if the plaintiff can show that it was

successful in reaching the targeted audience.  *See Lopez v. Gap, Inc.*, 883 F. Supp. 2d 400, 425

(S.D.N.Y. 2012); *Jewish Sephardic Yellow Pages*, 478 F. Supp. 2d at 345.  The Court should

consider not only the total amount of the plaintiff's expenditures, but also whether the plaintiff's

advertising specifically directed consumers to the mark as an indication of source.[50]  Secondary

meaning "cannot usually be proven by advertising that merely pictures the claimed trade dress

and does nothing to emphasize it or call attention to it."  J. Thomas McCarthy, *McCarthy on*

*Trademarks and Unfair Competition* § 8:8.50 (4th ed.).

---

[50] *See, e.g.*, *Jewish Sephardic Yellow Pages*, 478 F. Supp. 2d at 371 ("[M]erely showing that a
certain amount was spent on advertising provides little support for secondary meaning.  It must
be shown that there was promotion of the mark as an identifier for the product." (internal
quotation marks and citation omitted)); *Lopez*, 883 F. Supp. 2d at 426; *Urban Grp. Exercise
Consultants, Inc. v. Dick's Sporting Goods, Inc.*, No. 12 Civ. 3599 (RDS), 2013 U.S. Dist.
LEXIS 33270, at *8–9 (S.D.N.Y. Mar. 8, 2013).

Here, it is undisputed that LVL XIII did not engage in any traditional paid advertising. *See* Brown Dep. I, at 158–59 (LVL XIII did not engage in TV advertising or purchase any newspaper or magazine advertisements). And it spent only $82,000 in 2013 for marketing and promotion. *See* JSF ¶ 35.[51]  Courts have held far greater expenditures insufficient to support secondary meaning.[52]

Even if the Court were to relax the standard given the small scale of LVL XIII's business, the result would not differ.  That is because LVL XIII has not shown that its marketing activities "succeeded in reaching a relevant segment of the population."  *Lopez*, 883 F. Supp. 2d at 426. To the contrary, nearly half of LVL XIII's advertising expenditures were spent in connection with its launch party and the two trade shows it attended in summer 2013—none of which were open to the general public.  *See* Pl. 56.1 ¶¶ 163, 224–26; Def. Supp. 56.1 ¶ 302.  Such promotion cannot be assumed to have fostered *consumer* association of the TP with LVL XIII.[53]

Even more damaging, LVL XIII has not established that any of its promotional materials called attention *to the TP* as an indication of source.  *See Kaufman & Fisher Wish Co., Ltd. v. F.A.O. Schwarz*, 184 F. Supp. 2d 311, 318 (S.D.N.Y. 2001) ("handful of media articles" did not

---

[51] LVL XIII has not provided any evidence of its advertising expenditures for 2014.

[52] *See, e.g.*, *Jack Schwartz Shoes v. Skechers U.S.A.*, No. 00 Civ. 7721 (RMB) (THK), 2002 U.S. Dist. LEXIS 25699, at *64–66 (S.D.N.Y. 2002) (evidence that plaintiff spent $490,420 on advertising during 10-month period did not support secondary meaning because, "[g]iven the short period of time in question, an advertising campaign would need to be overwhelming in order to create an association between the [mark] and its source[,] [and] [p]laintiff's advertising expenditures were modest, at best"), *adopted by* 233 F. Supp. 2d 512 (S.D.N.Y. 2002); *Brandwynne v. Combe Int'l, Ltd.*, 74 F. Supp. 2d 364, 382 (S.D.N.Y. 1999) (advertising expenditures of $120,000 over three-year period weighed against finding of secondary meaning).

[53] This case is thus easily distinguished from *Centaur II*, 830 F.2d 1217, on which LVL XIII relies.  *See* Pl. SJ Br. 21.  There, the court emphasized that the plaintiff's advertising efforts, which included a direct mail solicitation campaign, had "served to put [plaintiff's product] before the relevant group of consumers."  *Centaur II*, 830 F.2d at 1222.

support secondary meaning because they "d[id] not explicitly link the product's design to its

source"), *aff'd*, 51 F. App'x 335 (2d Cir. 2002) (summary order).  To the contrary, LVL XIII

failed to identify a single article that discussed the TP or distinguished it from other elements of

the sneaker design, such as the "LVL XIII" inscription.  Pl. 56.1 ¶ 165.  Advertising may not

support secondary meaning where, as here, "the promotional material does not use the design

alone but instead with other marks."  TMEP § 1202.02(b)(i) (collecting cases); *see, e.g.*, *In re*

*Soccer Sport Supply Co., Inc.*, 507 F.2d 1400, 1403 (C.C.P.A. 1975) (advertisements displaying

design at issue along with word marks lacked "nexus between appellant's design per se and a

single source"); *In re Mogen David Wine Corp.*, 372 F.2d 539, 542 (C.C.P.A. 1967) (assuming,

where advertisements displayed decanter at issue bearing "MOGEN DAVID" word mark, that

consumers' "association of the decanter with appellant was predicated upon the impression

imparted by the [word mark] rather than by any distinctive characteristic of the container per

se").

        LVL XIII argues that its "savvy exploitation of low- and no-cost promotion via social

media" and celebrity endorsements eliminated the need for traditional paid advertising.  Pl. SJ

Br. 20–21; *see also* Brown Dep. II, at 175–76 (testifying that he "didn't feel like it was necessary

to invest [LVL XIII's] dollars into print ads and things of that nature, especially with the dying

business of print publications this day and age").[54]  But it has offered no concrete proof of the

---

[54] LVL XIII cites *Amini Innovation Corp. v. McFerran Home Furnishings, Inc.*, 68 F. Supp. 3d
1170, 1174 (C.D. Cal. 2014), to support that a plaintiff's social media presence, without more,
may satisfy the "advertising" factor.  But that reliance is misplaced.  The court there looked not
only to the plaintiff's social media presence, but also to the "substantial sums [plaintiff had
spent] advertising its products," and its "substantial presence at well-attended regular industry
trade shows, in trade publications, in consumer magazines, on its website, . . . and through its
product catalogues."  *Id.*; *see also Denimafia Inc. v. New Balance Athletic Shoe, Inc.*, No. 12
Civ. 4112 (AJP), 2014 WL 814532, at *11 (S.D.N.Y. Mar. 3, 2014) (that plaintiff "never had the
funds for traditional advertising such as television commercials and print advertising . . . and

existence, let alone success, of such an action plan. Although Brown testified that, by April

2013, he had personally acquired 50,000 Instagram followers, Def. Supp. 56.1 ¶ 300, the record

is silent as to the number of users following LVL XIII. And even if LVL XIII had adduced

evidence of a substantial online following, that would not support secondary meaning, because

LVL XIII has not identified a single post highlighting the TP as an indicator of source. *See* Pl.

56.1 ¶ 168; *Giggle, Inc. v. netFocal, Inc.*, 856 F. Supp. 2d 625, 632 (S.D.N.Y. 2012) (evidence

that plaintiff's website received more than one million unique hits not probative of secondary

meaning because "volume does not automatically establish secondary meaning" and "[a]

consumer may . . . visit [plaintiff's] website . . . but never again associate [its] mark with

[p]laintiff").[55] Nor has it presented evidence of any celebrity who called attention to the TP or

associated it with LVL XIII. *See* Brown Dep. IV, at 286–88 (admitting he was unaware of "any

verbal media placements that mentioned the toe plate").[56]

---

merely offer[ed] evidence of its use of free advertising" weighed against secondary meaning);
*Gameologist Grp., LLC v. Sci. Games Int'l, Inc.*, 838 F. Supp. 2d 141, 158 (S.D.N.Y. 2011)
(plaintiff's claim that it attended trade shows, paid to create prototypes of products, purchased an
"email blast," disseminated press releases, and distributed hundreds of samples of its board
games did not support secondary meaning, where plaintiff "produced no evidence as to the actual
costs of th[o]se activities nor show[ed] they were anything but modest"), *aff'd*, 508 F. App'x 31
(2d Cir. 2013) (summary order). In any event, as noted, LVL XIII has not adduced sufficient
evidence of its social media presence to support a finding of secondary meaning.

[55] In fact, LVL XIII has produced only 12 social media posts, none of which appear to depict
sneakers from LVL XIII's original sneaker line, much less call attention to the TP affixed to
those sneakers as an indicator of source. *See* Sloane Decl., Ex. 41; Pl 56.1 ¶¶ 205–08.

[56] Although Brown testified that he "was told" that DeRay Davis "made mention of the shoes
and the metal plate" on television, he clarified that he had "no firsthand knowledge" of this. *See*
Brown Dep. IV, at 286–87; *cf. Advance Magazine Publishers, Inc. v. Norris*, 627 F. Supp. 2d
103, 117 (S.D.N.Y. 2008) (hearsay evidence proffered through affidavit insufficient to
demonstrate media coverage without documentary evidence of such coverage in the record).

Accordingly, on the summary judgment record, there is no basis to conclude that LVL

XIII's social media presence compensated for its minimal paid advertising expenditures.  This

factor therefore favors LV.

>                       ii)        *Consumer Studies Linking the TP to a Single Source*

As discussed above in connection with LV's *Daubert* motion, consumer surveys have

been consistently cited as the most persuasive evidence of secondary meaning.  *See, e.g.*, *Jewish

Sephardic Yellow Pages*, 478 F. Supp. 2d at 370; *Ergotron*, 1996 WL 143903, at *8.  And, "in a

borderline case where it is not at all obvious that [a] designation has been used as a mark, survey

evidence may be necessary to prove trademark perception."  *McCarthy on Trademarks* § 3.3; *see

also Denimafia*, 2014 WL 814532, at *12 (failure to submit consumer study weighed against

finding of secondary meaning); *Jewish Sephardic Yellow Pages*, 478 F. Supp. 2d at 370 (same);

*Chum Ltd. v. Lisowski*, 198 F. Supp. 2d 530, 534–35 (S.D.N.Y. 2002) (same).

Here, LVL XIII did not conduct a secondary meaning survey, ostensibly due to the "large

expense involved."  Pl. SJ Br. 25 (quoting *McCarthy on Trademarks* § 32:195); Pl. 56.1 ¶ 203.

But that excuse is not convincing.  LVL XIII *did* commission an expert to opine on secondary

meaning—just not one who performed a survey or used an otherwise reliable methodology.  *See

discussion *supra*, at 17–39; *see also Cross Commerce*, 2014 WL 11343849, at *8 (defendant's

decision not to commission a survey due to expense "makes little sense in light of the significant

resources the parties have spent litigating this case").  In any event, resource constraints do not

relieve a plaintiff of the burden of coming forth with evidence on this factor.[57]

---

[57] *See Lopez*, 883 F. Supp. 2d at 426 ("Although the Court appreciates the modest nature of
Lopez's business and that it is unrealistic to expect him to mount more than a very modest
survey, and therefore assigns little weight to this factor, this factor, ultimately, cannot support a
finding of secondary meaning [because plaintiff did not submit any study].");  *Sports Traveler II*,
25 F. Supp. 2d at 164 (rejecting plaintiff's argument that it "should not be prejudiced because it

LV, for its part, retained a well-recognized survey expert, Michael B. Mazis, to conduct a survey to assess whether and to what extent the TP acquired secondary meaning. *See* Pl. 56.1 ¶¶ 180–82; Dkt. 123, Ex. 5 ("Mazis Rpt.). The Mazis survey sampled 587 men, ages 18–34, who had purchased in the past 12 months, or expected to purchase in the next 12 months, a pair of men's shoes costing $500 or more. *See* Mazis Rpt. ¶¶ 11–12.[58] It showed that, at most, 3% of respondents associated the TP, shorn of the "LVL XIII" literal element, with a single source. *See id.* ¶¶ 33, 39.[59] None identified LVL XIII as that source. *Id.* ¶ 36.[60] Those data unmistakably reveal a lack of secondary meaning.

In its motion to preclude Mazis's report and testimony, LVL XIII identified a number of methodological flaws in the survey, which it claims reduce its probative value. *See* Pl. SJ Br. 25; Dkt. 122. As the Court noted in denying that motion, some of those objections, although not justifying preclusion, have merit.[61] But given LVL XIII's failure to muster *any* contrary survey evidence, even if the factfinder were to afford the Mazis survey only limited weight, this factor

---

did not conduct a survey" due to resource constraints).

[58] The Court discussed Mazis's survey methodology in depth in its July 28, 2016 bench opinion, which denied LVL XIII's motion to preclude Mazis's report and testimony. *See* Tr. 17–41.

[59] Mazis arrived at this figure by including the responses of all participants, regardless whether they had previously seen the shoes pictured in the survey prompt. Mazis Rpt. ¶ 38. Mazis's primary analysis, which excluded participants who had not seen the shoes, yielded an even lower figure: Only 1% of respondents associated the TP with a single source. *Id.* ¶ 33.

[60] Mazis separately measured respondent recognition of the modified toe plate featured on LVL XIII's second line of sneakers. At most, 4% percent of respondents associated that toe plate with a single brand. Mazis Rpt. ¶¶ 34–35, 41. None associated it with LVL XIII. *Id.* ¶¶ 36, 42.

[61] These are that: (1) the survey universe was overbroad because it included men who had bought or expected to buy any high-end shoes, as opposed to only luxury sneakers, Tr. 28–29; and (2) the survey measured recognition at the wrong point in time (*i.e.*, in October 2015 rather than before March 2014), *id.* at 32–34.

would still favor LV.  *See Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 875 (2d Cir. 1986) ("survey evidence, even with its methodological defects[,] . . . [wa]s still somewhat probative" and could be considered on motion for summary judgment); *Akiro LLC v. House of Cheatham, Inc.*, 946 F. Supp. 2d 324, 339 (S.D.N.Y. 2013) ("Akiro's objections to the Isaacson Report at most diminish the weight of the survey evidence, and a reasonable juror would be well within his or her rights to dismiss those concerns . . . as unpersuasive.").

*iii)*     *Unsolicited Media Coverage*

As with paid advertising, LVL XIII has supplied only minimal evidence of unsolicited media coverage.  Of the 25 pre-March 2014 media placements it has identified, all but four were the result of pitches by its publicist.  *See* Pl. 56.1 ¶ 218.  As such, they were not unsolicited.  *See Gameologist*, 838 F. Supp. 2d at 159 (articles solicited by plaintiff as part of its promotional strategy would not support finding of unsolicited media coverage); *Distillers Prods. Co., LLC v. Refreshment Brands, Inc*., 198 F. Supp. 2d 474, 481 (S.D.N.Y.2002) (evidence of media coverage did not favor plaintiff where such coverage was, in part, in response to efforts of public relations firm hired by plaintiff).

As to the remaining four—(1) an interview of Brown posted on vervesocialmag.com; (2) Jason Derulo's July 19, 2013 performance on *Good Morning America*, during which he wore a pair of LVL XIII sneakers; (3) Obvious Mag's review of LVL XIII's participation at the Project Sole tradeshow; and (4) a feature on the "Chris B. Fashion" Tumblr page—none refer or call attention to the TP, as an indicator of source or otherwise.  *See* Pl. 56.1 ¶¶ 220–21; MacMull

Decl., Ex. 21; *id.*, Ex. 10, at 7; Tr. 78.[62]  Accordingly, they, too, do not prove secondary

meaning.[63]

LVL XIII argues that its sneakers "received additional unsolicited press coverage in the

form of reviews, testimonials, and social media placements."  Pl. SJ Br. 22.  But that argument

is, for many reasons, unavailing.

First, LVL XIII has produced evidence of only 12 social media posts, and none appear to

be from the relevant time period, *i.e.*, before LV's OTR Sneaker came on the market.  *See* Sloane

---

[62] LVL XIII's arguments to the contrary are not persuasive.  As to the Verve Social Magazine piece, LVL XIII contends that it included a "photo of LVL XIII's sneakers prominently featuring the toe plate."  Pl. 56.1 ¶ 220.  But the two photos submitted from that piece do not focus on the TP, as opposed to other features of the sneaker's design.  One photo is shot from above, such that the TP is barely even visible.  *See* MacMull Decl., Ex. 10, at 9.  As to Jason Derulo's performance, at no point during that segment was there any comment on the sneakers or the TP.  Tr. 78.  LVL XIII argues that the fact that Derulo "st[ood] on his head with these shoes in mid air" called attention to the "very prominent metallic plates."  *Id.*; *see* Compl. ¶ 25.  But as the Court noted at argument, Derulo's sneakers were no focus of Derulo's choreography.  *See* Tr. 79 (describing the photo as "a bit of a Where's Waldo.  There's a lot going on in the picture.  The toe plate is sort of hard to find. . . .  If [you were] told to look at the photo and to say the 10 things that strike you about [it], [the TP] would assuredly not be one of them."); *see also Urban Grp.*, 2013 U.S. Dist. LEXIS 33270, at *10–11 (rejecting argument that video on plaintiff's website served to "focus the viewers on [plaintiff's mark] . . . as a source identifier for [plaintiff]" because video "d[id] not mention, emphasize or call attention to the [] alleged trade dress").  In any event, even if the toe plates had been highlighted, nothing in the *Good Morning America* segment identified LVL XIII as the source of the sneakers bearing them.

[63] *See, e.g.*, *Lopez*, 883 F. Supp. 2d at 426–27 (evidence that artist was featured in magazine wearing plaintiff's apparel and that apparel was featured in music video did not support secondary meaning because plaintiff "d[id] not produce any evidence that consumers connected the apparel depicted in the photographs or the video to him or his company"); *Morgans Grp. LLC v. John Doe Co.*, No. 10 Civ. 5225 (KMW) (HBP), 2012 WL 1098276, at *7 (S.D.N.Y. Mar. 31, 2012) (fact that plaintiff's bar was featured in city guides and magazines did not support secondary meaning, where plaintiff had "not offered any evidence to demonstrate that the[] listings [] created the required association in the minds of the consumers who are likely to patronize [the bar]"); *Herman Miller, Inc. v. Palazzetti Imps. & Exps., Inc.*, 998 F. Supp. 757, 762 (E.D. Mich. 1998) (discrediting evidence of unsolicited media coverage where it "reflect[ed] interest more in an unusual product [or individual] than in the source of the product") (quoting *Duraco Prods. v. Joy Plastic Enters.*, 40 F.3d 1431, 1453 (3d Cir. 1994) (internal quotation marks omitted)).

Decl., Ex. 41; *cf. Jewish Sephardic Yellow Pages*, 478 F. Supp. 2d at 374 (unsolicited media coverage that predated mark at issue and focused on plaintiff's other product not probative of secondary meaning); *Sports Traveler II*, 25 F. Supp. 2d at 164 ("[A]ny media reference after June 26, 1996 is irrelevant because that is the date upon which Sports Traveler's trade dress must have attained secondary meaning.").[64]   Second, it is not clear that "likes" and comments on LVL XIII's and Brown's social media pages, which invite people to "follow them," qualify as "unsolicited" coverage.   Finally, the "accolades" on which LVL XIII relies all consist of general praise for LVL XIII's sneakers—none refer to the toe plates affixed to them.   *See, e.g.*, Pl. SJ Br. 22–23 ("Dope", "Amazing!", "NICE REAL NICE . . .", "Classic", "Must have", "I'm in love with this footwear!!!") (quoting Sloane Decl., Ex. 41, at 4–6, 10–12).   While these comments "may establish that [LVL XIII] had satisfied customers, [they] do[] not establish that [its] marks had taken root."   *Lopez*, 883 F. Supp. 2d at 427.

    The record evidence, therefore, falls "far short of the type of media coverage necessary [to support] secondary meaning."   *Gameologist*, 838 F. Supp. 2d at 159.[65]   This factor favors LV.

---

[64] LVL XIII contests this point.  *See* Tr. 83–84.  But its claim that the posts "predate the filing of [this lawsuit]," *id.* at 83, is belied by their content:  All appear to display shoes from LVL XIII's second line of sneakers, which was not launched until September 2015; and one displays a user comment referencing this lawsuit.  *See* Sloane Decl., Ex. 41, at 10 ("he's suing Louie Vuitton . . . I'm an instant fan").  LVL XIII's counsel did not fulfill its undertaking to provide the Court with documentation that would situate any of the posts within the relevant time period.  *See* Tr. 84 ("We will satisfy the Court on that question, if not this evening, very shortly.").

[65] *See also, e.g.*, *Giggle, Inc.*, 856 F. Supp. 2d at 632 (evidence of "a handful of cursory mentions and brief blurbs in . . . national and regional periodicals," "a few industry-specific articles that discuss its business and goods," and more than one million hits on plaintiff's website not probative of secondary meaning); *Denimafia*, 2014 WL 814532, at *12 ("isolated incidents" of unsolicited media coverage in several industry-specific publications insufficient to show secondary meaning); *Strange Music, Inc. v. Strange Music, Inc.*, 326 F. Supp. 2d 481, 490 (S.D.N.Y. 2004) ("dozen or so unsolicited articles that praise[d plaintiffs' product]" not probative of secondary meaning); *Sunenblick v. Harrell*, 895 F. Supp. 616, 627 (S.D.N.Y. 1995) ("Although his products have been played on some radio stations, and have received favorable

iv)    *Sales Success*

LVL XIII's evidence also falls short with respect to sales success.  Of the 1,000 pairs of sneakers LVL XIII manufactured for its first collection, only half sold, generating $141,241 in revenue.  JSF ¶¶ 31–32, 34.  The remainder were returned to LVL XIII to be donated.  *Id.* ¶ 33.  This sales level does not constitute "success" for purposes of establishing secondary meaning.[66]

LVL XIII argues that it should not be penalized for its modest sales figures, because one reason it stopped selling its sneakers was that "some retailers refused to carry [them] . . . because of the consumer confusion that is the subject matter of this lawsuit."  Pl. SJ Br. 23.  But even if that were true, it would not change matters, because LVL XIII must show that the TP acquired secondary meaning *before* LV's OTR Sneaker came on the market.  Only sales achieved before March 2014 bear on this analysis.  This factor, therefore, also favors LV.

---

reviews in certain publications, defendants correctly point out that releases under [plaintiff's] label have been few and far between, thereby leading the court to question whether such exposure . . . could generate any strength in the mark."), *aff'd*, 101 F.3d 684 (2d Cir. 1996).

[66] *See, e.g.*, *Denimafia*, 2014 WL 814532, at *5, *12 (clothing sales of $328,000 between 2004–2006 and $170,000 in 2007 "d[id] not support a finding of acquired distinctiveness"); *W.W.W. Pharm. Co. v. Gillette Co*., 984 F.2d 567, 569, 573 (2d Cir. 1993) (fact that plaintiff's sales "peaked" at $233,267, before dropping due to supplier problems, "evidence[d] . . . a low national recognition of [plaintiff's] product"); *Strange Music*, 326 F. Supp. 2d at 489 ("[S]ale[s] of 1,310 CDs does not amount to 'success' within the confines of the secondary meaning test."); *Sunenblick*, 895 F. Supp. at 620, 627 (sales of fewer than 5,000 records did not constitute sales success for purposes of secondary meaning); *Brandwynne*, 74 F. Supp. 2d at 382 ($100,000 in sales in single year did not establish secondary meaning).

LVL XIII cites *Mortellito v. Nina of California, Inc*., 335 F. Supp. 1288 (S.D.N.Y. 1972), for the proposition that the sales volume achieved by a small business owner need not mirror that of a large national retailer.  Pl. SJ Br. 23.  The court there held that the plaintiff's $184,000 in sales supported secondary meaning, given her "meager means" and the modest scale of her business.  *Mortellito*, 335 F. Supp. at 1290–91, 1295.  Notably, *Mortellito* was decided in 1972—the plaintiff's $184,000 in revenue today would amount to more than $1 million.  LVL XIII's sales ($141,241) are far less.

*v)*        *Attempts to Plagiarize the Mark*

"Evidence that a mark has been widely copied is persuasive evidence of secondary meaning because it demonstrates that the mark has become a 'strong source identifier in the eyes of the purchasing public.'"  *Lopez*, 883 F. Supp. 2d at 428 (quoting *T. Anthony, Ltd. v. Malletier*, No. 93 Civ. 6900 (KC), 1993 WL 659682, at *3 (S.D.N.Y. Nov. 24, 1993)); *accord Centaur I*, 652 F. Supp. at 1109.  The key question is "whether the copying was done deliberately, so as to benefit from [the plaintiff's] name and good will."  *Cartier, Inc. v. Four Star Jewelry Creations, Inc. ("Cartier I")*, 348 F. Supp. 2d 217, 243 (S.D.N.Y. 2004) (internal quotation marks and citations omitted).

Here, LVL XIII concedes that, aside from LV's alleged infringement, it is not aware of any third-party attempts to plagiarize the TP.  Pl. 56.1 ¶ 120.  And it has submitted no direct evidence that LV copied its design.  Rather, it argues that the "timeline of events leading up to the 2014 Runway Show" is "circumstantial evidence" of LV's plagiarism.  Pl. SJ Br. 19, 23–24.  It postulates:

> The pressure . . . brought on by Louis Vuitton's [] recognition that its initial "Converse copy" was a non-starter, coupled with the company's depressed sales as Asia's once red-hot markets cooled, was the backdrop that drove the calculated, cutthroat risk assessment behind [LV's] calculated infringement.  Risking legal trouble with Converse was out.  But Antonio Brown, whoever he was, was not a problem who could not be managed by Louis Vuitton.  Voila!

*Id.* at 7–8.

But LVL XIII has not produced a shred of evidence to support this narrative.  *See Conte v. Newsday, Inc.*, No. 06 Civ. 4859 (JFB), 2013 WL 978711, at *20 (E.D.N.Y. Mar. 13, 2013) ("'[S]peculative assertions' of copying do not create secondary meaning." (quoting *Sports*

*Traveler II*, 25 F. Supp. 2d at 165)).[67]  And it is refuted by the record evidence:  Fabrizio Viti,

the principal designer of the OTR Sneaker, testified without contradiction that, before this

lawsuit, he had never heard of LVL XIII or its sneakers.  Viti Decl. ¶ 13; Viti Dep. I, at 11–12.[68]

"Clearly, [he] could not have copied [LVL XIII's] trade dress."  *Sports Traveler II*, 25 F. Supp.

2d at 166 ("[T]here is nothing in the record to infer that the two people who created the cover for

Sports for Women, Lucy Sisman and Johan Svensson, copied Sports Traveler Magazine's trade

dress. . . .  Sisman had not seen any issue of Sports Traveler Magazine during the course of her

---

[67] LVL XIII instead relies on Colman's unsubstantiated claim of "Louis Vuitton's history of misappropriation with respect to smaller, vulnerable innovators in general and of LVL XIII's Mark in particular in reaction to its creative stagnancy."  Pl. SJ Br. 19.  Colman states that "[l]arge, wealthy fashion companies have, since at least the 1960s, managed to remain culturally relevant in part by appropriating trends, identity markers, and other characteristics of American streetwear."  Colman Rpt. ¶ 28.  On this basis, he imagines that LV "likely misappropriated LVL XIII's metal toe plate mark in an effort to siphon the aura of creativity that LVL XIII had (and has) achieved through genuinely innovative sneaker designs."  *Id.* ¶ 39(b).  Not only does this speculative claim lack any factual basis, it is also outside the proper ambit of expert testimony:  "Determining what motivated a particular person or entity is generally not an appropriate subject matter for expert testimony."  *R.F.M.A.S., Inc. v. So*, 748 F. Supp. 2d 244, 268 (S.D.N.Y. 2010); *see, e.g.*, *Sunny Merch*, 97 F. Supp. 3d at 507 ("[W]hile [plaintiff's expert] may properly explain why [defendant's] actions would be consistent with intentional copying or why such copying would be profitable (if that is indeed the case), he may not testify that [defendant] actually employed such a strategy.").  Colman's testimony on this point would thus be inadmissible even if the Court had not struck his report on other grounds.

[68] LVL XIII also posits that LV's "refusal to permit LVL XIII to depose [Viti's assistant] Mathieu Desmet, whose live testimony could have provided the key to the untold 'story' of the inspiration for his rapid redesign 're-creation,' should be credited to [LVL XIII's] favor at this juncture."  Pl. SJ Br. 32.  That argument is unpersuasive for many reasons.  Among them, LVL XIII did not seek to depose Desmet until after the close of fact discovery, which the Court had already extended on multiple occasions.  *See* MacMull Decl., Ex. 24, at 1, 3.  Given that LV identified Desmet in documents produced well within the discovery period, *see* Pl. Supp. 56.1 ¶ 412, LV was under no obligation to accede to LVL XIII's untimely request.

design work for Sports for Women . . . . Clearly, [she] could not have copied Sports Traveler Magazine's trade dress.").[69]

In any event, even if the Court were to credit LVL XIII's conspiracy theory, it would not support secondary meaning. LVL XIII does not claim that the alleged copying was done "so as to benefit from [LVL XIII's] name and good will." *Cartier I*, 348 F. Supp. 2d at 243. To the contrary, it implies that it was LVL XIII's *anonymity* that made it a less "risky" target to copy. That theory is at odds with the notion that the TP had acquired distinctiveness in the marketplace.[70]

LVL XIII next argues that this factor favors it because LV has not offered a "credible explanation" for the similarity between the parties' toe plates, or "how [the TP] suddenly appeared only months after LVL XIII's." Pl. SJ Br. 24 (quoting *Centaur II*, 830 F.2d at 1224). LVL XIII bases this argument on *Centaur II*, 830 F.2d 1217, where the plaintiff claimed that the defendant's use of the title "ADWEEK's Marketing Week" infringed plaintiff's "Marketing Week" mark. In that case, there was evidence that the defendant had been aware of the plaintiff's publication, that the parties had previously discussed a joint venture, and that the

---

[69] *See also Paco Sport, Ltd. v. Paco Rabanne Parfums*, 86 F. Supp. 2d 305, 324 (S.D.N.Y. 2000) (testimony by defendant's president that he "did not know of [plaintiff] when he chose the mark" undermined plaintiff's claim of intentional copying), *aff'd*, 234 F.3d 1262 (2d Cir. 2000).

[70] *See Gameologist*, 838 F. Supp. 2d at 163 (inference of bad faith weakened where "defendant would derive no benefit from sowing confusion as to the source of the product, such as where the plaintiff has no good will or reputation on which the defendant could hope to capitalize"); *Major League Baseball Props., Inc. v. Opening Day Prods., Inc.*, 385 F. Supp. 2d 256, 268 (S.D.N.Y. 2005) (lack of evidence of "any reputation or goodwill" upon which the defendant "could possibly have hoped to capitalize" weighed against finding of bad faith); *Medici Classics Prods., LLC v. Medici Grp., LLC ("Medici II")*, 683 F. Supp. 2d 304, 313 (S.D.N.Y. 2010) ("[G]iven [plaintiff's] low sales volume and the lack of evidence of secondary meaning, it is patently unreasonable to conclude that defendants sought to usurp that reputation or to otherwise capitalize on it.").

defendant's principal had copies of the plaintiff's publication in his office.  *Id.* at 1224.  Given those facts, the *Centaur II* court held, the "obvious similarity of the titles and the fact that [the defendant] failed to provide a credible explanation for [its] change [of title]" supported an inference of intentional copying.  *Id.*

This case bears no resemblance to *Centaur II*.  First, there is no evidence of a preexisting relationship between LVL XIII and LV or that LV was aware of LVL XIII before this lawsuit.[71]  Second, LV has plausibly explained its independent conception of the OTR Sneaker's toe plate: Viti testified that his initial design was inspired by a photo of James Dean wearing the Jack Purcell sneaker and his knowledge of "metal detailing"; that design was later modified, first to reduce its similarity to the Jack Purcell "smile," and then to make it look less "like a car."  *See* Pl. 56.1 ¶¶ 41, 43, 55, 58–61; Viti. Dep. 26–28.[72]  Third, as discussed below, far from being "obvious[ly] similar[]," *Centaur II*, 830 F.3d at 1224, the parties' trade dress have only one point of commonality—that they are metal toe plates, a design feature not at all uncommon in the designer shoe market.

On this record, there is zero basis to infer intentional copying.  *See, e.g.*, *Kaufman & Fisher Wish Co.*, 184 F. Supp. 2d at 320 (declining to infer bad faith absent evidence defendants

---

[71] As noted, Viti testified that he was unaware of LVL XIII until this litigation.  LV's trademark counsel similarly testified.  *See* Sloane Decl., Ex. 56, at 94–95 (no knowledge of LVL XIII or Brown before LV was served with the complaint).

[72] Contrary to LVL XIII's argument, Viti's credibility is not undermined by his testimony that: (1) he "made the metal plaque more of a rectangular design"; and (2) "[t]he final shape of the metal plate of the OTR Sneaker is not a rectangle."  Pl. SJ Br. 24 (citing Viti Decl. ¶ 9; Viti Dep. I, at 23).  Those statements are not contradictory.  Nor has LV failed to supply "any evidence . . . to document a timeline of independent conception and development" of the OTR Sneaker.  *See id.* at 19.  LV produced multiple records documenting the design progression, corroborating Viti's account.  *See* Pl. 56.1 ¶¶ 40–42, 47–54, 58–63.

knew of plaintiff's doll, as there was "insufficient similarity between the appearances of the two dolls to give rise to any inference of copying of the actual design"). This factor, too, favors LV.

### vi)      Length and Exclusivity of Use

With respect to the length of use, viewed generously, LVL XIII began "using" the TP in July 2013, when it first took orders from retailers at the Project Sole trade show. *See* Def. Supp. 56.1 ¶ 295.[73] Thus, the TP was in use for at most eight months before LV's OTR Sneaker came on the market in March 2014. That duration is far too brief to support secondary meaning.[74]

Critically, too, LVL XIII has not shown that its use of a metal toe plate was at *any* point exclusive. *See Time, Inc. v. Petersen Publ'g Co.*, 173 F.3d 113, 118 (2d Cir. 1999) (directing courts to look at "[t]he use of part or all of the mark by third parties" since third-party use

---

[73] November 2013, when LVL XIII's sneakers first became available at retail, is arguably a more appropriate measure of "first use" for purposes of gauging secondary meaning. *See* Def. Supp. 56.1 ¶ 293.

[74] *See, e.g.*, *Braun v. Dynamics Corp. of Am.*, 975 F.2d 815, 822, 826 (Fed. Cir. 1992) ("While not impossible, it is difficult for a product to acquire secondary meaning during an 18-month period."); *Cicena Ltd. v. Columbia Telecomm. Grp.*, 900 F.2d 1546, 1552 (Fed. Cir. 1990) (18-month use period "point[ed] strongly away from a finding of secondary meaning"); *Medici II*, 683 F. Supp. 2d at 310 (four-year use of mark insufficient to support secondary meaning); *Jack Schwartz Shoes*, 2002 U.S. Dist. LEXIS 25699, at *63 ("length" factor "militate[d] strongly against . . . [finding] secondary meaning" where plaintiff's product was on the market for only 10 months before defendant's product was introduced); *Sports Traveler II*, 25 F. Supp. 2d at 166 (nine months "too limited in duration and quantity to find that secondary meaning had attached to [plaintiff's] trade dress"); *Landscape Forms, Inc. v. Columbia Cascade Co.*, 117 F. Supp. 2d 360, 366–67 (S.D.N.Y. 2000) (five-year design use insufficient to establish secondary meaning). To be sure, "no absolute time span can be posited as a yardstick in cases involving secondary meaning," *Centaur II*, 830 F.2d at 1225, and in rare circumstances, where the other factors strongly weighed in plaintiff's favor, courts have found secondary meaning to have accrued within a shorter time period. *See, e.g.*, *L.A. Gear, Inc. v. Thom McAn Shoe Co.*, 988 F.2d 1117, 1130 (Fed. Cir. 1993) (five-month period not too short for acquisition of secondary meaning where plaintiff's "advertising and promotion were extensive, and public demand for [its] design was shown, by sales figures, to have been rapidly achieved"). But deviation from the usual standard is not warranted here, where LVL XIII's advertising expenditures, media coverage, and sales figures were all minimal. There is no basis on which a factfinder could find that the TP acquired secondary meaning in such a short time span.

"weakens its overall strength").  Quite the contrary, the record is replete with examples of toe

plates and other metal shoe ornaments used by LV and other luxury brands as early as 2010.[75]

------

[75] As to LV, Viti attested that, since 2010, he has "used metal accents, as an ornamental design feature, at the toe and/or the heel of both men's and women's shoes."  Viti Decl. ¶ 3.  He identified 13 examples of LV footwear bearing such adornments, *see id.* ¶¶ 3(a)–(n), three of which were men's shoes or boots featuring a metal toe plate, *see id.* ¶ 3(a) (LV men's Derby Shoe, 2011 collection); *id.* ¶ 3(b) (LV men's Samouri Ankle Boot, Fall/Winter 2012 collection); *id.* ¶ 3(d) (LV's men's Reflection Shoe, 2013 pre-collection).  Viti further attested that, since at least 2011, he "ha[s] been familiar with [similar] ornamental use by a number of other brands."  *Id.* ¶ 3.  LV has supplied evidence—in the form of website screenshots—of well over 20 examples of such third-party uses by designers including Fendi, Christian Louboutin, Balenciaga, New Rock, Giuseppe Zanotti, and Adidas.  *See generally* Harmon Decl., Exs. A–K.

LVL XIII objects to this evidence as "irrelevant" and "unsubstantiated."  Pl. SJ Br. 25–26.  The Court, for the most part, rejects that critique.

LVL XIII first argues that, because it claims rights only in a toe plate affixed to men's sneakers, LV's evidence of third-party use is irrelevant to the extent it involves other footwear.  *Id.* at 26 (citing *W.E. Bassett Co. v. Revlon, Inc.*, 435 F.2d 656, 661 (2d Cir. 1970) (third-party use did not weigh against secondary meaning where "the third-party products cited by [defendant] range[d] from very different to slightly different products from [plaintiff's], [and] most of the third-party products ha[d] names slightly different from [plaintiff's], or else the third-parties did not promote their [marks] with as much effort and money as [plaintiff] did"); *New Colt Holding Corp. v. RJG Holdings of Fla., Inc.*, 312 F. Supp. 2d 195, 229 (D. Conn. 2004) (rejecting evidence of third-party uses not relevant to market claimed by plaintiff)).  But that argument is not persuasive here, given Brown's testimony that (1) "luxury athletic footwear" is a "niche market" which bridges the gap between athletic shoes and dress shoes, *see* Brown Dep. I, at 47–48; and (2) LVL XIII's initial sneaker line included "sneaker boots," *i.e.*, "hybrid[s] between [] boot[s] and [] sneaker[s]," *id.* at 146.  *See Nabisco v. Warner-Lambert Co. ("Nabisco I")*, 32 F. Supp. 2d 690, 698 (S.D.N.Y. 1999) ("confections" as opposed to "mints" was "relevant product category" for gauging third-party use because "the consumer has the freedom to choose among mints, gums, or candies to achieve breath freshening and cool taste").  A reasonable juror would have to conclude that at least some of the many third-party uses cited by LV diluted LVL XIII's claim to exclusive use, thereby hindering its accrual of secondary meaning.

LVL XIII next argues that LV's screenshots are improperly authenticated and do not establish that "the third-party marks . . . were promoted in commerce" or "recognized by consumers in any way."  Pl. SJ Br. 26.  It relies on cases discounting evidence of third-party trademark registrations, on the ground that such registrations do not alone establish the actual use of the registered marks in commerce.  *See, e.g.*, *Scarves By Vera*, 544 F.2d at 1173–74; *Bear U.S.A., Inc. v. Kim*, 71 F. Supp. 2d 237, 255 (S.D.N.Y. 1999), *aff'd*, 216 F.3d 1071 (2d Cir. 2000).  But those cases are inapposite.  LV's evidence is not of third-party registrations; it consists instead of screenshots of websites and articles which reflect the actual use of metal shoe ornaments in

This pervasive third-party use undermines LVL XIII's claim that *its* relatively fleeting use gave rise to secondary meaning.[76]  This factor, therefore, weighs in LV's favor.

* * *

In sum, not one relevant factor supports a finding of secondary meaning.  Rather, each decisively favors LV.  Given LVL XIII's minimal advertising expenditures and sales success, the dearth of unsolicited media coverage calling attention to the TP, the absence of attempted plagiarism, and the ubiquity of metal shoe accents in the marketplace, no reasonable juror could

---

commerce.  *See Bear U.S.A.*, 71 F. Supp. 2d at 255 ("[E]vidence of third party registrations, *in contrast to evidence of third party usage in the marketplace*, is not persuasive evidence that a mark is weak.") (emphasis added); *Giggle*, 856 F. Supp. 2d at 632–33 ("[w]hen reliable," screenshots of advertisements and websites of third-party use can be "very persuasive in proving lack of secondary meaning"); *Icon Enters. Int'l, Inc. v. Am. Products Co.*, No. 4 Civ. 1240 (SVW), 2004 WL 5644805, at *33 (C.D. Cal. Oct. 7, 2004) ("[A] website is arguably more probative of actual use than either a trademark search or telephone listing."); *see also New Colt Holding Corp.*, 312 F. Supp. 2d at 209 ("[R]equiring Defendants to demonstrate that competing users are recognized by customers misplaces the burden of proof and places the proverbial cart before the horse.").

Nor is LV's authentication of these documents fatally deficient.  Almost every screenshot was authenticated by the person who produced it and who attested that it is a "true and correct copy of a screen print of an article" retrieved from a particular website on a particular date.  *See* Harmon Decl.  Most bear time stamps showing the publication date.  Although an attestation from a person responsible for each website publication as to its timing would have been more reliable, LV's proof is sufficiently reliable to be received, at least to show that, in the aggregate, numerous third parties used and publicly promoted metal toe plates before LVL XIII.  *Cf. Sunny Merch*, 97 F. Supp. 3d at 503 (rejecting objection to third-party advertisements, internet search results, and various articles and reports); *Giggle*, 856 F. Supp. 2d at 632–33 (screenshots of websites and advertisements depicting third-party use of "GIGGLE" mark not hearsay).

In any event, even if the Court disregarded all evidence of third-party use, the evidence of LV's earlier use of metal accents would preclude a finding of exclusivity.

[76] *See e.g.*, *Giggle*, 856 F. Supp. 2d at 633 ("With such an abundance of third-party use of the GIGGLE mark, especially those usages occurring even before Plaintiff entered the market in 2003, any secondary meaning in Plaintiff's GIGGLE family of marks has been greatly diminished."); *Lopez*, 883 F. Supp. 2d at 429 (evidence that numerous companies used plaintiff's mark, and that none did so to capitalize off of his reputation, undermined his claim of secondary meaning); *Denimafia*, 2014 WL 814532, at *12 (same).

find that, by March 2014, consumers had come to perceive the TP as an indicator of source. LV's survey evidence to that effect—and LVL XIII's failure to produce survey evidence to the contrary—only bolsters that conclusion.

Because LVL XIII has not shown that the TP acquired secondary meaning, it cannot succeed on its Lanham Act claims.  LV is thus entitled to summary judgment on those claims.[77]

### d.      Likelihood of Confusion[78]

Even if LVL XIII had established that the TP acquired secondary meaning, its Lanham Act claims would still fail because it has not shown a likelihood of confusion.  *See Two Pesos*, 505 U.S. at 769 ("[L]iability under § 43(a) [also] requires proof of the likelihood of confusion."); *Giggle*, 856 F. Supp. 2d at 630 ("Even if a mark is valid and protectable, a plaintiff must still prove a likelihood of confusion to succeed on its claims."); *Lopez*, 883 F. Supp. 2d at 419.

To establish this element, a plaintiff must show that "numerous ordinary prudent purchasers are likely to be misled or confused as to the source of the product in question because of the entrance in the marketplace of the defendant's mark," *Gruner + Jahr Printing & Publ'g Co. v. Meredith Corp.*, 991 F.2d 1072, 1077 (2d Cir. 1993), "or that there may be confusion as to [the] plaintiff's sponsorship or endorsement of the [defendant's] mark," *Hormel Foods Corp. v. Jim Henson Prods., Inc.*, 73 F.3d 497, 502 (2d Cir. 1996); *see also Star Indus., Inc. v. Bacardi & Co.*, 412 F.3d 373, 384 (2d Cir. 2005) ("The public's belief that the mark's owner sponsored or otherwise approved the use of the trademark satisfies the confusion requirement." (quoting

---

[77] It follows that LVL XIII's motion for summary judgment on those claims must be denied.

[78] Although the Court's holding that the TP did not acquire secondary meaning obviates the need to determine whether there was a likelihood of confusion, *see Thompson Med. Co.*, 753 F.2d at 216; *Cross Commerce*, 2014 WL 11343849, at *6, the Court considers this issue here in the interest of completeness and because it bears on LVL XIII's state-law claims.

*Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*, 604 F.2d 200, 204–05 (2d Cir.

1979)).  "Affiliation confusion exists where use of a 'unique and recognizable identifier' could

lead consumers to 'infer a relationship' between the trademark owner and the new product."  *De*

*Beers LV Trademark Ltd. v. DeBeers Diamond Syndicate, Inc.*, 440 F. Supp. 2d 249, 274

(S.D.N.Y. 2006) (quoting *Star Indus.*, 412 F.3d at 384).

 "[T]he relevant confusion is that which affects the purchasing and selling of the goods or

services in question."  *W.W.W. Pharm.*, 984 F.2d at 574 (internal quotation marks and citations

omitted).  However, a plaintiff need not show "actual or potential confusion *at the time of*

*purchase*."  *Lois Sportswear*, 799 F.2d at 872 (quoting *Grotrian, Helfferich, Schulz, Th. Steinweg*

*Nachf. v. Steinway & Sons*, 523 F.2d 1331, 1342 (2d Cir. 1975)) (emphasis in *Grotrian*).  Rather,

"initial-interest confusion" and "post-sale confusion" are equally actionable.  *Id.* at 872–73.[79]

Regardless, the plaintiff must demonstrate "a probability of confusion, not a mere possibility."

*Star Indus.*, 412 F.3d at 383 (quoting *Gruner + Jahr*, 991 F.2d at 1077) (internal quotation marks

omitted).

 Here, LVL XIII's claims are based primarily on a theory of reverse confusion.  *See* Tr.

84.[80]  Whereas "forward confusion" involves the misimpression that the senior user is the source

---

[79] Initial-interest confusion occurs when a potential customer is initially attracted to the junior
user's product by virtue of its use of a mark that is confusingly similar to the senior user's mark.
*See Grotrian*, 523 F.2d at 1342.  Post-sale confusion occurs when "an observer, other than a
direct purchaser, [] sees a product bearing a mark or trade dress that is confusingly similar to [the
senior user's mark], [and] assume[s] that the product she is viewing is the [senior user's]
product, or that there is some sort of association between the manufacturers of the two products.
This might result in a transfer of goodwill, and effect [sic] the consumer's buying decision."
*Jack Schwartz Shoes*, 2002 U.S. Dist. LEXIS 25699, at *72–73 (citing *Lois Sportswear*, 799
F.2d at 872–73, 875–76).

[80] Although LVL XIII cursorily alludes to forward confusion in its brief, *see* Pl. SJ Br. 30, at
argument, its counsel clarified that "the most prominent species of confusion here is reverse

or sponsor of the junior user's products, "reverse confusion" exists where a junior user "selects a trademark that is likely to cause consumers to believe, erroneously, that the goods marketed by the [senior] user are produced by the [junior] user." *Lang v. Ret. Living Pub. Co.*, 949 F.2d 576, 583 (2d Cir. 1991); *accord Banff, Ltd. v. Federated Dep't Stores, Inc.*, 841 F.2d 486, 490 (2d Cir. 1988). "The reverse confusion theory protects the mark of a prior user from being overwhelmed by a subsequent user, typically where the subsequent user is larger and better known and consumers might conclude that the senior user is the infringer." *Mejia & Assocs. Inc. v. IBM*, 920 F. Supp. 540, 546 (S.D.N.Y. 1996). LVL XIII claims that, due to the similarities between the TP and the toe plate on the OTR Sneaker, consumers were likely misled to believe either that LVL XIII had collaborated with LV on the OTR Sneaker, or that it had infringed LV's design. *See* Tr. 84. LVL XIII implies that such confusion was particularly likely in the initial-interest and post-sale settings, *i.e.*, when consumers saw the OTR Sneaker from a distance, in a photograph, or on the feet of a passerby. *See* Pl. SJ Br. 28.

In assessing the likelihood of confusion, courts in this Circuit consider the "*Polaroid* factors" articulated by Judge Friendly in *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492 (2d Cir. 1961). *Star Indus.*, 412 F.3d at 384; *see also W.W.W. Pharm.*, 984 F.2d at 572 (applying *Polaroid* test to reverse confusion claim). Those are: (1) the strength of the plaintiff's mark; (2) the degree of similarity between the plaintiff's and defendant's marks; (3) the competitive proximity of the products sold under the marks; (4) the likelihood that the plaintiff will bridge the gap; (5) actual confusion; (6) the defendant's good faith, or lack thereof, in adopting its mark;

---

confusion. What [Brown] experienced was people seeing the shoe, believing that he had either copied the On the Road [S]neaker or that he was collaborating with Louis Vuitton." Tr. 84.

(7) the quality of the defendant's product; and (8) the sophistication of the plaintiff's customers. *Time, Inc.*, 173 F.3d at 117; *see also Polaroid*, 287 F.2d at 495.

In applying the *Polaroid* test, "[t]he proper approach is to weigh each factor in the context of the others to determine if, on balance, a likelihood of confusion exists." *W.W.W. Pharm.*, 984 F.2d at 572. The court "generally should not treat any single factor as dispositive; nor should [it] treat the inquiry as a mechanical process by which the party with the greatest number of factors wins." *Playtex Prods., Inc. v. Georgia-Pacific Corp.*, 390 F.3d 158, 162 (2d Cir. 2004).[81] "Instead, the court should focus on the ultimate question of whether consumers are likely to be confused." *Id.* (internal quotation marks and citation omitted).

The Second Circuit has held that "summary judgment in a trademark action may be appropriate . . . where the undisputed evidence would lead only to one conclusion as to whether confusion is likely." *Cadbury Beverages, Inc. v. Cott Corp.*, 73 F.3d 474, 478 (2d Cir. 1996); *see, e.g.*, *Universal City Studios, Inc. v. Nintendo Co., Ltd.*, 746 F.2d 112, 115 (2d Cir. 1984) (affirming grant of summary judgment for defendant where plaintiff "failed to raise a question of fact on the issue of the likelihood of consumer confusion"). "If a factual inference must be drawn to arrive at a particular finding on a *Polaroid* factor, and if a reasonable trier of fact could reach a different conclusion, the district court may not properly resolve that issue on summary judgment." *Patsy's Brand, Inc. v. I.O.B. Realty, Inc.*, 317 F.3d 209, 215 (2d Cir. 2003) (internal

---

[81] The Second Circuit has recognized a caveat to this general rule: "[I]n an appropriate case, the 'similarity of the marks' factor can be dispositive and will warrant summary judgment for an infringement defendant if the court is satisfied that the . . . marks are so dissimilar that no question of fact is presented." *Nabisco, Inc. v. Warner-Lambert Co. ("Nabisco II")*, 220 F.3d 43, 46 (2d Cir. 2000) (internal quotation marks and citations omitted) (collecting cases); *Resource Developers, Inc. v. Statue of Liberty–Ellis Island Foundation, Inc.*, 926 F.2d 134, 141– 42 (2d Cir. 1991) (affirming summary judgment where marks were "so materially different that no question of fact was presented on the issue of likelihood of their confusion").

quotation marks and citation omitted).  However, "[t]he fact that on summary judgment the evidence must be construed in a light favorable to the non-moving party does not modify the standard itself, which requires a showing of a probability, or likelihood, of confusion." *Nora Beverages, Inc. v. Perrier Grp. of Am., Inc*., 269 F.3d 114, 121 (2d Cir. 2001).  The Second Circuit has emphasized that "courts retain an important authority to monitor the outer limits of substantial similarity within which a jury is permitted to make the factual determination whether there is a likelihood of confusion as to source." *Universal City Studios*, 746 F.2d at 116 (internal quotation marks and citations omitted) (collecting cases).  Accordingly, "summary judgment is appropriate if the court is satisfied that the products or marks are so dissimilar that no question of fact is presented." *Id.*

With these principles in mind, the Court considers each *Polaroid* factor.

### i)    Strength of LVL XIII's Mark

The first *Polaroid* factor "focuses on 'the distinctiveness of the mark, or more precisely, its tendency to identify the goods' as coming from a particular source." *Lang*, 949 F.2d at 581 (quoting *McGregor–Doniger Inc.*, 599 F.2d at 1131).  Assessing this factor, courts consider both the inherent distinctiveness of a mark and the distinctiveness it has acquired in the marketplace, *i.e.*, secondary meaning.  *Streetwise Maps, Inc. v. VanDam, Inc.*, 159 F.3d 739, 743 (2d Cir. 1998).  The "inventiveness" of the mark and the extent of third-party use are particularly relevant to this inquiry.  *See Star Indus.*, 412 F.3d at 385.[82]

---

[82] *See also, e.g.*, *W.W.W. Pharm.*, 984 F.2d at 573 (extensive third-party use of mark "weighs against a finding that [plaintiff's trademark] is strong"); *Lang*, 949 F.2d at 581 (same); *Giggle*, 856 F. Supp. 2d at 633 ("With such an abundance of third-party use of the GIGGLE mark, especially those usages occurring even before Plaintiff entered the market in 2003, any secondary meaning in Plaintiff's GIGGLE family of marks has been greatly diminished, making Plaintiff's family of marks much weaker.").

A mark's "strength" is "crucial to the likelihood of confusion analysis" because a plaintiff's well-known association with the claimed mark "makes it much more likely that consumers will assume wrongly that [the plaintiff] is somehow associated with [the defendant's product] or has authorized the use of its mark." *Lois Sportswear*, 799 F.2d at 873; *see also H. Lubovsky, Inc. v. Esprit De Corp.*, 627 F. Supp. 483, 486–87 (S.D.N.Y. 1986) ("The strength of a mark is directly related to likelihood of confusion, for the stronger the mark, the more likely that the consumer will associate it with the familiar purveyor."). By contrast, where the plaintiff's mark is not associated with any particular source, defendant's use of a similar mark is unlikely to generate confusion. *See Thompson Med. Co.*, 753 F.2d at 215–16 ("If a mark has secondary meaning, a purchaser will associate it with a certain producer, and will be likely to make that same association when an identical mark (or a confusingly similar mark), is used on another producer's product. In the absence of secondary meaning, however, there will be no such association in the minds of the purchasing public.").

Here, the TP, being product design, cannot be inherently distinctive. *Wal-Mart*, 529 U.S. at 216. And, for the reasons set forth above, a reasonable jury could not find that it acquired secondary meaning. There is also substantial evidence of third-party use of metal shoe ornaments and toe plates predating LVL XIII's first sneaker collection. This factor, therefore, strongly militates against a finding of a likelihood of confusion.[83]

---

[83] Some courts have held that "where a plaintiff alleges reverse confusion, 'it is appropriate to consider the strength of the junior user's mark, because the essence of such a claim is that the junior user overpowers the senior user's mark.'" *Denimafia*, 2014 WL 814532, at *13 (quoting *Gameologist*, 838 F. Supp. 2d at 160 n.8) (collecting cases); *but see W.W.W. Pharm.*, 984 F.2d at 572–73 (examining strength only of senior user's mark in reverse confusion case); *ImOn, Inc. v. ImaginOn, Inc.*, 90 F. Supp. 2d 345, 351 (S.D.N.Y. 2000) (same); *Trustees of Columbia Univ. v. Columbia/HCA Healthcare Corp.*, 964 F. Supp. 733, 744–45 (S.D.N.Y. 1997) (same). Here, there is no evidence that the OTR Sneaker's toe plate is any stronger a mark than the TP. Like the TP, it is a product design feature, which cannot be inherently distinctive. And there is no

ii)      *Similarity of the Marks*

"In assessing similarity, courts look to the overall impression created by the [marks] and the context in which they are found and consider the totality of factors that could cause confusion among prospective purchasers." *Gruner + Jahr*, 991 F.2d at 1078.  This inquiry goes beyond a mere side-by-side comparison; that two marks appear similar is not dispositive. *See Hormel Foods*, 73 F.3d at 503–04.  The Second Circuit has instructed courts to compare the marks "in their entirety, because 'juxtaposing fragments of each mark [or dress] does not demonstrate whether the marks as a whole are confusingly similar.'" *Paco Sport*, 86 F. Supp. 2d at 315 (quoting *Universal City Studios*, 746 F.2d at 117).

Here, both parties' trade dress consists of a metal toe plate affixed to the outsole of a men's sneaker.  But that alone does not make them "confusingly similar." *Polaroid* requires the Court to consider the similarity of the marks *in context*. *See Gruner + Jahr*, 991 F.2d at 1078. Here, that includes a high-end shoe market permeated by metal shoe ornaments.  Given the pervasiveness of such design features, the mere fact that two brands use metal toe plates does not imply an association.  Rather, the toe plates would have to be sufficiently similar for consumers to assume that they originated from the same source or sponsor.

That is clearly not the case here.  There are virtually no points of commonality between the parties' toe plates.[84]  And their differences are manifest:  LVL XIII's is rectangular, with

_____

indication that it acquired secondary meaning during the six-month period it was on the market. Indeed, Viti attested that he "designed the metal plate of the OTR Sneaker to be a decorative or ornamental feature, not an indication that the shoe came from Louis Vuitton."  Viti Decl. ¶ 10. Therefore, even if the Court were to consider the strength of LV's mark, this factor would still weigh against a likelihood of confusion.

[84] LVL XIII has failed to identify a single similarity between the parties' marks aside from their identity as metal toe plates. *See* Pl. SJ Br. 28–29 (arguing that parties' marks are similar because they are both metal plates "on the toe of the outsole of their respective men's sneakers").

sharp 90-degree edges; LV's is a trapezoid, with soft rounded edges.[85]  LVL XIII's is adorned

with a "LVL XIII" inscription and two screws;[86] LV's is bare, with no literal element or

adornment.  LVL XIII's is of a golden or copper hue; LV's is best characterized as grey or

silver.[87]

Despite these differences, LVL XII argues that "the marks are virtually identical"

because their distinguishing features are unlikely to be perceived "at a distance or from a height

[] of five feet or more."  Pl. SJ Br. 28.  Having observed the sneakers, the Court rejects that

assessment.  *See Malletier v. Dooney & Bourke, Inc.*, 561 F. Supp. 2d 368, 384–85 (S.D.N.Y.

2008) (marks were sufficiently different to distinguish the parties' products—"even when

viewed in public from a distance, in a store window, from across a room, from a passing car, []

while walking in the street, in an advertisement, or hanging off of a woman's shoulder"—where

---

[85] Seizing on Viti's testimony that the OTR Sneaker's toe plate is "more of a rectangular design" than his initial rendition of the Jack Purcell "smile," LVL XIII asserts that the toe plate is, in fact, a rectangle.  *See* Pl. SJ Br. 29 n.11.  But LV's toe plate's dimensions speak for themselves.  Its top edge is undeniably shorter than its bottom edge.

[86] Although LVL XIII has disclaimed the "LVL XIII" inscription and screws as parts of its mark, it acknowledges that these elements were present on every toe plate in its first sneaker collection.

[87] LV argues that the distinct labeling and packaging of the parties' sneakers makes them further distinguishable.  *See* Def. SJ Reply Br. 21 & n.11.  It is true that the logos on the OTR Sneaker ("LOUIS VUITTON" is imprinted on the heel plate, tongue, shoelace rivets, and insole; and the Initials Logo is imprinted on the rubber sole) "'would tend to lead the average consumer to believe' that LV's shoes are not LVL XIII's."  *Id.* (quoting *Lopez*, 883 F. Supp. 2d at 420–21; *see also O'Keefe v. Ogilvy & Mather Worldwide, Inc*., 590 F. Supp. 2d 500, 522 (S.D.N.Y. 2008) ("The Second Circuit has 'repeatedly found that the presence of a distinct brand name . . . weigh[s] against a finding of confusing similarity.'" (quoting *Playtex Prods.*, 390 F.3d at 164)).  But to the extent that LVL XIII claims confusion as to *association*, as opposed to *source*, labeling is less relevant—a consumer could appreciate that the OTR Sneaker was marketed by LV, but still believe it was the product of a collaboration with LVL XIII.  *See Lois Sportswear*, 799 F.2d at 873–74 ("Appellants' labeling in no way dispels the likelihood that consumers will conclude that appellants' jeans are somehow connected to appellee by virtue of the nearly identical stitching patterns.").  By contrast, the dissimilarities noted in text, above, are likely to dispel both types of confusion.

plaintiff's mark consisted of "a combination of letters *and* shapes," whereas defendant's was "solely comprised of the 'DB' monogram, without any other shapes whatsoever"). And that critique, even if true as to the screws and "LVL XIII" engraving, would not apply to the marked differences in shape and color among the competing toe plates. *Those* differences are palpable even from eye-level or at a distance. They are sufficiently acute to preclude a likelihood of confusion.

In sum, because the parties' toe plates do not generate the same "overall impression," they are unlikely to confuse consumers. *Gruner + Jahr*, 991 F.2d at 1078. This factor, therefore, also strongly favors LV.

### iii) *Competitive Proximity of the Products*

The "competitive proximity" factor concerns whether and to what extent products bearing the two parties' marks compete with each other. *Cadbury Beverages*, 73 F.3d at 480. Courts assessing this factor consider "whether the products serve the same purpose and whether they share similar geographic distribution, market position and audience appeal." *La Cibeles, Inc. v. Adipar, Ltd.*, No. 99 Civ. 4129 (AGS), 2000 WL 1253240, at *7 (S.D.N.Y. Sept. 1, 2000) (internal quotation marks and citation omitted); *see also Jordache Enterprises, Inc. v. Levi Strauss & Co.*, 841 F. Supp. 506, 517 (S.D.N.Y. 1993) ("Factors to consider in determining the competitive proximity of the products include appearance, style, function, fashion appeal, advertising orientation and price.") (citing *McGregor–Doniger*, 599 F.2d at 1134). If the products "serve the same purpose, fall within the same general class or are used together, the use of similar designations is more likely to cause confusion." *Lang*, 949 F.2d at 582.

Here, LV rightly concedes that the "content" and "audience appeal" considerations favor LVL XIII. Def. SJ Br. 32. The parties' respective toe plates are featured on virtually identical

products: luxury men's sneakers with a price exceeding $490.  *See Jack Schwartz Shoes*, 2002

U.S. Dist. LEXIS 25699, at *78 ("There is no dispute that the products in issue are both men's

shoes, and are therefore closely related.").  And it is undisputed that LVL XIII targeted LV's

customers.[88]  *See Akiro*, 946 F. Supp. 2d at 336 (proximity factor weighed in plaintiff's favor

where both parties sold goods in the natural and curly hair care product market and defendant

"repeatedly described [plaintiff's brand] as a competitor").

　　LV nevertheless argues that this factor is neutral because the "geographic distribution"

and "market position" considerations favor it.  Def. SJ Br. 32.  LV notes that "consumers

[would] never encounter LVL XIII and LV shoes together at [the] point of purchase" because the

OTR Sneaker was sold only through LV-operated stores and LV's website, whereas LVL XIII

sneakers could be purchased only in small regional stores in five states and Washington D.C. and

through the Carbon Bazaar website.  *Id.*

　　Were LVL XIII claiming point-of-sale confusion, LV's argument may have had some

purchase.  But it is misplaced here, where LVL XIII's allegations predominantly involve initial-

interest and post-sale confusion, *i.e.*, when customers see the OTR Sneaker in a photograph or on

the feet of a passerby.  In this context, it is less relevant that the parties' products are not sold in

---

[88] LVL XIII's business plan states that its target customer "will consist of a consumer from the age group of 17–35 with the income ability to afford the likes of a Gucci or Louis Vuitton item." JSF ¶ 14.  Brown testified that when he created the business plan, he identified LV among his "inspiration[s]" and "competitors."  Brown Dep. V, at 83.

the same locations.[89]  And courts have construed this factor to favor the plaintiff where identical

products are sold in similar, albeit not coextensive, channels—for instance, on the Internet.[90]

Accordingly, the Court finds that any discrepancies in geographic distribution and market

position are not so substantial as to outweigh the similarities between the parties' products in

terms of content, price, and target clientele.  This factor, therefore, favors LVL XIII.

### iv)    Bridging the Gap

"'Bridging the gap' refers to the likelihood that the senior user will enter the junior user's

market in the future, or that consumers will perceive the senior user as likely to do so."  *Star*

*Indus.*, 412 F.3d at 387.  This factor "protects the plaintiff's interest in being able to enter a

related field at some future time."  *Cartier II*, 294 F. App'x at 619.  Where, as here, the parties'

products are already in competitive proximity, there is "no gap to bridge, and this factor is

irrelevant to the *Polaroid* analysis."  *Star Indus.*, 412 F.3d at 387 (citing *Patsy's*, 317 F.3d at

---

[89] Similarly, were LVL XIII primarily claiming confusion as to source, the exclusive distribution of the OTR Sneaker through LV-run channels would have reduced the likelihood of confusion. Consumers observing LVL XIII sneakers sold in an outside forum would have been less likely to mistakenly attribute them to LV.  But such is not the case here, where LVL XIII primarily claims confusion as to association or sponsorship. Those types of confusion may exist regardless of the parties' separate distribution channels.

[90] *See, e.g.*, *Bath & Body Works Brand Mgmt., Inc. v. Summit Entm't, LLC*, 7 F. Supp. 3d 385, 395–96 (S.D.N.Y. 2014) (rejecting claim that parties did not compete in same market because plaintiff's products were sold "exclusively in [its] stores and on its website," where "both parties' respective products were sold in retail stores in malls and over the internet" and the parties shared a target demographic); *BeautyBank, Inc. v. Harvey Prince, LLP*, No. 10 Civ. 00955 (AJN), 2013 WL 11327097, at *15 (S.D.N.Y. Mar. 29, 2013) (parties' products were "largely in competitive proximity" where both "s[old] to customers through internet retailing"); *see also Cartier, Inc. v. Sardell Jewelry, Inc. ("Cartier II")*, 294 F. App'x 615, 619 (2d Cir. 2008) (summary order) (products' ability to be sold in same venue not necessary for a finding of competitive proximity); *Patsy's*, 317 F.3d at 218 (defendants' restriction of sales to its restaurant and franchises "did not tip this factor in [d]efendants' favor" because the products "appeal[ed] to the same consumers, and sale locations [were] geographically close"); *but see Strange Music*, 326 F. Supp. 2d at 491 (no competitive proximity where plaintiffs' CDs were sold primarily through its website, whereas defendants' CDs were sold in traditional music stores and outlets).

218) (treating this factor as neutral where both parties used marks on liquor bottle labels); *accord Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 115 (2d Cir. 2009) (same, where both parties used marks in connection with sale of coffee products); *Sunny Merch*, 97 F. Supp. 3d at 496 (same, where both parties' marks appeared on sunglasses).

*v)     Actual Confusion*

Although "actual confusion need not be shown to prevail under the Lanham Act," *Lois Sportswear*, 799 F.2d at 875, "[t]here can be no more positive or substantial proof of the likelihood of confusion." *Dooney & Bourke*, 561 F. Supp. 2d at 385 (quoting *Savin Corp. v. Savin Grp*., 391 F.3d 439, 459 (2d Cir. 2004)).  Accordingly, "courts have concluded that the absence of such evidence may favor the junior user." *Paco Sport*, 86 F. Supp. 2d at 319 (collecting cases); *accord McGregor-Doniger*, 599 F.2d at 1136 ("[I]t is certainly proper for the trial judge to infer from the absence of actual confusion that there was also no likelihood of confusion." (internal quotation marks and citation omitted)).

"Evidence of actual confusion may consist of anecdotal or survey evidence." *Paco Sport*, 86 F. Supp. 2d at 319.  To be relevant under the Lanham Act, the confusion must be of a type that "could inflict commercial injury [on the plaintiff] in the form of either a diversion of sales, damage to goodwill, or loss of control over reputation." *Lang*, 949 F.3d at 583; *see also Trustees*, 964 F. Supp. at 747 ("[T]here is a difference between isolated expressions of momentary confusion and confusion that leads to actual purchasing decisions.").

Here, LVL XIII has not presented survey evidence as to consumer confusion.  *See Orb Factory, Ltd. v. Design Sci. Toys, Ltd.*, No. 96 Civ. 9469 (RWS), 1999 WL 191527, at *12 (S.D.N.Y. Apr. 7, 1999) ("[A] plaintiff's failure to offer a survey showing the existence of confusion is evidence that the likelihood of confusion cannot be shown.") (collecting cases).

78

Instead, it relies on 12 anecdotes of oral communications made to Brown or LVL XIII,[91] three

text messages, and two Instagram posts, which it claims reflect "actual and material confusion."

Pl. SJ Br. 30; *see* Pl. 56.1 ¶¶ 257, 267.[92]

As to the anecdotes, most involve inquiries by fashion industry professionals whether

LVL XIII had collaborated with LV on the OTR Sneaker.  *See* Brown Dep. II, at 232–42; Brown

Dep. IV, at 424–32; *id.* at 432 ("[E]veryone pretty much had the same question.  I mean it was

either one of two things.  Did you do a collaboration with Louis Vuitton or did they copy your

design?").  Courts have held such inquiries not probative of actual confusion.  *See, e.g.*, *Nora*

*Beverages*, 269 F.3d at 124 ("Inquiries about the relationship between an owner of a mark and an

alleged infringer do not amount to actual confusion.  Indeed, such inquiries are arguably

premised upon a *lack* of confusion between the products such as to inspire the inquiry itself.").

And nine of the 12 purportedly confused persons had a pre-established personal or business

relationship with Brown or LVL XIII.  Pl. 56.1 ¶ 268.[93]  As such, they are not representative of

the typical consumer.[94]

---

[91] The 12 individuals who contacted Brown or LVL XIII are listed in LVL XIII's interrogatories.
*See* Pl. 56.1 ¶ 267.  Six submitted declarations attesting to their purported confusion.  *See* Baptist
Decl.; Hall Decl.; Hamilton Decl.; Johnson Decl.; Bolton Decl.; Roque Decl.

[92] Brown also testified that consumers at two boutiques had asked retailers whether LVL XIII
was collaborating with LV.  *See* Brown Dep. IV, at 415–22.  But he admitted lacking first-hand
knowledge of these inquiries, including how many consumers had expressed such "confusion,"
or what they had said.  *See id.* at 418–22.  The Court does not credit this vague hearsay.

[93] *See also* Johnson Decl. ¶ 4; Hamilton Decl. ¶ 4; Hall Decl. ¶ 3; Baptist Decl. ¶ 9.

[94] *See, e.g.*, *Jewish Sephardic Yellow Pages*, 478 F. Supp. 2d at 370 ("[C]ourts have concluded
that testimony from persons closely associated with the plaintiff does not adequately reflect the
views of the buying public." (internal quotation marks and citation omitted)); *Paco Sport*, 86 F.
Supp. 2d at 319 ("[B]ecause of their professional association with Paco Rabanne both De
Gruttola and Pover are more aware of Paco Rabanne's marks and more sensitive to them than an
average consumer.  Accordingly, their reaction to Paco Sport's is not indicative of the typical

As to the three unaffiliated persons, only two, Tavius Bolton and Kathleen Roque, appear to have been consumers.[95]  Each attested that, upon seeing the OTR Sneaker, he or she was disappointed by what he assumed to be a collaboration between LVL XIII and LV.  *See* Bolton Decl. ¶¶ 4–5; Roque Decl. ¶¶ 4–8.  Each attested that he or she was glad to learn that LVL XIII had not sponsored or authorized the OTR Sneaker.  Bolton Decl. ¶ 6; Roque Decl. ¶ 9.  But neither indicated that he or she had made—or forewent—a purchase based on this confusion.[96]  Only Bolton stated that he would have done so, had his confusion persisted.  *See* Bolton Decl. ¶ 6.

---

consumer's reaction."); *Brown v. Quiniou*, 744 F. Supp. 463, 472 (S.D.N.Y. 1990) (testimony of "fashion professional with substantial background in that industry . . . cannot reasonably be said to reflect that of the average consumer"); *Elizabeth Taylor Cosmetics Co. v. Annick Goutal, S.A.R.L.*, 673 F. Supp. 1238, 1246 (S.D.N.Y. 1987) (evidence of actual confusion was "scant" where it "consist[ed] mostly of anecdotal testimony of Goutal saleswomen who [were] employed at Bergdorf–Goodman and of Annick Goutal herself"); *In re Paint Prods. Co.*, 8 U.S.P.Q.2d 1863, 1866 (T.T.A.B. 1988) ("Because these affidavits were sought and collected by applicant from ten customers who have dealt with applicant for many years, the evidence is not altogether persuasive on the issue of how the average customer for paints perceives the words 'PAINT PRODUCTS CO.' in conjunction with paints and coatings.").

[95] LVL XIII has supplied no identifying details as to the third person, Edgar Moreno.

[96] *See, e.g.*, *Denimafia*, 2014 WL 814532, at *19 ("none of Denimafia's five alleged instances demonstrate[d] actual confusion" because "none of [the purportedly confused persons] testified that New Balance's use of the <=> mark affected a purchasing decision of any kind or confused them as to the source of the products"); *O'Keefe*, 590 F. Supp. 2d at 524 ("[B]ecause 'the relevant confusion is that which affects the purchasing and selling of the goods or services in question,' to be evidence of actual confusion in the marketplace, the testimony must indicate that the 'confusion affected [the potential customer's] determination to purchase [plaintiff's] product.'" (quoting *W.W.W. Pharm.*, 984 F.2d at 574)); *La Cibeles*, 2000 WL 1253240, at *10 ("The relevance of Ibanez' statements is minimal also because they do not evidence actual purchases made by confused consumers as a result of their confusion.").

As to the text messages, each was sent by a friend or former colleague of Brown's.  *See*

Brown Dep. IV, at 388–91, 393; Sloane Decl., Exs. 46–47.[97]  The first attaches a photo of the

OTR Sneaker and states:  "Don't know if u scene [sic] it before, but LV did that . . . LvL Viii

wayy [sic] doper."  Sloane Decl., Ex. 47, at 1.  The second states:  "Louis Vuitton should hire

you instead of copying your designs!"  *Id.* at 2.  Neither reflects actionable confusion.[98]

The third text message and the two Instagram posts, by contrast, reflect actual confusion.

The text message and first Instagram post each consist of a photo of the OTR Sneaker and an

inquiry whether it was made by LVL XIII.  *See* Sloane Decl., Ex. 46, at 2–3.  The second

Instagram post tags a photo of the OTR Sneaker "New #LVLXIII shoe."  *Id.* at 1.  Each evinces

confusion as to source.  Critically, however, none indicates that the speaker made a purchasing

decision based on his confusion.  Indeed, Brown admitted he was unaware of *any* consumer who

experienced confusion at the point of purchase.  Brown Dep. IV, at 437–38.[99]

---

[97] *See Gameologist*, 838 F. Supp. 2d at 162–63 ("[H]earsay evidence of confusion on the part of friends and family members . . . does not suffice to raise a genuine issue of material fact as to consumer confusion, especially given that this inquiry focuses on the consuming public as a whole, not interested parties already familiar with the plaintiff's mark through personal connections."); *Giggle*, 856 F. Supp. 2d at 636 (discounting emails asking whether there was an association between plaintiff and defendant because "the email correspondents addres[ed] Plaintiff by her first name . . . suggesting that they are not the average customers of Plaintiff's stores").

[98] *See, e.g.*, *Dooney & Bourke*, 561 F. Supp. 2d at 386–87 (evidence not probative of confusion where it showed that "despite the fact that one source's bag may remind some consumers of the bags of another source, consumers are generally aware that the two multi-colored and monogrammed designs come from different, unaffiliated sources which they were able to distinguish and identify by name").

[99]  *See Computer Assocs. Int'l, Inc. v. AJV Computerized Data Mgmt., Inc.*, 889 F. Supp. 630, 637 (E.D.N.Y. 1995) (no actual confusion where plaintiff did not offer evidence "of a single consumer, retail or wholesale, who intended to buy AJV's software but mistakenly bought CAI's" due to confusion regarding plaintiff's and defendant's marks).

Considered in the aggregate, the record evidence of "actual confusion" is *de minimis*.  It "does not go far toward demonstrating that an '*appreciable* number of ordinarily prudent purchasers' are likely to be confused.'"  *O'Keefe*, 590 F. Supp. 2d at 524 (quoting *Mejia*, 920 F. Supp. at 551) (internal quotation marks omitted) (emphasis in original).[100]  But, because the parties' sneakers coexisted in the marketplace for only a short period, the Court will not draw a strong inference against LVL XIII on that basis.  *See Lois Sportswear*, 799 F.2d at 875 (where "[t]here has been little chance for actual confusion," it "would be unfair to penalize [a plaintiff] for acting to protect its trademark rights before serious damage has occurred"); *Hasbro, Inc. v. Lanard Toys, Ltd.*, 858 F.2d 70, 78 (2d Cir. 1988) (lack of actual confusion did not warrant inference against senior user in light of short time that junior user's product was on the market).  This factor, therefore, tips slightly in LV's favor.

### vi)     Bad Faith

"The inquiry into willfulness or bad faith 'considers whether the defendant adopted its mark with the intention of capitalizing on the plaintiff's reputation and goodwill and on any confusion between his and the senior user's product.'"  *De Beers*, 440 F. Supp. 2d at 278 (quoting *Savin Corp.*, 391 F.3d at 460).  "Evidence of intentional copying by a junior user may be indicative of an intent to create a confusing similarity between the products."  *Bristol–Myers Squibb Co. v. McNeil–P.P.C., Inc.*, 973 F.2d 1033, 1044 (2d Cir. 1992).

---

[100] *See, e.g.*, *Trustees*, 964 F. Supp. at 746–47 (evidence of actual confusion was "de minimis" where several of plaintiff's doctors testified that a few third parties had told them they thought defendant's advertisements were connected with plaintiff, but "plaintiff produced no evidence of any patients or doctors who made decisions about which hospital to select based upon [that] confusion"); *see also Universal City Studios*, 746 F.2d at 118 n.8 ("[T]he fact that there may be a few confused consumers does not create a sufficiently disputed issue of fact regarding the likelihood of confusion so as to make summary judgment improper.").

As discussed above, there is zero evidence that LV copied the TP—much less that it did so with the goal of capitalizing on LVL XIII's reputation.  Quite the contrary, LV's evidence is that (1) the OTR Sneaker's principal designer had never heard of LVL XIII or its sneakers before this lawsuit, and (2) LV's design team acted in *good faith* to avoid infringement—including by soliciting the advice of LV's in-house counsel and modifying its design to distance it from the Jack Purcell sneaker.  *See* Pl. 56.1 ¶¶ 44–45, 50–54, 58–60; *see also Lang*, 949 F.2d at 583 ("[R]eliance on the advice of counsel . . .  support[s] a finding of good faith."); *Sports Traveler II*, 25 F. Supp. 2d at 166 (same).  That LV prominently displayed its own logos on the OTR Sneaker[101] further undermines the notion that it sought to pass the shoes off as LVL XIII's.  *See Jack Schwartz Shoes*, 2002 U.S. Dist. LEXIS 25699, at *80 (bad faith factor favored defendant where "evidence of copying [was] relatively weak and the undisputed evidence show[ed] that Defendant attempted to make clear the source of the 6905 shoe by placing its own logo on the shoe in multiple places"); *see also Medici II*, 683 F. Supp. 2d at 313 ("[G]iven [plaintiff's] low sales volume and the lack of evidence of secondary meaning, it is patently unreasonable to conclude that defendants sought to usurp that reputation or to otherwise capitalize on it."); *Gameologist*, 838 F. Supp. 2d at 163 (same); *Major League Baseball Props.*, 385 F. Supp. 2d at 267 (same).

LVL XIII nevertheless argues that the Court should infer bad faith from LV's failure to submit evidence of a trademark search.  Pl. SJ Br. 33.  But a defendant's failure to conduct a trademark search is "not sufficient to demonstrate bad faith."  *J.T. Colby & Co. v. Apple Inc.*, No. 11 Civ. 4060 (DLC), 2013 WL 1903883, at *23 (S.D.N.Y. May 8, 2013) (citing *Star Indus.*,

---

[101] LV's "LOUIS VUITTON" trademark is printed on the rectangular metal heel plate, tongue, shoelace rivets, and insole of the OTR Sneaker.  Pl. Supp. 56.1 ¶ 407.  The Initials Logo is printed on its rubber sole.  *Id.*

412 F.3d at 388), *aff'd*, 586 F. App'x 8 (2d Cir. 2014) (summary order).  And the Second Circuit

"has never held adoption of a mark with no knowledge of a prior similar mark to be in bad

faith[,] even in the total absence of a trademark search."  *Star Indus.*, 412 F.3d at 388.[102]  This

factor, therefore, favors LV.

*vii)    Quality of LV's Product*

The seventh *Polaroid* factor, the quality of the defendant's product, "directs courts to

weigh cross-cutting considerations."  *Akiro*, 946 F. Supp. 2d at 340.

> On the one hand, the court must determine "whether defendant's products or
> services are inferior to plaintiff's, thereby tarnishing plaintiff's reputation if
> consumers confuse the two."  On the other hand, if the products are roughly equal
> in quality, the court must also consider whether "that very similarity of quality"
> may tend to create confusion as to source by bringing the products into even
> closer proximity.

*Id.* (quoting *Morningside Grp. Ltd. v. Morningside Capital Grp., L.L.C.*, 182 F.3d 133, 142 (2d

Cir. 1999)).  Here, LVL XIII "attempts to take both forks of this road," *id.*, arguing first, that the

OTR Sneaker is inferior to LVL XIII sneakers in "workmanship [and] consumer satisfaction,"

and second, that even if the sneakers were of the same quality, this factor would favor LVL XIII

because buyers would "be more likely to substitute the products."  Pl. SJ Br. 34.

In support of its first argument, LVL XIII relies entirely on an email from a shoe manager

at a Boston LV store.  The email states:

> I have an issue that Carmen my ops manager has been trying to address with a
> client.  style 986189 show python shoe purchased at ULS.  The metal plate is

---

[102] *See Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc.*, 15 F. Supp. 2d 389, 399 (S.D.N.Y. 1998) (that plaintiff was a "relatively obscure firm in existence for six short months before defendant began using the mark suggest[ed] a lack of bad faith on the part of defendant," notwithstanding defendant's failure to perform a trademark search), *aff'd*, 192 F.3d 337 (2d Cir. 1999).  Inferring bad faith from the lack of such a search would be particularly unwarranted here, as the TP was not in fact registered at any point leading up to the design of the OTR Sneaker.  As of June 24, 2013, the only action the PTO had taken as to the '102 Application was to issue a non-final Office Action, requiring LVL XIII to amend its application.  *See* Pl. 56.1 ¶ 102.

> coming off in the back of the heel. . . .  We called Aventura . . . [and] they have
> seen this damage happen multiple times already.  I may have to give a refund, is
> this a know[n] issue?

MacMull Decl., Ex. 28, at 6.  The negative account of LV's OTR Sneaker embedded in this

email is inadmissible double hearsay, not cognizable on a motion for summary judgment.  And

even if it were admissible, this evidence would be too skimpy to show LV's sneaker was of

lesser quality than LVL XIII's.  Indeed, the record is devoid of evidence as to the quality of, or

consumer satisfaction with, either product.[103]

"Because there is insufficient evidence in the record indicating the superiority or

inferiority of the products at issue," or that they were of confusingly comparable quality, "this

factor is neutral."  *BeautyBank*, 2013 WL 11327097, at *16.[104]  It has no bearing on the Court's

assessment of the likelihood of confusion.

---

[103] Brown testified that "the LVL XIII shoe and the [OTR S]neaker are essentially the same quality."  Brown Dep. IV, at 486.  But his opinion is not probative of consumer perception.  *Cf. Gameologist*, 838 F. Supp. 2d at 164 ("Even crediting the plaintiff's opinion, this is not enough to raise a genuine issue of material fact that the plaintiff's reputation would be injured by any inferior quality of the defendants' products."); *Malaco Leaf, AB v. Promotion In Motion, Inc.*, 287 F. Supp. 2d 355, 377 (S.D.N.Y. 2003) (plaintiff's expert's "personal opinion concerning his taste preference [was] insufficient to create a question of fact regarding the quality of defendant's product," where he "submitted no survey, or any other information, concerning consumers' perceptions of a quality differential").  In any event, LVL XIII now seeks to walk back Brown's testimony, arguing that "Brown believes the quality of the <u>materials</u> used for the products are the same," but denies that their quality is comparable in any other respect.  Pl. 56.1 ¶ 98.

[104] *See also, e.g.*, *Star Indus.*, 412 F.3d at 389 ("[A]bsent factual findings or evidence one way or the other, this [quality] factor is at most evenly balanced."); *Akiro*, 946 F. Supp. 2d at 340–41 (quality factor neutral where record "contain[ed] scant evidence as to whether AUNT JACKIE'S products are inferior to MISS JESSIE'S products, and even if there were sufficient facts for a reasonable juror to reach a conclusion on that question, the record also contain[ed] little evidence about the nature of the relevant market that might illuminate whether any similarity or difference in quality would make consumer confusion more or less likely"); *Dooney & Bourke*, 561 F. Supp. 2d at 389 (quality factor neutral where there was "[no] evidence in the record substantiating the high or low quality of defendant's products relative to those of plaintiff").

*viii)    Consumer Sophistication*

The final *Polaroid* factor, consumer sophistication, "consider[s] the general impression of the ordinary purchaser, buying under the normally prevalent conditions of the market and giving the attention such purchasers usually give in buying that class of goods." *Star Indus*., 412 F.3d at 390 (internal quotation marks and citation omitted).  In a reverse confusion case, "the consumers relevant to [this] inquiry are those who purchase [the plaintiff's] products." *Sterling Drug, Inc. v. Bayer AG*, 14 F.3d 733, 742 (2d Cir. 1994); *accord Denimafia*, 2014 WL 814532, at *24.

In general, "[t]he greater the value of an article the more careful the typical consumer can be expected to be." *McGregor-Doniger*, 599 F.2d at 1137 ("[T]he average purchaser of an automobile will no doubt devote more attention to examining different products and determining their manufacturer or source than will the average purchaser of a ball of twine."); *accord Dooney & Bourke*, 561 F. Supp. 2d at 389 ("If the goods are expensive, the reasonably prudent buyer does not buy casually, but only after careful consideration.  Thus, confusion is less likely than where the goods are cheap and bought casually." (quoting *McCarthy on Trademarks* § 23:96) (internal quotation marks omitted)).  And "the more sophisticated the purchaser, the less likely he or she will be confused by the presence of similar marks in the marketplace." *Sly Magazine, LLC v. Weider Publ'ns L.L.C. ("Sly Magazine II")*, 346 F. App'x 721, 723 (2d Cir. 2009) (summary order) (internal quotation marks and citation omitted); *see also Centaur II*, 830 F.2d at 1228 (existence of sophisticated consumers "usually militates against a finding of a likelihood of confusion").

Here, the sophistication of LVL XIII's consumers can be inferred from the high price points of its sneakers.[105]  And LVL XIII has conceded that its customers are brand-conscious and deliberate shoppers.  *See* Brown Dep. III, 69–71 (testifying that customers "pay attention" when they purchase his products, "buy [his sneakers] because [they are] LVL XIII," and "consciously [] ma[k]e the choice in their mind to buy the product"); *see also Jack Schwartz Shoes*, 2002 U.S. Dist. LEXIS 25699, at *81–82 ("courts have noted that shoe shoppers are increasingly savvy and sophisticated"; this factor favored defendant because "sophisticated consumers are more likely to notice the brand-name of the shoe").  To be sure, there are circumstances where consumer sophistication "cannot be relied on to prevent confusion."  *McGregor-Doniger*, 599 F.2d at 1137. But that is generally the case only where both the products and marks at issue are "identical." *Id*.[106]  Here, by contrast, the marks at issue are easily distinguishable.  *See* discussion *supra*, at 73–75.  Accordingly, a reasonable juror could only conclude that this factor favors LV.

*ix)*  *Balancing the factors*

Viewed in combination, the *Polaroid* factors lopsidedly favor LV.  The proximity factor favors LVL XIII, and the bridging-the-gap and quality factors are neutral, but the remaining

---

[105] LVL XIII's sneakers sold for between $495 and $1,200.  *See* Pl. 56.1 ¶¶ 154–55.

[106] *Compare Lane Capital*, 15 F. Supp. 2d at 400 (buyer sophistication did not reduce likelihood of confusion where both parties used identical "Lane Capital Management" mark in connection with their respective investment management businesses), *and Lois Sportswear*, 799 F.2d at 875 (buyer sophistication likely to increase confusion because sophisticated consumers would be more likely to assume that the parties' "nearly identical back pocket stitching patterns . . . indicate[d] some sort of association between the two [jeans] manufacturers"), *with O'Keefe*, 590 F. Supp. 2d at 525 ("Although it is true that 'when . . . there is a high degree of similarity between the parties' services and marks, the sophistication of the buyers cannot be relied on to prevent confusion,' there is no similarity between the parties['] services or marks in this case. This factor weighs in [defendant's] favor." (citation omitted)), *and Paco Sport*, 86 F. Supp. 2d at 327 (distinguishing *Lois Sportswear*, and rejecting argument that consumer sophistication increased likelihood of confusion, because the parties' products were "competitively distant").

factors all point against a likelihood of confusion.[107]  Most significant, the overall impressions created by the parties' toe plates are sufficiently dissimilar to rule out any confusion as to their association.  That is particularly so given the extensive third-party use of metal shoe ornaments, the weakness of the TP as a source identifier, and the sophistication of LVL XIII's consumers. Given the pervasiveness of metal toe plates in the market, and the fact the TP had not acquired secondary meaning, it is highly unlikely that upon seeing the OTR Sneaker's toe plate, a sophisticated consumer would mistakenly associate it with LVL XIII.[108]  LVL XIII's failure to produce any probative evidence of actual confusion or bad faith reaffirms this conclusion.

The Court therefore holds that there was no likelihood of confusion between the parties' toe plates, and that a reasonable juror could not so find.  This ruling supplies an independent basis for granting LV's motion for summary judgment on LVL XIII's Lanham Act claims.[109]

## 2.    New York Common Law Unfair Competition

"The essence of an unfair competition claim under New York law is that the defendant has misappropriated the labors and expenditures of another."  *Saratoga Vichy Spring Co., Inc. v. Lehman*, 625 F.2d 1037, 1044 (2d Cir. 1980).  To prevail, a plaintiff "must couple its evidence

---

[107] *See Sunny Merch*, 97 F. Supp. 3d at 495 ("Although the [proximity] factor analysis tends to favor Louis Vuitton . . . the Court need not rely heavily on this factor in its overall *Polaroid* analysis.").

[108] *See Thompson Med. Co.*, 753 F.2d at 215–16 ("If a mark has secondary meaning, a purchaser will associate it with a certain producer, and will be likely to make that same association when an identical mark (or a confusingly similar mark), is used on another producer's product.  In the absence of secondary meaning, however, there will be no such association in the minds of the purchasing public."); *Jack Schwartz Shoes*, 2002 U.S. Dist. LEXIS 25699, at *84–86 (confusion unlikely in post-sale context, even though shoes were "substantially similar in appearance," where plaintiff's trade dress was not distinctive and there was "little or no probative evidence suggesting that consumers identif[ed] the design of [plaintiff's shoe] with its source").

[109] It follows that LVL XIII's motion for summary judgment on these claims is denied.

supporting liability under the Lanham Act with additional evidence demonstrating [the

defendant's] bad faith.'" *Info. Superhighway, Inc. v. Talk Am., Inc.*, 395 F. Supp. 44, 56

(S.D.N.Y. 2005) (quoting *Philip Morris USA Inc. v. Felizardo*, No. 3 Civ. 5891 (HB), 2004 WL

1375277, at *6 (S.D.N.Y. June 18, 2004)).  It must prove: (1) actual confusion or a likelihood of

confusion; and (2) the defendant's bad faith.  *Sly Magazine II*, 346 F. App'x at 723.

Because LVL XIII has failed to establish either element, its common law unfair

competition claim fails as a matter of law.  LV is thus entitled to summary judgment on this

claim.  *See, e.g.*, *Empresa Cubana del Tabaco v. Culbro Corp.*, 399 F.3d 462, 485 (2d Cir.

2005); *Denimafia*, 2014 WL 814532, at *26 n.101; *Gameologist*, 838 F. Supp. 2d at 165; *Lopez*,

883 F. Supp. 2d at 430–31.[110]

### 3.    Deceptive Business Practices

GBL § 349(a) prohibits "[d]eceptive acts or practices in the conduct of any business,

trade or commerce or in the furnishing of any service" in New York.  To establish liability, a

plaintiff must show that: (1) the defendant engaged in an act or practice that was materially

misleading, and (2) that the plaintiff was injured thereby.  *See Sports Traveler, Inc. v. Advance

Magazine Publishers, Inc. ("Sports Traveler I")*, No. 96 Civ. 5150 (JFK), 1997 WL 137443, at

*2 (S.D.N.Y. Mar. 24, 1997).  "The standard for whether an act or practice is misleading is

objective, requiring a showing that a reasonable consumer would have been misled by the

defendant's conduct."  *Pelman ex rel. Pelman v. McDonald's Corp.*, 396 F. Supp. 2d 439, 444

(S.D.N.Y. 2005).  For conduct to be "materially" misleading it must affect consumers' choice of

product.  *See Bildstein v. MasterCard Int'l Inc.*, 329 F. Supp. 2d 410, 414 (S.D.N.Y. 2004).

---

[110] Accordingly, LVL XIII's motion for summary judgment on this claim is denied.

Corporate competitors may bring claims under § 349(a) only if "some harm to the public at large is at issue." *Securitron Magnalock Corp. v. Schnabolk*, 65 F.3d 256, 264 (2d Cir. 1995) (internal quotation marks and citation omitted). "Because section 349 is modeled after the Federal Trade Commission Act, federal courts have interpreted the statute's scope as limited to the types of offenses to the public interest that would trigger Federal Trade Commission intervention under 15 U.S.C. § 45, such as potential danger to the public health or safety." *Sports Traveler I*, 1997 WL 13744, at *2. Accordingly, many courts have found that mere evidence of consumer confusion is not enough to satisfy this element.[111]

Here, as discussed, LVL XIII has not established that LV's conduct created a likelihood of confusion—much less actual confusion that affected consumers' purchasing decisions. It has

---

[111] *See Sports Traveler I*, 1997 WL 137443, at *3 ("The Courts of this Circuit have held that trademark infringement actions alleging only general consumer confusion do not threaten the direct harm to consumers that is required to state a claim under section 349.") (collecting cases); *compare id.* (dismissing § 349 claim where complaint merely alleged consumer confusion resulting from trademark infringement and was "devoid of allegations supporting an inference that the public's health or safety was at stake as a result of the alleged infringement"), *LaStadt v. Fox News Network LLC*, 719 F. Supp. 2d 312, 323–24 (S.D.N.Y. 2010) (same), *LBB Corp. v. Lucas Distrib., Inc.*, No. 08 Civ. 4320 (SAS), 2008 WL 2743751, at *3 (S.D.N.Y. Jul. 14, 2008) (same), *and Cibeles*, 2000 WL 1253240, at *15 (same), *with Securitron*, 65 F.3d at 264–65 (public harm "manifest" where defendants (1) gave false information regarding plaintiff's products to regulatory agency concerned with public safety, causing agency to undertake unnecessary investigations; and (2) risked unnecessary cancellation of health care center's contract), *Houbigant, Inc. v. ACB Mercantile*, 914 F. Supp. 964, 984 (S.D.N.Y. 1995) (public harm requirement satisfied where defendants were part of unlawful scheme to export and sell counterfeit items), *and Weight Watchers Int'l, Inc. v. Stouffer Corp.*, 744 F. Supp. 1259, 1285 (S.D.N.Y. 1990) ("[T]he false advertising involving diet and food that [the defendant] allegedly conducted clearly would involve a [sufficient] public harm if proved.").

LVL XIII cites *GTFM, Inc. v. Solid Clothing, Inc.*, 215 F. Supp. 2d 273, 302 (S.D.N.Y. 2002), and *Burberry Ltd. & Burberry USA v. Designers Imports, Inc.*, No. 07 Civ. 3997 (PAC), 2010 WL 199906, at *8 (S.D.N.Y. Jan. 19, 2010), for the proposition that a plaintiff may satisfy the "public harm" requirement merely by showing general consumer confusion. But those cases involved intentional counterfeiting, which is distinct from, and arguably more harmful than, garden-variety trademark infringement. Accordingly, they are not persuasive authority here.

thus failed to satisfy the "material deception" requirement of its § 349 claim.  And even if LVL

XIII had shown confusion, that would not qualify as "public harm" actionable under § 349.[112]

LV is therefore entitled to summary judgment on this claim, too.[113]

**C.**   **LVL XIII's Motion for Summary Judgment on LV's Counterclaims**

The Court turns now to LV's counterclaims.  These fall into two sets.  The first mirrors

LVL XIII's Lanham Act claims:  LV seeks (1) a declaratory judgment that LVL XIII has no

exclusive right in the shape of a rectangular metal toe plate; and (2) an injunction requiring LVL

XIII to disclaim the non-distinctive elements of the TP (*i.e.*, all elements other than the "LVL

XIII" inscription).  LV has acknowledged that these counterclaims would be mooted by a

holding that the TP is not protectable under the Lanham Act.[114]  They are, therefore, dismissed.

LV's second set of counterclaims stems from LVL XIII's use of the "LVL XIII" word

mark.  LV brings claims for trademark infringement, under § 32(a) of the Lanham Act, and

---

[112] LVL XIII argues that, in addition to showing confusion, it has established "real public harm" by way of Colman's testimony that LV's misconduct (1) deprived LVL XIII of the financial means to create innovative designs; (2) disillusioned the public by suggesting that ventures such as LVL XIII's will ultimately "sell out" to large wealthy companies; and (3) undermined the integrity of the U.S. trademark regime and the rule of law in the public's eyes.  *See* Pl. SJ Br. 37 (citing Colman Rpt. ¶ 39(d)).  But Colman's expert report has been precluded.  And even if the Court were to consider his testimony, his claim of harm is unsubstantiated and not the type contemplated by § 349.  This "evidence" would not satisfy the "public harm" requirement.

[113] It follows that LVL XIII's motion for summary judgment on this claim is also denied.

[114] *See* Tr. 61–63 (agreeing there would be "[no] reason to reach" LV's first two counterclaims if Court were to determine that LVL XIII had "no rights in th[e] toe plate" because it had not shown secondary meaning); *see also Leach v. Ross Heater & Manuf. Co.*, 104 F.2d 88, 91–92 (2d Cir. 1939) (counterclaim for declaratory judgment could be dismissed as "unnecessary" if court were to hold that plaintiff did not have protectable rights in patent).

unfair competition and false designation of origin, under § 43(a).[115]  It claims that LVL XIII's use of this mark is likely to cause confusion with LV's Initials Logo.[116]

Each of these counterclaims is analyzed under the "familiar two-prong test" that applies to infringement claims brought under § 43(a): LV must show, first, that its Initials Logo is entitled to protection, and second, that LVL XIII's use of its word mark is likely to cause consumer confusion as to the origin or sponsorship of its products.  *Virgin Enters.*, 335 F.3d at 146; *see Nabisco II*, 220 F3d at 45; *Gameologist Grp.*, 838 F. Supp. 2d at 152–53.

LVL XIII concedes that the Initials Logo is a valid mark entitled to protection.  Pl. SJ Br. 51.  The sole issue for decision, therefore, is whether a reasonable juror could find that LVL XIII's use of its word mark is likely to cause confusion.  Although this presents a considerably closer question than LVL XIII's claims, an analysis of the *Polaroid* factors reveals that the answer is no.  The Court, again, addresses each factor in turn.

### 1.    Strength of the Initials Logo

As noted, in gauging the strength of a mark, courts consider both its inherent distinctiveness and its "acquired distinctiveness, *i.e.*, fame, or the extent to which prominent use of the mark in commerce has resulted in a high degree of consumer recognition."  *Virgin Enters.*, 335 F.3d at 147 (internal quotation marks omitted).  As to inherent distinctiveness, "the law accords broad, muscular protection to marks that are arbitrary or fanciful in relation to the products on which they are used, and lesser protection, or no protection at all, to marks consisting of words that identify or describe the goods or their attributes."  *Id*.  As to acquired

---

[115] In its amended answer, LV also brought a counterclaim for deceptive business practices under GBL § 349, which it later withdrew, having not established public harm.  Def. SJ Reply Br. 36.

[116] Because LV has not provided details as to the type of confusion it alleges, the Court assumes that its claims are based on a theory of traditional forward point-of-sale confusion.

distinctiveness, "[i]f a mark has been long, prominently and notoriously used in commerce, there is a high likelihood that consumers will recognize it from its prior use." *Id.* at 148. Such widespread consumer recognition "increases the likelihood that consumers will assume [the mark] identifies the previously familiar user, and therefore increases the likelihood of consumer confusion if the new user is in fact not related to the first." *Id.*

Here, there is no question that LV's Initials Logo is strong by virtue of both its inherent and acquired distinctiveness. As a registered trademark, it is presumptively distinctive. *See Savin Corp.*, 391 F.3d at 457; *McGregor-Doniger*, 599 F.2d at 1132. And although personal names are generally descriptive, they may be inherently distinctive where, as with LV's Initials Logo, they are presented in a "stylized" form. *Patsy's*, 317 F.3d at 217 ("[A] personal name rendered in a distinctive lettering style may be considered strong even without a showing of secondary meaning.").[117] Finally, LVL XIII does not dispute that the Initials Logo has acquired secondary meaning as a result of: (1) LV's more than century-long use of the logo on a wide variety of products; (2) its extensive marketing and advertising of products bearing the logo; and (3) the fame the logo has achieved as a result. *See* Pl. Supp. 56.1 ¶¶ 376–81.

To the extent, however, that LV claims a broader exclusive right to use the non-stylized "LV" letter combination, the same conclusion does not follow. On this point, *Gruner + Jahr*, 991 F.2d 1072, is instructive. The district court there held that, even though the registered "PARENTS" logo was strong, the mark was weak in its non-stylized form. *Gruner + Jahr USA Pub., a Div. of Gruner + Jahr Printing & Pub. Co. v. Meredith Corp.*, 793 F. Supp. 1222, 1231 (S.D.N.Y. 1992), *aff'd*, 991 F.2d 1072 (2d Cir. 1993). As the court explained, the "origin-

---

[117] *See also Star Indus.*, 412 F.3d at 383 (stylized version of the letter "O" was inherently distinctive because of its shading, border, and thickness); *Gruner + Jahr*, 991 F.2d at 1077–78 ("PARENTS" mark, which was otherwise descriptive, was distinctive in its stylized form).

indicating quality" of the mark "l[ay] in the customized manner in which it [was] displayed, and not in the mere use of the word 'parents.'" *Id.* (internal quotation marks omitted). The Second Circuit affirmed. It held that "the trademark registration of the title PARENTS in its distinctive typeface did not confer an exclusive right to plaintiff on variations of the word 'parent.'" *Gruner + Jahr*, 991 F.2d at 1077. And the descriptive nature of the mark and extensive third-party use "lessen[ed] the possibility that a purchaser would be confused and think the mark came from a particular source." *Id.* at 1078. Accordingly, the Second Circuit upheld the ruling that "the 'parents' portion of the mark—divorced from the stylized typeface and its particular placement on [plaintiff's] magazine cover—was extremely weak." *Id.*

Similarly, here, although the Initials Logo is strong in its stylized form, that does not mean that LV has the "exclusive right to . . . [every] variation[]" of the "LV" initials. *Gruner + Jahr*, 991 F.2d at 1077. And because LV has offered no evidence of using those initials in a non-stylized form, there is no basis to conclude that they have acquired secondary meaning in that context.[118] LVL XIII, for its part, has supplied evidence of seven third-party registrations for trademarks in the apparel or accessory industries that incorporate the "LV" letter combination. *See* MacMull Decl., Ex. 33.[119] On this record, a reasonable juror could not find that the "LV"

---

[118] LV has produced PTO registrations for the "LV ROADSCAPE" and "LV LANDSCAPE" composite marks. *See* Sloane Decl., Ex. 59, at 68, 70. But it has not presented any evidence of its standalone use of the "LV" component of those marks, let alone evidence of (1) advertising expenditures in connection with such a mark; (2) a consumer study linking such a mark to LV; or (3) sales figures for products bearing such a mark. Instead, it has cited five examples of third-party references to LV as "LV." *See* Pl. Supp. 56.1 ¶ 397. Without more, those isolated references cannot sustain a finding of secondary meaning for the non-stylized mark.

[119] *See e.g.*, *Giggle*, 856 F. Supp. 2d at 633–34 (trademark search reports are "probative of third parties' attempts to use those marks in commerce and [are] . . . commonly accepted by courts for evaluation of third-party use") (collecting cases).

portion of the Initials Logo, "divorced from the stylized typeface and particular [entwined configuration of the letters]," is distinctive. *Gruner + Jahr*, 991 F.2d at 1078.[120]

Because this factor cuts both ways, the Court, drawing all reasonable inferences in LV's favor, holds that it can support, but only weakly, a likelihood of confusion.

### 2. Similarity of the Marks

In the context of word marks, similarity is a "holistic consideration that turns on the marks' sight, sound, and overall commercial impression under the totality of the circumstances." *Bath & Body Works*, 7 F. Supp. 3d at 394 (citing *Malletier v. Burlington Coat Factory Warehouse Corp*., 426 F.3d 532, 538 (2d Cir. 2005)); *see also U.S. Polo Ass'n, Inc. v. PRL USA Holdings, Inc.*, 800 F. Supp. 2d 515, 528 (S.D.N.Y. 2011) ("An assessment of the similarity of marks examines the similarity between them in appearance, sound, and meaning."), *aff'd*, 511 F. App'x 81 (2d Cir. 2013) (summary order). The Second Circuit has instructed that courts must compare "[e]ach mark . . . in its entirety" because "juxtaposing fragments of each mark does not demonstrate whether the marks as a whole are confusingly similar." *Advance Magazine Publishers*, 627 F. Supp. 2d at 117; *see also Giggle*, 856 F. Supp. 2d at 635 ("Under the anti-dissection principle, the similarity analysis must assess the marks in their entirety without dissecting out any one component.") (citing *McCarthy on Trademarks* § 11:27) (collecting cases).

Here, both parties' marks use the letters "LV" in a Roman-like font. But that alone does not make them "similar" for purposes of a *Polaroid* analysis. That two marks share an element

---

[120] *See also Giggle*, 856 F. Supp. 2d at 635 ("[A]ny strength Plaintiff has acquired in its GIGGLE family of marks is not in the words themselves but in the appearance, colors, and styles associated with Plaintiff's use. . . .  Plaintiff has not shown that it has strong rights in all appearances and uses of the GIGGLE family of marks.").

does not mean they are likely to be confused.  *See Brockmeyer v. Hearst Corp.*, 248 F. Supp. 2d

281, 296 (S.D.N.Y. 2003) ("[S]imply because [the marks] contain [a] common element does not

mean that they are 'similar' for the purpose of assessing confusion under the *Polaroid*

factors.").[121]  That is true even where the common element is presented in a similar typeface.

*See, e.g.*, *Flushing Bank v. Green Dot Corp.*, 138 F. Supp. 3d 561, 588 (S.D.N.Y. 2015)

("GObank" and "iGObanking" logos were "as a whole dissimilar" due to visual differences, even

though they shared a literal element and their "type font [was] [] somewhat similar").

On this point, Judge Koeltl's analysis in *Brockmeyer*, 248 F. Supp. 2d 281, is apt.  The

plaintiff there alleged that the publishers and distributors of "O The Oprah Magazine" infringed

its ">>O<<" trademark.  Assessing the two marks' similarity, Judge Koeltl noted that both

parties' magazines featured the letter "O" prominently on their covers in a similar size and

typeface, such that the magazines could each be referred to as "O Magazine."  *Id.* at 296.  But, he

---

[121] *See, e.g.*, *Nabisco II*, 220 F.3d at 46–48 (parties' use of "DENTYNE ICE" and "ICE BREAKERS" marks were "so dissimilar as to require judgment for [defendant]"); *Universal City Studios*, 746 F.2d at 116–18 (no similarity between "DONKEY KONG" and "KING KONG" marks); *Giggle*, 856 F. Supp. 2d at 635 (finding marks dissimilar where defendant's mark "only share[d] a single word—'giggle'—in common with any member of [plaintiff's] GIGGLE family of marks"); *Strange Music*, 326 F. Supp. 2d at 490–91 ("STRANGE MUSIC" and "sTRANGEmUSIC" marks created dissimilar "overall impressions" due to differences in "fonts, colors and emblems"); *Medici Classics Prods. LLC v. Medici Grp. LLC ("Medici I")*, 590 F. Supp. 2d 548, 554 (S.D.N.Y. 2008) ("There is one obvious similarity between plaintiff's and defendants' marks in that they both employ the word 'Medici.'  However, this factor does not necessarily make the marks similar for purposes of assessing confusion under a *Polaroid* analysis."); *Dana Braun, Inc. v. SML Sport Ltd.*, No. 03 Civ. 6405 (BSJ), 2003 WL 22832265, at *10 (S.D.N.Y. Nov. 25, 2003) ("SARAH ARIZONA" and "SARAH McKENZIE" did "not create the same overall impression"); *Paco Sport*, 86 F. Supp. 2d at 316 (marks not confusingly similar, although they "both include[d] the name PACO," because the "PACO" on plaintiff's product was always accompanied by "RABANNE," whereas the "PACO" on defendant's products "appear[ed] alone or in conjunction with the words JEANS, SPORT, and others"); *Int'l Data Group, Inc. v. J & R Electronics, Inc.*, 798 F. Supp. 135, 139 (S.D.N.Y. 1992) ("Computerworld" not confusingly similar to "J & R Computer World"), *aff'd*, 968 F.2d 499, 1992 WL 406398 (2d Cir. 1992).

held, notwithstanding those similarities, the marks were not confusingly similar because

"plaintiff's use of guillemets and the differences in cover layouts, photos and legends tend to

differentiate the marks when viewed in context." *Id.*  The marks were further distinguishable

because "the 'O' in the defendants' magazine [was] a reference to Oprah Winfrey and her values,

while the plaintiff's mark ma[de] no reference to any particular personality, and only to the

values associated with lesbianism, fetish culture, and sadomasochism." *Id.*  Given those

differences, "the marks [could] not be said to be similar for the purposes of [the] confusion

analysis." *Id.*

So too, here.  In this case, any similarity between the parties' marks is more than offset

by their differences.  Most significant are the obvious visual distinctions between the two logos:

LV's Initials Logo presents the letters "L" and "V" as a single interlocking image, with the "V"

overlapping the italicized "L" on a downward angle from right to left.  By contrast, the "LV" in

LVL XIII's mark is invariably followed by "L XIII," with all characters arranged collinearly.

These differences in visual presentation render the marks dissimilar as a matter of law.  *See, e.g.*,

*SLY Magazine, LLC v. Weider Publications L.L.C. ("Sly Magazine I")*, 529 F. Supp. 2d 425, 439

(S.D.N.Y. 2007) (fact that both marks included word "SLY" did not make them confusingly

similar, where defendant's "SLY" was always shown in block capital letters, whereas plaintiff's

was always presented in italicized script or followed by a tagline), *aff'd*, 346 F. App'x 721 (2d

Cir. 2009) (summary order).

Moreover, given the common use of roman numerals and the "LVL" abbreviation,[122] it is

reasonable to assume that at least some consumers would (like the Court) understand LVL XIII's

---

[122] *See, e.g.*, http://www.acronymfinder.com/LVL.html (identifying "level" as highest-ranked
meaning for "LVL" acronym); http://acronyms.thefreedictionary.com/LVL (same);
http://www.urbandictionary.com/define.php?term=lvl (same);

mark to denote "level 13."  So read, LVL XIII's mark takes on a pronunciation and connotation which further distinguish it from the Initials Logo.[123]  Given these differences, no reasonable juror could conclude that the marks are likely to be confused.

Indeed, LV ultimately eschewed the broad argument that the two marks, in all contexts, are confusingly similar.  Rather, it argues that the particular way LVL XIII presented its mark on social media and the Carbon Bazaar website made it likely to cause confusion.  Specifically, it claims, many of LVL XIII's online photos "presented the shoe at an angle such that only the letters 'LV' in the word mark on the toe plate [were] visible."  Def. SJ Reply Br. 32.  In that context, LV argues, LVL XIII's mark was likely to be confused with the Initials Logo.  *Id.*

That argument is unpersuasive.  To be sure, in assessing similarity, the Court must consider "how [the marks] are presented in the marketplace."  *The Sports Auth., Inc. v. Prime Hosp. Corp.*, 89 F.3d 955, 962 (2d Cir. 1996).  But LV's characterization of that presentation

---

http://www.internetslang.com/LVL-meaning-definition.asp ("The definition of LVL is 'Level.'"); http://slang.org/LVL-meaning-definition ("The most popular meaning of LVL is: level.").

[123] *See, e.g.*, *Hormel Foods*, 73 F.3d at 503 (although plaintiff's mark "SPAM" and defendant's mark "Spa'am" bore "more than a passing resemblance" to one another, defendant's addition of an apostrophe and an "a" to "SPAM" and the resultant change in pronunciation established "some significant differences"); *Sly Magazine I*, 529 F. Supp. 2d at 439 (marks not confusingly similar where "defendants' use of 'SLY' . . . connote[d] the values, image, and persona of the namesake of the magazine," whereas "[p]laintiff's 'Sly' . . . reference[d] no particular personality, but rather refer[red] to the values associated with fashion and style"); *La Cibeles*, 2000 WL 1253240, at *6 (no reasonable trier of fact could find "Petit Cheri" and "Petite Cherie" confusingly similar because, "although the two marks do bear a resemblance, the addition of the 'e' in both words and the pronunciation of the 't' engendered by defendant's use of the feminine conjugation create a significant difference between the marks"); *In re Hearst Corp.*, 982 F.2d 493, 494 (Fed. Cir. 1992) ("VARGA GIRL" and "VARGAS" were "sufficiently different in sound, appearance, connotation, and commercial impression, to negate likelihood of confusion"); *Nat'l Distillers & Chem. Corp. v. William Grant & Sons, Inc.*, 505 F.2d 719, 721 (C.C.P.A. 1974) ("Confusion would not be likely to result from concurrent use of DUET and DUVET . . . [because] DUET is a familiar word; DUVET is not.  DUET has clear and obvious meaning; DUVET does not.").

here is misleading.  Although many of the photographs do present LVL XIII's shoes on an angle, they do not, as LV claims, highlight the "LV" portion of its mark.  To the contrary, in most photographs on which LV relies, the literal element of the toe plate is barely, if at all, legible.  *See, e.g.*, Sloane Decl., Ex. 37, at 30–33; *id.*, Ex. 41, at 4–5, 9–10; *id.*, Ex. 35, at 3, 5–11.  And in every instance, the page displaying the photograph also presents the full "LVL XIII" mark— either as a standalone reference to the brand or as a link to its website (www.lvlxiii.com).  *See id.*; *see also Starbucks*, 588 F.3d at 106 ("To the extent the Charbucks Marks are presented to the public through Black Bear's website, the dissimilarity between the marks is still evident as the Charbucks brand of coffee is accompanied by Black Bear's domain name, www.blackbearcoffee.com, and other products, such as shirts and cups, displaying Black Bear's name.").  Therefore, because the "LVL XIII" mark and the Initials Logo are demonstrably dissimilar, this factor weighs strongly against a likelihood of confusion.

### 3.     Competitive Proximity of the Products

It is undisputed that LV has featured its Initials Logo on the OTR Sneaker, among many other products.  Pl. Supp. 56.1 ¶ 407.  As discussed above, *supra*, at 75–77, that product is competitively proximate to LVL XIII's sneakers.  This factor, therefore, favors LV.[124]

---

[124] LV's evidence that it has featured the Initials Logo on the metal heel plates of men's dress shoes, *see* Sloane Decl., Ex. 14, at 95–96, further supports this holding, given the similarity in price and style between those shoe and LVL XIII's sneakers.  *See H. Lubovsky*, 627 F. Supp. at 494 (competitive proximity favored plaintiff even though defendant's shoes were "far more sporty and informal," because they were "generally of similar type, for the same kinds of occasions, and in a roughly similar price range").

### 4.   Bridging the Gap

Because the parties' products are already in competitive proximity, there is "no gap to bridge," and this factor is neutral.  *See Starbucks*, 588 F.3d at 115 (internal quotation marks and citation omitted); *Star Indus.*, 412 F.3d at 387.

### 5.   Actual Confusion

As discussed above, although "actual confusion need not be shown to prevail under the Lanham Act," *Lois Sportswear*, 799 F.2d at 875, courts have held that the absence of such evidence "is a strong indicator that the likelihood of confusion is minimal."  *Plus Prods. v. Plus Discount Foods, Inc.*, 722 F.2d 999, 1006 (2d Cir. 1983).  This inference is weakened, however, where the parties' products have been competing for only a short time.  *See Lois Sportswear*, 799 F.2d at 875.

Here, LV has not offered evidence of actual confusion.  To the contrary, its 30(b)(6) witness testified that she was "not aware of any actual confusion" between the LVL XIII word mark and the Initials Logo.  Def. Supp. 56.1 ¶ 371.  Therefore, accounting for the brevity of the parties' co-existence in the marketplace, this factor slightly favors LVL XIII.

### 6.   Bad Faith

As noted, the inquiry into bad faith "considers whether the defendant adopted its mark with the intention of capitalizing on [the] plaintiff's reputation and goodwill and [on] any confusion between his and the senior user's product."  *Savin Corp.*, 391 F.3d at 460 (internal quotation marks and citation omitted).  "The burden of proving bad faith rests with the party claiming infringement."  *J.T. Colby & Co.*, 2013 WL 1903883, at *23 (citing *Star Indus.*, 412 F.3d at 388).  As the Second Circuit has explained, "[w]hile . . . caution must be exercised in granting summary judgment when state of mind is in issue, '[t]he summary judgment rule would

be rendered sterile . . . if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion.'" *Nora Beverages*, 269 F.3d at 125 (quoting *Res. Developers, Inc. v. Statue of Liberty-Ellis Island Found., Inc.*, 926 F.2d 134, 141 (2d Cir. 1991)).

Here, LV argues that LVL XIII's bad faith can be inferred from the following facts:  (1) Brown has long been familiar with LV and its Initials Logo; (2) LVL XIII considers LV "both an inspiration for its planned line of shoes and a competitor"; (3) "[o]ut of all the fonts and all the presentations possible of the name 'Level Thirteen,'" Brown chose to use the "LVL XIII" abbreviation in a "near-identical font to LV's signature font"; and (4) the photos LVL XIII supplied to Carbon Bazaar present its sneakers in such a way that the "LV" portion of the "LVL XIII" logo is predominant.  Def. SJ Reply Br. 33; Tr. 90.  In combination, LV argues, these facts could lead a reasonable juror to find that LVL XIII deliberately sought to capitalize on LV's reputation and goodwill.

Although LV's notion that Brown sought to exploit LV's goodwill is intuitively understandable, its evidence of bad faith is, ultimately, weak.  As to Brown's familiarity with LV, it is well established that "[p]rior knowledge of a senior user's mark does not, without more, create an inference of bad faith."  *Playtex Prods.*, 390 F.3d at 166; *accord Malaco Leaf*, 287 F. Supp. 2d at 376 ("While it is undisputed that PIM's President . . . was aware of plaintiff's Swedish Fish candy before introducing Famous Sqwish Candy Fish, adoption of a mark with actual knowledge of another's mark is not, alone, evidence of bad faith.").  Courts have typically found such knowledge probative of bad faith only where it is "accompanied by similarities so strong that it seems plain that deliberate copying has occurred."  *Paddington*, 996 F.2d at 587.[125]

---

[125] *Compare MetLife, Inc. v. Metro. Nat. Bank*, 388 F. Supp. 2d 223, 234 (S.D.N.Y. 2005) (crediting defendant's testimony that "the MetLife logo did not 'come up in any way' during the redesign process," but holding that "[n]evertheless, the similarity between the parties' marks is

Such is not the case here, as the parties' trademarks are far from confusingly similar. *Cf. Jewish Sephardic Yellow Pages*, 478 F. Supp. 2d at 376 ("[A] comparison of plaintiff's and defendant's 'Kosher Yellow Pages' marks . . . reveals obvious differences that suggest a lack of imitative intent."). Nor is LVL XIII's identification of LV as a competitor dispositive, because "the intent to compete . . . is vastly different from the intent to deceive purchasers as to the source of the product." *Streetwise Maps*, 159 F.3d at 745.

As to LVL XIII's choice of abbreviation, Brown has offered a credible explanation for selecting this moniker: He testified that because "level thirteen" would have been "too long" to fit on a toe plate, he referenced allacronyms.com to select an abbreviation for "level." Brown Dep. V, at 192–93. Of the options, Brown testified, "LVL" "stood out" out as the most obvious choice. *Id.* at 193. Consistent with this, "LVL" is the website's top ranked abbreviation; the alternative options are more cryptic. *See* https://www.allacronyms.com/level/abbreviated; Pl. Supp. 56.1 ¶ 395 (noting that "Lev," "LEL," and "L" are among the listed abbreviations); *see also Nora Beverages*, 269 F.3d at 125 (no fact issue as to bad faith where only evidence was the similarity of the parties' bottle designs and that defendant chose its design from a "limitless array

---

such that it strains credulity to believe that neither MNB nor the firm it hired to redesign its logo were not consciously influenced by the MetLife logo"), *and Omega Eng'g v. Omega Shielding*, No. 96 Civ. 1333 (PCD), 1998 WL 35256542, at *4 (D. Conn. Mar. 3, 1998) ("defendant's bad faith might reasonably be inferred from the similarity of the contested mark to [plaintiff's] mark," where plaintiff and defendant were direct competitors and both used the same "Omega" mark), *with Lang*, 949 F.2d at 583–84 ("Retirement Living's prior knowledge of Lang's trade name does not give rise to a necessary inference of bad faith, because adoption of a trademark with actual knowledge of another's prior registration of a very similar mark may be consistent with good faith."), *and La Cibeles*, 2000 WL 1253240, at *10 (holding that "no reasonable trier of fact could conclude that the selection and use of the mark Petite Cherie was made with the intent of capitalizing on Petit Cheri's existing reputation," even though defendant "was aware of plaintiff's mark before its Petite Cherie was launched").

of available design options") (internal quotation marks omitted).[126]  Moreover, any bad faith that

could be inferred from LVL XIII's selection of the "LVL" acronym is negated by its efforts to

decode its logo.  As LV points out, LVL XIII has made a concerted effort to "instruct readers and

viewers how to pronounce its name."  Pl. Supp. 56.1 ¶ 396.  Such conduct is at odds with the

claim that LVL XIII intended to pass off its sneakers as LV's.  *See Denimafia*, 2014 WL 814532,

at *22–23 (that "New Balance knew of Denimafia's mark and chose to use it despite options of

'variations more different from the 5EP Logo'" did not create dispute of fact as to bad faith

where New Balance had taken "affirmative steps" to distinguish its mark from Denimafia's).

Finally, as discussed above, the record evidence does not support LV's claim that the

Carbon Bazaar photos effectively showcased the "LV" portion of the mark.  The toe plate's

literal element is indecipherable in most of the photos.  And the full "LVL XIII" logo is

displayed beside each photo on the webpage.  *See* Sloane Decl., Ex. 35.  Accordingly, these

images do not bespeak an intent to deceive.  *Cf. Nora Beverages*, 269 F.3d at 125 ("[B]y placing

its labels prominently upon its bottles, [defendant] negated an inference of intent to deceive

consumers as to the source of its product.").

In sum, the Court holds that, although there is a smidgeon of evidence favoring LV, the

"suspicious facts" highlighted by LV, considered separately or together, are insufficient to create

a material question of fact as to bad faith.[127]  LVL XIII, for its part, has proffered evidence of its

---

[126] LVL XIII's decision to use a Roman-style font is similarly non-incriminating, given the generic nature of this typeface.  *See also* Tr. 63 (concession by LV's counsel that the typeface of the two logos is "not exactly the same").

[127] LV has identified no case where circumstantial evidence of this caliber was found to create an issue of fact as to bad faith.  And there is much case law to the contrary.  *See, e.g.*, *Playtex Prods.*, 390 F.3d at 166 (evidence did not support inference of bad faith where Playtex showed that (1) defendant was aware of plaintiff's trademark, and (2) commissioned a study which stated that a "[product] design similar to the current Playtex design may be appealing"); *Malaco Leaf*,

good faith in selecting its logo:  The record shows that LVL XIII sought the advice of counsel

before finalizing its logo, and that counsel affirmed that it "c[ould] file a trademark application

for the brand name LVL XIII."  Dkt. 161, Ex. 2 ("Pelton Dep. II"), at 11–12; *see Lang*, 949 F.2d

at 583 ("[R]eliance on the advice of counsel . . .  support[s] a finding of good faith.").  "The fact

that the [PTO] approved the application to register [the 'LVL XIII'] mark without any reference

or citation to [LV's] registration of [the Initials Logo] supports [LVL XIII's] judgment."

*Brockmeyer*, 248 F. Supp. 2d at 298–99.  Under these circumstances, and given the obvious

dissimilarities between the two marks, LVL XIII could have "reasonably concluded that there

would be no confusion between [its] mark . . . and [the Initials Logo], a conclusion eventually

affirmed by the [PTO]."  *Id.* ("no basis from which to infer any bad faith," despite defendant's

awareness of plaintiff's mark, where defendant "made a good faith determination [that] using

[its] mark . . . would not infringe any other mark" and ultimately obtained registration from the

PTO); *Playtex Prods., Inc. v. Georgia-Pac. Inc.*, No. 2 Civ. 7848 (HB), 2003 WL 21939706, at

*7 (S.D.N.Y. Aug. 12, 2003) ("Playtex's failure to produce evidence of bad faith strongly

favor[ed] Georgia-Pacific" where "the PTO found no conflict with other marks, including

[Playtex's] WET ONES, when it reviewed Georgia-Pacific's ITU for MOIST ONES").

---

287 F. Supp. 2d at 376 (no inference of bad faith despite evidence that (1) defendant's president
was aware of plaintiff's mark and possessed plaintiff's product; and (2) defendant purchased
sample packages of plaintiff's product during design process); *Sports Traveler II*, 25 F. Supp. 2d
at 165 (Sports Traveler had not met its burden of creating issue of fact as to Conde Nast's bad
faith where it showed only that (1) Conde Nast's designer had previously been involved with
Sports Traveler and was privy to its trade dress prototypes; (2) Conde Nast had contemplated
acquiring Sports Traveler; and (3) there were copies of Sports Traveler Magazine in Conde
Nast's office); *Nabisco I*, 32 F. Supp. 2d at 700–01 (evidence that defendant (1) monitored the
development and sales of plaintiff's "Ice Breakers" product before it launched "Dentyne Ice,"
and (2) failed to discuss "Ice Breakers" with its legal department insufficient to show bad faith).

Because LV has failed to proffer any non-speculative evidence of bad faith, and LVL XIII has produced evidence of its good faith, this factor favors LVL XIII.

### 7.     Quality of LV's Product

As discussed above in connection with LVL XIII's claims, there is no record evidence as to the relative quality of the parties' products.  The seventh *Polaroid* factor is thus neutral and does not affect the Court's analysis.  *See Star Indus.*, 412 F.3d at 389; *Bath & Body Works*, 7 F. Supp. 3d at 398.

### 8.     Consumer Sophistication

The eighth *Polaroid* factor, consumer sophistication, weighs against finding a likelihood of confusion for the same reasons discussed in connection with LVL XIII's claims:  Given the "high price point of both LVL XIII's and LV's products," Def. SJ Br. 35, it can be assumed that the typical customer is sophisticated and unlikely to be confused by any similarities between the parties' logos.  Indeed, "several courts have noted[ that] purchasers of Louis Vuitton products tend to be sophisticated[, ] discerning," and less susceptible to confusion.  *Sunny Merch*, 97 F. Supp. 3d at 498 (internal quotation marks and citation omitted) (collecting cases).  This factor, therefore, also favors LVL XIII.

### 9.     Balancing the Factors

In light of the above considerations, the Court holds that the *Polaroid* factors, on balance, favor LVL XIII.  Although two factors—strength and proximity—to some degree favor LV, they do not outweigh the four which, strongly, point against a likelihood of confusion.[128]

---

[128] *See Dooney & Bourke*, 561 F. Supp. 2d at 390 (granting summary judgment for defendant, "[a]lthough Louis Vuitton's mark is strong and there is a proximity between the products, . . . [because] a reasonable jury could only conclude that Dooney & Bourke's mark is not likely to cause confusion with Louis Vuitton's Monogram Multicolore mark"); *cf. Akiro*, 946 F. Supp. 2d at 342 ("Akiro's strong mark and the fact that the two brands' products compete with one

Of particular significance is the "similarity of the marks" factor.  The Second Circuit has held that, "in an appropriate case, [this] . . . factor can be dispositive and will warrant summary judgment for an infringement defendant if . . .  [the] marks are so dissimilar that no question of fact is presented."  *Nabisco II*, 220 F.3d at 46 (internal quotation marks and citations omitted).  Such is the case here:  Given the obvious differences between the two marks, the Court assesses that "no reasonable factfinder could conclude that there is any likelihood of confusion between them," especially given the sophistication of the relevant consumers.  *Kaufman & Fisher Wish Co.*, 184 F. Supp. 2d at 323.[129]  LV's failure to offer non-speculative evidence as to bad faith, or to proffer *any* proof of actual confusion, solidifies this conclusion.[130]

The Court, therefore, grants LVL XIII's motion for summary judgment on each of LV's Lanham Act counterclaims.[131]

---

another are not, on their own, sufficient to overcome the other factors and entitle Akiro to judgment as a matter of law.").

[129] *See, e.g.*, *Playtex Prods.*, 390 F.3d at 166–67 (relying on "dissimilarity in the mark[s] themselves[] [and] the differences in the way the products [were] presented to consumers" to affirm grant of summary judgment, even though five of the *Polaroid* factors favored plaintiff).

[130] *See THOIP v. Walt Disney Co.*, 788 F. Supp. 2d 168, 191 (S.D.N.Y. 2011) (no reasonable juror could find likelihood of confusion, even though proximity, quality, and strength factors weighed in plaintiff's favor, where there was no evidence of actual confusion, bad faith, or a likelihood that defendant's mark would overwhelm plaintiff's).

[131] LVL XIII separately argues that LV's counterclaims are barred by the doctrines of laches and acquiescence.  *See* Pl. SJ Br. 40–45; Pl. SJ Reply Br. 2–4.  To prevail on a laches defense in a trademark infringement action, a "defendant must show three things: (1) that the senior user knew of the junior user's use of the mark; (2) that the senior user inexcusably delayed taking action; and (3) that the junior user was prejudiced by the delay."  *Gucci Am., Inc. v. Guess?, Inc.*, 868 F. Supp. 2d 207, 244 (S.D.N.Y. 2012).  To establish acquiescence, a defendant must also show that "the senior user actively represented that it would not assert a right or claim." *ProFitness Physical Therapy Ctr. v. Pro-Fit Orthopedic & Sports Physical Therapy P.C.*, 314 F.3d 62, 67 (2d Cir. 2002) (internal quotation marks and citation omitted).

**CONCLUSION**

For the foregoing reasons, the Court grants LV's motion to preclude the report and testimony of LVL XIII's expert witness. The Court also grants LV's motion for summary judgment with respect to all of LVL XIII's claims, and denies LVL XIII's motion for summary judgment on the same. Finally, the Court grants LVL XIII's motion for summary judgment with respect to all of LV's counterclaims.

The Clerk of Court is respectfully directed to terminate the motions pending at docket numbers 88, 103, 106, and 125, and to close this case.

SO ORDERED.

*Paul A. Engelmayer*

Paul A. Engelmayer
United States District Judge

Dated: September 13, 2016
New York, New York

---

Having dismissed LV's counterclaims on other grounds, the Court need not resolve LVL XIII's summary judgment motion based on these affirmative defenses. *See Sunny Merch*, 97 F. Supp. 3d at 501 n.8. It notes, however, that there is no evidence that LV had either actual or constructive knowledge of LVL XIII's marks before this lawsuit. *See Perfect Pearl Co. v. Majestic Pearl & Stone, Inc.*, 887 F. Supp. 2d 519, 545 (S.D.N.Y. 2012) ("doctrine of constructive knowledge [did] not apply" because: (1) plaintiff was unaware of defendant's existence until shortly before it filed its claims; (2) plaintiff's "use of the marks long predated [defendant's] founding"; and (3) defendant "fail[ed] to explain what facts known to [plaintiff] purportedly gave rise to a duty to inquire as to [defendant's] use of the marks"). Accordingly, LV "delayed" at most three months (as to the counterclaims concerning the TP) and six months (as to those concerning the word mark) before filing its counterclaims. *See* Dkts. 18, 40. Such delay, without more, would not rise to the level of barring relief. *See, e.g., Inc. Pub'g Corp. v. Manhattan Magazine, Inc.*, 616 F. Supp. 370, 397 (S.D.N.Y. 1985) ("If plaintiffs had made a strong showing of likelihood of confusion, I would not have regarded plaintiffs' inaction between April and July as rising to the level of an equitable bar to relief."). And, at least as to LV's second set of counterclaims, LVL XIII has not alleged, much less proved, prejudice from that delay. *See Perfect Pearl Co.*, 887 F. Supp. 2d at 545 (burden is on party asserting laches defense to show prejudice from delay); *Bath & Body Works*, 7 F. Supp. 3d at 393 n.7 (plaintiff's laches defense to counterclaims "insufficient to warrant summary judgment" because plaintiff "offered no evidence to demonstrate it was prejudiced by [defendant's] delay").